No. 2023-1730

# United States Court of Appeals for the Federal Circuit

CENTRIPETAL NETWORKS, LLC,
*Appellant*,

v.

PALO ALTO NETWORKS, INC.,
*Appellee.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in No. IPR2021-01157

**OPENING BRIEF FOR CENTRIPETAL NETWORKS, LLC**

Paul J. Andre
James Hannah
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
333 Twin Dolphin Dr., Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700

Jeffrey Price
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

Scott M. Kelly
Bradley C. Wright
John R. Hutchins
Banner & Witcoff, Ltd.
1100 13th Street, NW Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000

***ATTORNEYS FOR CENTRIPETAL NETWORKS, LLC***

## REPRESENTATIVE PATENT CLAIM AT ISSUE PURSUANT TO FED. CIR. R. 32(A)(3)

U.S. Patent No. 10,749,906

1. A method of filtering packets at a packet security gateway configured for protection of a network and associated with a security policy management server external from the network, the method comprising:

receiving, by the packet security gateway, a dynamic security policy comprising a first set of packet filtering rules from the security policy management server, wherein each packet filtering rule of the first set of packet filtering rules comprises at least one packet matching criterion and a corresponding packet transformation function, and wherein one or more first packet filtering rules of the first set of packet filtering rules were automatically created or altered by the security policy management server based on malicious traffic information received from a malicious host tracker service;

performing, on a packet by packet basis, packet filtering on a first portion of packets associated with the network protected by the packet security gateway based on the first set of packet filtering rules by performing at least one of multiple packet transformation functions specified by at least one packet filtering rule of the first set of packet filtering rules on the first portion of packets, wherein at least one of the multiple packet transformation functions specified by the at least one packet filtering rule of the first set of packet filtering rules corresponds to a packet digest logging function that supports a network communications awareness service and comprises:

> identifying a subset of information specified by a packet matching the packet matching criterion of a packet filtering rule that specified the packet digest logging function;
>
> generating a record comprising the subset of information specified by the packet;
>
> reformatting the subset of information specified by the packet in accordance with a logging system standard; and

routing, by the packet security gateway, the packet to a monitoring device;

receiving, by the packet security gateway and after performing packet filtering on the first portion of the packets, an updated second set of packet filtering rules for the dynamic security policy from the security policy management server, wherein the updated second set of packet filtering rules comprises an update to the first set of packet filtering rules and was generated by the security policy management server based on updated malicious traffic information received from the malicious host tracker service; and

performing, on a packet by packet basis, packet filtering on a second portion of the packets associated with the network protected by the packet security gateway based on the updated second set of packet filtering rules.

## CERTIFICATE OF INTEREST

Counsel for Centripetal Networks, LLC certifies the following:

1. The full name of every entity represented by us is:

   Centripetal Networks, LLC

2. The name of the real party in interest for the entity. Do not list the real party if it is the same as the entity:

   Not applicable.

3. All parent corporations and any other publicly held companies that own 10 percent or more of the stock of the party or amicus curia represented by me are listed below:

   CNI Holdings, Inc.

4. The names of all law firms, and the partners or associates that have not entered an appearance in the appeal, and (a) appeared for the entity in the lower tribunal; or (b) are expected to appear for the entity in this court:

   Blair Silver of Irell & Manella LLP

5. Other than the originating case number(s), the title and number of any related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a) that will directly affect or be directly affected by this court's decision in the pending appeal.

   *Centripetal Networks, LLC v. Palo Alto Networks, Inc.*, No. 2:21-cv-00137 (E.D. Va.).

6. All information required by Fed. R. App. P. 26.1(b) and (c) in criminal cases and bankruptcy cases.

   None.

Respectfully submitted,

Dated: July 21, 2023 By: */s/ James Hannah*

Paul J. Andre
James Hannah
Kramer Levin Naftalis
& Frankel LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shore, CA 94065
Tel: (650) 752-1700
Fax: (650) 752-1800
pandre@kramerlevin.com
jhannah@kramerlevin.com

Jeffrey Price
Kramer Levin Naftalis
& Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
jprice@kramerlevin.com

Scott M. Kelly
Bradley C. Wright
John R. Hutchins
Banner & Witcoff, Ltd.
1100 13th Street, NW Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000
skelly@bannerwitcoff.com
bwright@bannerwitcoff.com
jhutchins@bannerwitcoff.com

*Attorneys for Appellant*
Centripetal Networks, LLC

# TABLE OF CONTENTS

Page


STATEMENT OF RELATED CASES .......... 1

JURISDICTION .......... 2

STATEMENT OF THE ISSUE .......... 3

INTRODUCTION .......... 4

STATEMENT OF THE CASE AND FACTS .......... 6

A. THE ’906 PATENT .......... 6

B. OVERVIEW OF THE IPR PROCEEDING .......... 8

1. Jungck Discloses a Virus Watch Service That Identifies Malicious Program Code .......... 8

2. The Parties’ Arguments and the Board’s Findings Regarding the “malicious traffic information received from a malicious host tracker service” Limitation .......... 10

SUMMARY OF THE ARGUMENT .......... 18

ARGUMENT .......... 19

A. STANDARD OF REVIEW .......... 19

B. THE BOARD IMPERMISSIBLY DECLINED TO CONSTRUE DISPUTED CLAIM TERMS .......... 20

1. A Malicious Host Tracker Service Identifies and Provides Identifying Information About Malicious Network Hosts .......... 22

2. Malicious Traffic Information is Information That Identifies Malicious Hosts .......... 25

C. JUNGCK DOES NOT DISCLOSE A "MALICIOUS HOST TRACKER SERVICE" OR "MALICIOUS TRAFFIC INFORMATION" UNDER THE PROPER CLAIM SCOPE........ 29

1. The Court Should Reverse Because Jungck Does Not Disclose a Malicious Host Tracker Service ........ 29

2. The Court Should Reverse Because Malicious Program Code is Not Malicious Traffic Information ........ 34

3. The Court Should Reverse Because the Board's Additional Findings Regarding Spoofed IP Addresses are Not Supported by Substantial Evidence........ 38

CONCLUSION ........ 43

# TABLE OF AUTHORITIES

Page(s)

Cases

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) .......... 22

*Amgen Inc. v. Vidal*,
No. 2019-2171, 2022 WL 1112817 (Fed. Cir. Apr. 14, 2022) .......... 42

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) .......... 24

*In re Freeman*,
30 F.3d 1459, 1465 (Fed. Cir. 1994) .......... 31

*Gechter v. Davidson*,
116 F.3d 1454 (Fed. Cir. 1997) .......... 21

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017) .......... 21

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*,
851 F.3d 1270 (Fed. Cir. 2017) .......... 34

*In re Nuvasive, Inc.*,
842 F.3d 1376, 1382-83 (Fed. Cir. 2016) .......... 34

*Owens Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) .......... 34, 43

*Pers. Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) .......... 20

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) .......... 19

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) .......... 22

*In re Universal Elecs., Inc.*,
No. 2022-1230, 2023 WL 3335536 (Fed. Cir. May 10, 2023) .......... 29, 42

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) .......... 24, 25

**Statutes**

5 U.S.C. § 706(2)(A), (E) .......... 20

35 U.S.C. § 282(b) .......... 20

**Other Authorities**

37 C.F.R. § 42.22 .......... 33

37 C.F.R. § 42.100(b) .......... 20

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Centripetal Networks, LLC states that:

(1) no appeal other than the current appeal has been taken in or from the United States Patent and Trademark Office, Patent Trial and Appeal Board's decisions in Case No. IPR2021-01157.

(2) Centripetal Networks, LLC and Palo Alto Networks, Inc., are parties to *Centripetal Networks, LLC v. Palo Alto Networks, Inc.,* No. 2:21-cv-00137 (E.D. Va.).

(3) no other cases may be directly affected by the Court's decision in this appeal.

## JURISDICTION

The Patent Trial and Appeal Board (the "Board") issued on March 10, 2023, Final Written Decision in IPR2021-01157 (Appx1-52). Patent Owner, Centripetal Networks, LLC, timely filed a Notice of Appeal on March 31, 2023 (Appx677-681). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUE

1. Did the Board err when it refused to construe the disputed "malicious host tracker service" and "malicious traffic information" terms and did not consider whether the prior art discloses tracking and providing information about malicious hosts?

# INTRODUCTION

The Internet is as dangerous as it ever has been. There are more than 500,000 pieces of malware ("malware" stands for malicious software) released every day. Because it is impossible to keep up with the number of new threats that are constantly being released, Centripetal came up with a unique solution to combat the problem. Rather than focus on the "what" (i.e. the malware itself), Centripetal developed technology that blocked "who" is releasing the malware in the first place. With Centripetal's technology, the Internet is a safer place because the bad guys have been removed from the equation.

This case turns on whether the conventional techniques of identifying malware is the same as identifying computers, known as hosts, that send the malware. During the proceeding below, the parties disputed whether the prior art's disclosure of sending information that identifies harmful programs is a "malicious host tracker service," *i.e.* a service that identifies and provides information about malicious ***hosts*** rather than the malicious code those hosts disseminate. Despite this fundamental dispute, the Board declined to construe the term "malicious

host tracker service" and failed to consider the fact that ***hosts*** had to tracked in order to satisfied the claim language.

The term "malicious host tracker service" has a plain and ordinary meaning in the art as a service that identifies and provides identifying information about ***hosts*** determined to be associated with malicious network traffic. The Board's decision should be reversed, therefore, because the Board failed to construe this key term or explain how the prior art's identification of malicious programs is the same as identifying hosts. Because there is no evidence to support a conclusion that the prior art teaches the identification of malicious hosts, the Board decision should be reversed.

## STATEMENT OF THE CASE AND FACTS

This appeal is taken from *inter partes* review ("IPR") of U.S. Patent No. 10,749,906 ("the '906 Patent") in IPR2021-01157. Appellant Centripetal Networks, LLC ("Centripetal") appeals the Board's rulings that Claims 1-17 of the '906 Patent ("Challenged Claims") are unpatentable, including the Board's failure to provide any express construction of disputed claim terms in its Final Written Decision ("FWD") and its conclusions regarding obviousness.

### A. THE '906 PATENT

The '906 Patent is directed to systems and methods for "protecting a secured network." Appx64 at Abstract, Appx84 at 1:57-58. As shown in Figure 5, Network E includes packet security gateways ("PSGs") 112-118 that communicate with a security policy management server ("SPMS") 120.




FIG. 5

Appx75 at Fig. 5; Appx90-91 at 14:8-15:29. A PSG (*e.g.*, PSG 112) receives packets and proactively protects a network (*e.g.*, network A) from malicious attacks based on dynamic security policies provided by the SPMS that are generated from malicious traffic information received from a malicious host tracker service 508. Appx86 at 5:1-18, 5:41-60, Appx89 at 12:12-23, Appx90-91 at 14:66-15:29, Appx93 at 20:55-62, Appx71 at Fig. 1, Appx79 at Fig. 9.

As disclosed in the '906 Patent, a malicious host tracker service identifies and provides identifying information about network ***hosts*** related to malicious network traffic, which can include a list of network

addresses that identify specific computers on the Internet. Appx85 at 3:34-40, Appx90-91 at 14:66-15:29. Based on this identifying information, the SPMS "automatically create[s] or alter[s]" the rules of a dynamic security policy as "new network addresses associated with malicious network traffic are determined." Appx91 at 15:7-13.

### B. OVERVIEW OF THE IPR PROCEEDING

Palo Alto Networks, Inc. ("PAN") alleged that the Challenged Claims are obvious over various combinations of the Jungck, Shah, Ke, and Sarathy references. Appx114-115. Jungck is the only reference relevant to the issues raised on appeal, which asks whether Jungck's virus watch service is a "malicious host tracker service" and whether the "malicious program code" is information that identifies a host.

#### 1. Jungck Discloses a Virus Watch Service That Identifies Malicious Program Code

Jungck discloses a packet interceptor (called an edge server in some embodiments) that applies rules to intercepted packets. Appx2728 at ¶ 111, Appx2733-2735 at ¶¶ 152, 153, 157. In one embodiment, the packet interceptor can "monitor the data transmission . . . for malicious ***program code***, i.e. program code that has been previously identified (by . . . a third party such as a virus watch service) as unwanted, harmful,

or destructive such as viruses." Appx2728 at ¶ 111 (emphasis added). Jungck does not disclose that this "virus watch service" identifies or provides information about malicious hosts like the claimed malicious host tracker service. *Id.*

In another embodiment, the packet interceptor can "monitor the data transmission" for "other unauthorized data being transmitted." *Id.* For example, the edge server can detect packets with a spoofed IP address:

> If the edge server 602A detects a data packet whose origin address could not have come from the downstream network or POP's 114 to which it is connected, <u>**the edge server 602A knows**</u> that this data packet must be a forgery and can eradicate it or prevent it from reaching the network 100.

*Id.* (emphasis added). The edge server (not a third-party virus watch server) can determine whether a packet is a forgery because it is located at the Internet Service Provider ("ISP") responsible for assigning those network addresses to hosts on the downstream network. *See* Appx431-434. Accordingly, if Client 1 pretends to be Client 4 by spoofing Client 4's network address, edge server 602A will intercept that packet and determine that the network address has been spoofed because Client 4 is not downstream:




Appx436 (citing Appx2695, Fig. 6 (annotation added in Patent Owner's Response)).

### 2. The Parties' Arguments and the Board's Findings Regarding the "malicious traffic information received from a malicious host tracker service" Limitation

In the Petition, PAN argued that the malicious program code identified by a third-party virus watch service corresponds to the claimed host identifying information that is associated with a "malicious host tracker service." Appx148-150 ("based on malicious traffic information received from a malicious host tracker service (*e.g.,* 'malicious program code . . . previously identified [by] . . . a third party such as a virus watch

service'"). PAN also asserted that spoofed IP addresses are an example of malicious program code that would be identified by a third-party virus watch service. Appx150. PAN did not identify any other service that could be considered a "malicious host tracker service." *Id.*

In response to PAN's position, Centripetal argued that the "malicious host tracker service" term should be construed to mean "a service that identifies and provides identifying information about network hosts that have been determined to be associated with malicious network traffic." Appx414-415. This construction reflects the plain language of the term, which literally recites a service that tracks malicious hosts. *Id.* This claim interpretation is also fully consistent with the specification, which describes a subscription service that aggregates and disseminates identifying information, such as "the list of known network addresses associated with malicious network traffic," for hosts associated with malicious network traffic:

> Malicious host tracker service 508 may aggregate information associated with malicious network traffic and updates received from malicious host tracker service 508 may include one or more network addresses that have been determined to be associated with malicious network traffic.

Appx91 at 15:13-18; *see also* Appx85 at 3:33-40 ("In some embodiments, the list of known network addresses associated with malicious network traffic may be received from a subscription service that aggregates information associated with malicious network traffic.").

Under this plain meaning of the term, Centripetal showed that malicious program code and spoofed IP addresses are not "identifying information about network hosts that have been determined to be associated with malicious network traffic," which is what the malicious host tracker service must track. *See* Appx428-441. For one, malicious program code is "program code that has been previously identified (by the server 108 or a third party such as a virus watch service) as unwanted, harmful, or destructive such as viruses," not identifying information about network hosts (malicious or not). Appx429 (citing Appx2728 at ¶ 111). This explicit definition from Jungck is also consistent with the POSITA's[1] understanding of the term "malicious program code." Appx430 (citing Appx5089-5090 at ¶ 68, Appx5170; Appx5173; Appx1237-1238 at ¶ 73).

---

[1] A person of ordinary skill in the art ("POSITA").

Under this interpretation, Jungck's virus watch service cannot be considered a malicious host tracker service because it identifies malicious program code, not information about network hosts associated with malicious traffic. *See* Appx428-431. In other words, Jungck's virus watch service tells you what to look out for, not who to look out for.

With respect to Jungck's spoofed IP addresses, Centripetal showed that spoofed IP addresses are not (and cannot be) received at an edge server from a third party, like Jungck's virus watch service. *See* Appx431-438. Rather, the information needed to identify spoofed packets is independently maintained at each individual edge server because each edge server is located at a corresponding service provider that allocates the range of network addresses assigned to downstream hosts. *See id.* Centripetal also showed that spoofed IP addresses do not identify malicious hosts because, "[l]ike a person whose identity has been stolen, the host whose network address is spoofed by a malicious host is not a malicious host itself." Appx404-405. In other words, because the impersonated host is not the actual malicious host, the spoofed IP address of the impersonate host provides no identifying information for the malicious host. *Id.*

In its Reply, PAN did not propose a construction for the term "malicious host tracker service." Instead, PAN stated that the form of the "malicious traffic information" provided by that service is not limited to any particular form. Appx495-497. PAN then used its broad interpretation of "malicious traffic information" to bootstrap a similarly broad definition of the "malicious host tracker service." Appx495-496 ("The 'malicious host tracker service' is required to provide only 'malicious traffic information.' '906, cl. 1, 8, 13. The 'malicious traffic information' is not limited to any particular type. *Id.*"). Thus, PAN argued that the "malicious host tracker service" was not entitled to its plain and ordinary meaning and that the Board should determine that any service that provides "malicious traffic information" (with no limitations on what constituted such information) is, by definition, a malicious host tracker service.

Based on this overly broad interpretation of the claims, PAN maintained its argument that malicious program code includes spoofed IP addresses that the virus watch service provides. *See* App498-499. Moreover, despite the Petition only pointing to Jungck's third party virus watch service as the alleged malicious host tracker service (Appx131,

Appx149-151), PAN made a new argument, asserting that the virus watch service was a "non-limiting example[]" and that a POSITA would have known that third-party services also identify information about a malicious host. *See* Appx499-500 (providing no evidence of such services); *see also* Appx499-502. PAN made the same allegation for malicious program code and spoofed IP addresses being "non-limiting examples" despite only pointing to this type of information in its Petition. *See* App500; *see also* App499-502.

Centripetal rebutted PAN's Reply arguments, showing first that its construction does nothing more than describe what the words "malicious host tracker service" mean to a POSITA. *See* Appx535. Centripetal also reiterated that its construction is the one most in line with the specification's disclosure of the malicious host tracker service and the information it identifies and provides to the SPMS. *See* Appx536-538; Appx91 at 15:13-18. Centripetal also observed that PAN's spoofed-IP address theory does not show that the spoofed IP addresses identify information about the actual network hosts associated with the malicious activity and that the edge server, not the virus watch service, identifies the spoofed IP addresses and hosts. *See* Appx540-542, Appx549. Finally,

Centripetal noted that PAN failed to identify any other examples of third party services or malicious program code in its Petition that could facially satisfy "malicious host tracker service" and "malicious traffic information," respectively, under the correct scope of the claims. Appx542-544.

Nevertheless, the Board found all Challenged Claims unpatentable. *See* Appx51. Significantly, the Board failed to adopt explicit constructions for the "malicious traffic information" and "malicious host tracker service" during the claim construction step, even though the terms were in dispute. *See, e.g.*, Appx9-11. This fundamental error led to a number of inconsistent findings during its obviousness analysis, which was untethered to any objective construction of the disputed terms. For example, while the Board concluded that malicious traffic information includes lists of network addresses, it failed to appreciate that these lists of network addresses must identify hosts associated with malicious network activity. Appx26-29. This error led the Board to incorrectly find that Jungck's spoofed IP addresses satisfy the claimed "malicious traffic information." But, as the Board also recognized,

spoofed IP addresses (and malicious program code generally) do not identify malicious hosts. Appx29.

Equally problematic, the Board found that the spoofed IP addresses are provided to the edge server (the alleged PSG, *see* Appx144). Appx29 ("Jungck discloses that a virus service can provide the edge server a list of suspect addresses, i.e., spoofed addresses"). However, the claims require that the *SPMS* generate rules based on malicious traffic information it receives from the malicious host tracker service. Appx96 at Claim 1 (reciting that "the first set of packet filtering rules were automatically created or altered by the *security policy management server* based on malicious traffic information *received from a malicious host tracker service*" (emphasis added)). No finding was made, nor does the evidence support, that Jungck's alleged SPMS (which PAN asserts are Jungck's external devices (Appx144)) receives from the virus watch service spoofed IP addresses nor any identifying information.[2]

[2] In IPR2018-01443 ("the '1443 IPR") proceeding, the Board's factual findings rested on server 108 (the alleged SPMS) identifying malicious program code, it did not make any findings related to Jungck's third party virus watch service providing spoofed IP addresses to Jungck's edge server or external devices. Appx1818; *see also* Appx1850-1852.

## SUMMARY OF THE ARGUMENT

The Board's decision should be reversed because the Board declined to construe the disputed "malicious host tracker service" or determine that Jungck teaches such a service. By its own terms, a "malicious host tracker service" is a service that *tracks malicious hosts* by identifying and providing identifying information about hosts determined to be associated with malicious network traffic. The Board's analysis stripped this term of all patentable weight, tacitly assuming that any service that provides the claimed "malicious traffic information" is, by definition, a malicious host tracker service. By not according patentable weight to the "malicious host tracker service" term, the Board ran afoul of this Court's precedent, which requires that the Board resolve disputes over claim scope and only determine obviousness once the claims have been construed.

The Board's first error was compounded by its overbroad interpretation of the "malicious traffic information" term. Rather than construe the term in the context of the intrinsic record, the Board "agree[d] with Petitioner that the independent claims are not limited to the packet identification features Patent Owner asserts." Appx10. But

Centripetal's claim construction position did not attempt to limit the "malicious traffic information" term to any particular form. Appx536-537 (agreeing "that host-identifying information need not be in the *form* of network addresses"). The only "limitation" on this term that Centripetal actually proposed was that the malicious traffic information provided by a malicious host tracker service has to identify malicious hosts, regardless of the form that the identification takes. Appx537. The Court should also reverse the Final Written Decision because even if Jungck's spoofed IP addresses were provided by the "virus watch service" (they are not), the Board correctly recognized that spoofed IP addresses do not identify malicious hosts.

## ARGUMENT

### A. STANDARD OF REVIEW

Claim Construction: This Court reviews "de novo the Board's ultimate claim constructions and any supporting determinations based on intrinsic evidence," while reviewing "any subsidiary factual findings involving extrinsic evidence for substantial evidence." *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020) (citation omitted). "In an *inter partes* review proceeding, a claim of a

patent . . . shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b).

Obviousness: This Court reviews "the Board's ultimate determination of obviousness de novo and its underlying factual determinations for substantial evidence." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 991 (Fed. Cir. 2017) (citation omitted).

The Board's Compliance with the Administrative Procedure Act: This Court reviews "the Board's IPR decisions to ensure that they are not 'arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law . . . [or] unsupported by substantial evidence.'" *Id.* at 992 (quoting 5 U.S.C. § 706(2)(A), (E)) (further citation omitted).

## B. THE BOARD IMPERMISSIBLY DECLINED TO CONSTRUE DISPUTED CLAIM TERMS

The Board's refusal to construe the disputed "malicious host tracker service" and "malicious traffic information" terms constitutes reversible error. Appx9-11; Appx414-415; Appx535-538.

This Court's precedent requires that the Board resolve any disputes over claim scope before proceeding to its obviousness analysis. *See Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375, 1379 (Fed. Cir. 2017) (finding that the Board erred in "not adopt[ing] any explicit construction of the term for its Final Written Decision" and reversing because the Board's findings were not supported by the correct construction); *Gechter v. Davidson*, 116 F.3d 1454, 1460 (Fed. Cir. 1997) ("[c]laim construction must also be explicit, at least as to any construction disputed by the parties . . . ."). In such circumstances, the Court determines the correct construction of the disputed terms and whether there is sufficient record evidence to show that the prior art teaches these limitations as properly construed. *Homeland Housewares*, 865 F.3d at 1375.

The Court should reverse the Final Written Decision because the Board did not adopt explicit constructions of the disputed terms prior to determining whether PAN met its burden to show that they were in the prior art.

### 1. A Malicious Host Tracker Service Identifies and Provides Identifying Information About Malicious Network Hosts

As the name implies, the plain meaning of the "malicious host tracker service" term is a service that "identifies and provides identifying information about network hosts that have been determined to be associated with malicious network traffic." Appx535. This technique involves filtering traffic on the basis of *who* is sending it, not *what* is being sent.

"[T]he claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (citations omitted); *see also ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) (holding that claim language must be considered in "the context of the surrounding words") (citations omitted). By its own terms, the "malicious host tracker service" is a service that tracks malicious hosts. Appx535; *see also id.* ("It is a service that tracks (*i.e.* identifies and provides information about) malicious hosts (*i.e.* network hosts that have been determined to be associated with malicious network traffic).").

That the "malicious host tracker service" must identify and provide information about malicious hosts is fully consistent with the specification's use of the term. In every instance, the service is described as one that identifies and provides identifying information about malicious hosts. Appx90-91 at 14:6-15:55; Appx75 at Fig. 5. For example, the malicious host tracker service can track malicious hosts by providing identifying information (*e.g.*, network addresses) about network hosts determined to be associated with the malicious traffic:

> Malicious host tracker service 508 may aggregate information associated with malicious network traffic and updates received from malicious host tracker service 508 may include one or more network addresses that have been determined to be associated with malicious network traffic.

Appx91 at 15:13-18. In this manner, the SPMS "automatically create[s] or alter[s]" the rules of a dynamic security policy as "new network addresses associated with malicious network traffic are determined." *Id.* at 15:7-13. What the claims require, and what the intrinsic record supports, therefore, is a service that *tracks malicious hosts* by identifying and providing information about the hosts associated with malicious network traffic.

PAN did not address the meaning of the term "malicious host tracker service" other than to say that it has no particular meaning beyond being a service that provides "malicious traffic information." Appx496 ("The 'malicious host tracker service' is required to provide only 'malicious traffic information.'"); Appx125-128 (declining to propose a construction for "malicious host tracker service"). The Board followed the same tack, declining to attribute any patentable weight to the term "malicious host tracker service" beyond being a service that provides "malicious traffic information." Appx10.

PAN's argument, and the Board's apparent adoption of that argument, are in error because the interpretation renders the phrase "malicious host tracker" meaningless. *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.") (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006) (rejecting a construction of a term that would render another limitation superfluous)). If the term "malicious host tracker service" has no meaning apart from the claimed "malicious traffic information" it provides, then the "malicious host tracker" phrase

is superfluous. Thus, under the Board's (tacit) interpretation there is no difference between the two following limitations:

> [1] "malicious traffic information received from a malicious host tracker service"; and
>
> [2] malicious traffic information received from a ~~malicious host tracker~~ service.

Accordingly, even if the Board had explicitly construed the "malicious host tracker service," which it did not, such an interpretation would be contrary to this Court's precedent. *Wasica*, 853 F.3d at 1288 n.10. And as detailed below, the Board never determined whether Jungck's "virus watch service" qualifies as a "malicious host tracker service" under any objective interpretation of the limitation. *See* Argument § D.1, *infra*.

#### 2. Malicious Traffic Information is Information That Identifies Malicious Hosts

The Board's failure to explicitly construe the term "malicious host tracker service," and its failure to apply an explicit construction in its obviousness analysis, are sufficient on their own to warrant reversal. Nevertheless, the Court should also reverse because the Board's (again tacit) understanding of the "malicious traffic information" term is inconsistent with the plain meaning of the term, which is "information identifying the hosts that the service tracks."

As the Board acknowledged in the midst of its obviousness analysis, the "the Specification explicitly describes malicious traffic information as including a list of known addresses associated with malicious network traffic, e.g., lists of addresses associated with malicious traffic aggregated by and received from a subscription service." Appx26 (citing Appx85 at 3:33-40). Indeed, the Board referred to this aspect of the specification to distinguish the "types of information that the '906 Patent refers to as malicious" from "malware" and "malicious program code." *Id.* These findings reinforce the need for an explicit construction of "malicious traffic information" and show why Jungck's "virus watch service," which operates on the basis of "malicious program code," is not a "malicious host tracker service" and does not provide "malicious traffic information." *Id.*; *see also* Argument § D, *infra* (establishing that there is no record evidence that can support a conclusion that Jungck's virus watch service is a malicious host tracker service).

The Board's claim construction analysis did not consider and did not resolve the parties' actual dispute over the meaning of the term (*i.e.* whether or not the malicious traffic information must be "information identifying the hosts that the service tracks"). Appx536. Rather than

construe the term "malicious traffic information" according to its plain and ordinary meaning in the context of the '906 Patent, the Board focused solely on whether the claims limit the malicious traffic information "to any specific form." Appx10. But Centripetal expressly agreed that the "malicious traffic information" need not be in any specific form. Appx536 ("The word 'may' in this sentence reflects the fact that network addresses provide only one way to identify malicious hosts, and that a malicious host tracker service could provide malicious traffic information about malicious hosts it identifies using information other than network addresses.").

While Centripetal agrees that the "malicious traffic information" is not limited to a list of network addresses, the fact remains that the "malicious traffic information" provided by the "malicious host tracker service" must identify malicious hosts in one way or another. Accordingly, the Board's focus on whether the term "malicious traffic information" should be limited to a particular form of host-identifying information (e.g., a list of network addresses) was in error. Appx9-10.

Further, the Board's reference to the claimed "packet digest logging function" is completely irrelevant to the scope of the disputed claim

limitations. Appx10 ("Additional evidence that claim 1 is not limited to the packet identification features asserted by Patent Owner is found in the claim's further recitation of packet transformation functions specified by packet filtering rules that include a packet digest logging function, logging . . . ."). The Board confuses the criteria used to create the claimed packet filtering rules (*i.e.* malicious traffic information received from a malicious host tracker service) with information from a packet that can be logged after satisfying the "packet matching criterion." *See id.* (quoting Appx89 at 11:52-12:5).

Information that is logged after a packet satisfies a packet filtering rule ("e.g., associated network addresses, ports, protocol types, URIs, arrival times, packet sizes, directions, interface names, media access control (MAC) addresses, matching rule IDs, metadata associated with matching rules, enforced policy names, or the like") is not the criteria needed to trigger the logging packet transformation function. Appx89 at 11:52-12:5; Appx86 at 5:11-16 ("[A] dynamic security policy includes any rule . . . that specifies criteria corresponding to one or more packets and identifies a packet transformation function to be performed on packets"). Accordingly, the list of data that may be logged by performing the "packet

digest logging function" has no bearing on the meaning of the term "malicious traffic information."

For the foregoing reasons, this Court should find that "malicious host tracker service" means "a service that identifies and provides identifying information about network hosts that have been determined to be associated with malicious network traffic," with this identifying information being the "malicious traffic information."

### C. JUNGCK DOES NOT DISCLOSE A "MALICIOUS HOST TRACKER SERVICE" OR "MALICIOUS TRAFFIC INFORMATION" UNDER THE PROPER CLAIM SCOPE

The Board's obviousness determination is not supported because Jungck's virus watch service is not a "malicious host tracker service" that identifies and provides "malicious traffic information" under the proper plain-meaning interpretations of those terms.

#### 1. The Court Should Reverse Because Jungck Does Not Disclose a Malicious Host Tracker Service

Although the Board noted that Jungck renders obvious the claims even under Centripetal's constructions (Appx11) it did not actually apply Centripetal's construction of "malicious host tracker service" during its obviousness analysis. *See* Appx25-30. The Court should reverse. *In re Universal Elecs., Inc.*, No. 2022-1230, 2023 WL 3335536, at *3 (Fed. Cir.

May 10, 2023) ("We cannot conclude that the Board has 'done its job' when it avoids an applicant's primary argument by omitting the disputed limitation from its obviousness analysis") (citation omitted).

The closest the Board came to addressing the "malicious host tracker service" came in its discussion of what it referred to as "Patent Owner's narrow interpretation of malicious traffic information." Appx27. However, rather than determine whether Jungck's virus watch service is a "malicious host tracker service" under the proper construction of the term, the Board applied collateral estoppel. *Id.* (stating that it "rejected previous arguments that Jungck's third-party services identify only malware and cannot identify malicious hosts"). Notably, however, the term "malicious host tracker service" is not found in the claims of the unrelated IPR considered in the earlier decision. Further, the earlier decision does not identify *any* service that "identifies and provides identifying information about network hosts that have been determined to be associated with malicious network traffic," as the term is properly construed. Appx414.

As a preliminary matter, collateral estoppel cannot possibly apply in these circumstances because the issues are not identical, the earlier

case was decided under the different broadest reasonable interpretation ("BRI") standard, and because the issue raised in this proceeding was not actually litigated in the earlier proceeding. *See In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994). In the earlier proceeding, the Board determined that "it would have been an obvious extension of Emb#5 to receive the block list from a third party watch service that aggregates information." Appx1851. No such service was identified (either by the Board or petitioner), however, and the Board provided no citation to support its statement. *Id.* Accordingly, there has been no factual determination that Jungck actually discloses anything akin to a "malicious host tracker service."

The only other potentially relevant factual finding from the earlier proceeding concerns Jungck's disclosure of spoofed network addresses. Appx1851-1852. However, the issues of whether spoofed network addresses could be tracked by a third-party like Jungck's virus watch service, or whether such addresses can be considered "malicious traffic information" under the *Phillips* claim construction standard, was not actually litigated in that case. *Id.* Instead, as the Board's decision reflects, the only question considered during the earlier proceeding was

whether spoofed network addresses could be considered program code. Appx1818, Appx1850-1852.

The issues raised in this proceeding, *i.e.* whether Jungck discloses a "malicious host tracker service," whether a spoofed network addresses can be provided by a third-party, and whether a spoofed network address is an example of "malicious traffic information" were not litigated in the earlier proceeding. *Id.* Accordingly, the Board's attempted reliance on collateral estoppel to resolve this issue should be rejected. Indeed, the Board's conclusion that "Jungck discloses a packet security gateway, e.g., Jungck's edge server, receiving malicious traffic information from a malicious host tracking service," does not even facially read on the Challenged Claims, which require that an SPMS receive that information. Appx27; *see* Appx96 at Claim 1, Appx91 at 15:7-13.

The Board's reliance on collateral estoppel also runs headlong into its factual determinations in this case. As discussed above, the Board's interpretation of the "malicious traffic information" limitation excludes malicious program code/malware that the "virus watch service" provides. Appx26. The Board worked around this problem stating that PAN's challenge was not limited to spoofed IP addresses. Appx27 ("Petitioner

replies that, in order to attack a strawman, Patent Owner 'pretends' that the Petition's challenge grounds are limited to Jungck's disclosure of a virus watch service and only the identification of spoofed network addresses.").

PAN and the Board misrepresent the record. The only element of the prior art that PAN ever mapped to the claimed "malicious traffic information received from a malicious host tracker service" was "program code . . . previously identified [by] . . . a third party such as a virus watch service." Appx149; *id.* (identifying rules that monitor traffic for "a forgery"); Appx150 ("One example of such malicious program code pertains to spoofed source addresses."). Neither the Petition, the Reply, nor the Final Written Decision identify any *other* service that track malicious hosts that could possibly qualify as a malicious host tracker service. *Id*; *see also* Appx25-29; Appx542. Nor did PAN or the Board identify information aside from spoofed network addresses that could possibly qualify as "malicious traffic information." Appx25-29; Appx542. If PAN intended to rely on a third party service that actually tracks malicious hosts, it was incumbent on PAN to identify that service with particularity in the Petition. 37 C.F.R. § 42.22. It did not.

Accordingly, for these reasons as described in greater detail below, the Board has not "done its job" when its obviousness determination is contrary to the only permissible findings that can be drawn in light of the proper claim scope and claim mapping. *See In re Nuvasive, Inc.*, 842 F.3d 1376, 1382-83 (Fed. Cir. 2016); *see also Owens Corning v. Fast Felt Corp.*, 873 F.3d 896, 902-03 (Fed. Cir. 2017) (reversing the Board's obviousness determination that was contrary to the "one permissible factual finding" that could be drawn from the record in light of the correct claim construction); *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 851 F.3d 1270, 1275 (Fed. Cir. 2017) (reversing when substantial evidence does not support the Board's findings).

### 2. The Court Should Reverse Because Malicious Program Code is Not Malicious Traffic Information

With respect to malicious program code and malware, the Board conceded that these types of data do not identify malicious hosts. Appx26.

Under the correct construction, spoofed IP addresses also do not fall within the type of information the '906 Patent refers to as malicious because they do not *identify information about network hosts associated with the malicious network traffic*. *See* Appx404-405, Appx435-438. The

Board admitted as much. Appx29 ("We agree with Patent Owner that . . . [a] virus service's identification of a spoofed IP address indicates that traffic from that address is suspect, not necessarily malicious."). Accordingly, the Board conceded that spoofed IP addresses do not fit the type of identifying information about hosts deemed to be associated with malicious activity.

Spoofing an IP address involves impersonating another host to allow the actual host associated with the malicious traffic to go undetected. Appx404-405; Appx431. As established in the Patent Owner Response and Sur-Reply, a spoofed IP address "is a false IP address contained within the header of an IP packet" (Appx431):

> [T]he spoofed network address does not identify the malicious host responsible for sending the packet. Like a person whose identity has been stolen, the host whose network address is spoofed by a malicious host is not a malicious host itself.

*See* Appx404-405; *see also* Appx435-438; Appx549-550. Because these IP addresses are spoofed, and the true identities of the malicious network hosts are unknown, the spoofed IP addresses do not contain identifying information about the malicious network hosts to fall within the types of information provided by a malicious host tracker service.

Significantly, in the ’1443 IPR proceeding, the Board focused its findings on spoofed IP addresses “that appear[] (*falsely*) to come from a client downstream of a network.” Appx1850-1852 (emphasis added) (citing Appx2728 at ¶ 111 (referring to detecting DoS attacks having forged IP addresses that impersonate other hosts based on a programmed range of valid network addresses), Appx2748 at ¶ 269 (same)), Appx1818 (noting that the network addresses are associated with DoS attacks). The Board never addressed whether spoofed IP addresses are *identifying information about malicious network hosts* or whether they are (or can be) provided by a malicious host tracker service (they cannot). Appx539 (“[S]uch spoofed network addresses are not relevant to the language of the ’906 Patent’s claims” that require “identifying information about network hosts that have been determined to be associated with malicious network traffic”) (citing Appx435-437, Appx442-445). In fact, in addressing these issues for the first time here, the Board had no explanation of how spoofed IP addresses fall within the proper scope of the claims, going as far as agreeing with Centripetal that spoofed IP addresses do not mean malicious. Appx29.

Conceding that spoofed IP addresses do not identify malicious hosts, the Board repeated PAN's argument that its challenge was not *limited* to spoofed IP addresses and pointed back to the fact that the virus watch service monitors for malicious program code. Appx27-28 (expressing that Jungck's edge server monitors traffic based on malicious program code). The Board's reasoning here cannot be squared with its earlier determination that malicious program code does not identify a malicious host. Appx26 (finding that referring to "malicious program code" and "malware" "depart[s] from the claim language, i.e., 'malicious traffic information'").

To the extent the Board was referring to "other unauthorized data," this too is not information identifying the malicious network hosts under the correct scope. *See* Appx404 (establishing that the "virus watch services provide information used to detect 'virus or other unauthorized data,' not information about the hosts sending such data."). In fact, PAN conceded that "other unauthorized data" is just another example of malicious program code. Appx499 (asserting that other unauthorized data "is not a different category from 'malicious program code.'"). Indeed, unauthorized data is just like malicious program code as it is contained

in the payload of an IP packet, offering no identifying information about network hosts associated with malicious network activity. *See* Appx430-431.

There is no evidence on record, let alone substantial, that supports a finding that spoofed IP addresses, malicious program code, malware, or other unauthorized data falls within the scope of identifying information about malicious network hosts., i.e. "malicious traffic information." *See* Appx2728 at ¶ 111. The Court should, therefore, reverse the Board's determination that the Challenged Claims are unpatentable.

### 3. The Court Should Reverse Because the Board's Additional Findings Regarding Spoofed IP Addresses are Not Supported by Substantial Evidence

As established above, the Board's decision should be reversed because Jungck does not disclose a "malicious host tracker service" or "malicious traffic information" as those terms are properly construed. The Board's determination should also be reversed because there is no substantial evidence to support several other relevant factual determinations. In particular, the Board dismissed Centripetal's arguments that Jungck's edge server itself identifies packets with spoofed IP addresses because it believed that the virus watch service

provides a list of spoofed IP addresses. Appx29; *see also* Appx28; Appx432-435. But that belief is untethered to the claims and is contrary to the evidence of record.

As an initial matter, the Board's spoofed-IP address findings facially fail to support a conclusion of obviousness. The claims require, *inter alia*, that "the first set of packet filtering rules were automatically created or altered by the security policy management server based on malicious traffic information received from a malicious host tracker service." Appx96-97 at Claims 1, 8; *see also* Appx97 at Claim 13. In other words, the plain language requires that the malicious traffic information is received by the SPMS to generate the rules, as the specification confirms. Appx91 at 15:10-18 (disclosing that the "security policy management server 120 may *receive* updates (e.g. as part of a subscription) *from malicious host tracker service . . . .*") (emphasis added).

According to the Board, that limitation is met when Jungck's virus watch service provides spoofed IP addresses to Jungck's edge server (the alleged PSG). But that finding is unrelated to whether such information is provided to Jungck's external devices (the alleged SPMSs). *See* Appx29. Accordingly, no evidence supports a conclusion that the virus

watch service provides spoofed IP addresses, let alone identifying information about malicious hosts, to the external devices to even facially satisfy the claims.

Equally problematic, is that the Board's spoofed-IP address findings are contradicted by unrebutted record evidence showing that Jungck's edge server identifies the spoofed IP addresses with no involvement from the virus watch service or any other third party service. Appx432-434; Appx2728 at ¶ 111, Appx2748 ¶¶ at 269, 271. This spoofed-based identification is illustrated below, with the impersonated host (**client 4**) and the actual malicious host (**client 1**) identified by the edge server. Specifically, as established in the Patent Owner Response, the Internet Service Provider ("ISP") provides the edge server a list of IP addresses associated with the point of presence ("POP") of the ISP's network it is connected to. Appx432-434; Appx2728 at ¶ 111, Appx2748 ¶¶ at 269, 271.

In this way, and as the illustration shows, where client 4's IP address is forged (to appear that the attack is coming from the impersonated **client 4**), the edge server can see that, based on the source address, the packet "could not have come from any POP 114 of the service

provider 118 to which the edge server . . . is connected." Appx2728 at ¶ 111; Appx432-434. As such, the edge server can eliminate that packet with the spoofed IP address and "*<u>then attempt to identify the actual originating client</u>*" (the malicious **client 1**). Appx2728 at ¶ 111 (emphasis added).




Appx436 (citing Appx2695 at Fig. 6 (annotated in Appx436); Appx435-436; Appx539, Appx549-550.

Therefore, the evidence shows that the virus watch service has no involvement whatsoever in identifying spoofed IP addresses *or* tracking malicious network hosts and providing any type of identifying

information about these hosts. Because the Board did not evaluate this argument, the Final Written Decision "does not meet the requirements for a sustainable obviousness rejection. *In re Universal Elecs.*, 2023 WL 3335536, at *4.

On the evidence of record, there is only one possible evidence-supported finding: that the spoofed IP addresses are identified by the edge server, not any service that could be considered a malicious host tracker service. Accordingly, the Board's additional spoofed-IP address findings fail to provide substantial evidence for its ultimate obviousness determination.

* * *

This Court is left with no option but to reverse because, under the correct interpretations of the "malicious host tracker service" and "malicious traffic information" terms, the only conclusion supported by substantial evidence is that Jungck does not teach a service that identifies and provides identifying information about the network hosts associated with malicious network traffic. *See Amgen Inc. v. Vidal*, No. 2019-2171, 2022 WL 1112817, at *3 (Fed. Cir. Apr. 14, 2022) (reversing because "under the correct construction of 'final thiol-pair ratio" [] the

only conclusion supported by substantial evidence is that neither Schlegl nor Hevehan disclose a 'final thiol-pair ratio.'") (citing *Owens Corning*, 873 F.3d at 902).

## CONCLUSION

Centripetal respectfully requests that the Court reverse the Board's Final Written Decision in IPR2021-01157 and find Claims 1-17 of the '906 Patent patentable.

Respectfully submitted,

Dated: July 21, 2023

By: */s/ James Hannah*

Paul J. Andre
James Hannah
Kramer Levin Naftalis
& Frankel LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shore, CA 94065
Tel: (650) 752-1700
Fax: (650) 752-1800
pandre@kramerlevin.com
jhannah@kramerlevin.com

Jeffrey Price
Kramer Levin Naftalis
& Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-7502
jprice@kramerlevin.com

Scott M. Kelly
Bradley C. Wright

John R. Hutchins
Banner & Witcoff, Ltd.
1100 13th Street, NW Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000
skelly@bannerwitcoff.com
bwright@bannerwitcoff.com
jhutchins@bannerwitcoff.com

*Attorneys for Appellant*
Centripetal Networks, LLC

## ADDENDUM – TABLE OF CONTENTS


| Date | Description | Appx No. |
|---|---|---|
| 03/10/2023 | Final Written Decision – IPR2021-01157 | Appx1 |
| | U.S. Patent No. 10,749,906 | Appx64 |

Trials@uspto.gov
571-272-7822

Paper 36
Entered: March 10, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

PALO ALTO NETWORKS, INC.,
Petitioner,

v.

CENTRIPETAL NETWORKS, INC.,
Patent Owner.

---

IPR2021-01157
Patent 10,749,906 B2

---

Before BRIAN J. McNAMARA, JON. M. JURGOVAN, and STEVEN M. AMUNDSON, *Administrative Patent Judges.*

McNAMARA, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I. BACKGROUND

On March 15, 2022, we instituted an *inter partes* review of claims 1–17 of U.S. Patent No. 10,749,906 B2 (Ex. 1001, "the '906 Patent"). Paper 11 ("Dec. to Inst."). Patent Owner filed a Patent Owner Response (Paper 18, "PO Resp."), Petitioner filed a Petitioner Reply (Paper 21, "Reply") and Patent Owner filed a Surreply (Paper 23, "Surreply"). A transcript of an oral hearing held on November 30, 2022 (Paper 35, "Hrg. Tr.") has been entered into the record.

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). We base our decision on the preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

Having reviewed the arguments of the parties and the supporting evidence, we conclude that Petitioner has demonstrated by a preponderance of the evidence that the challenged claims are unpatentable.

## II. THE '906 PATENT

The '906 patent discloses methods and systems for protecting a secured network. Ex. 1001, Abstract. Figure 1 of the '906 patent is reproduced below.




FIG. 1

Figure 1 of the ’906 patent illustrates a network environment that includes packet security gateways (PSGs) situated between networks and a security policy management (SPM) server that communicates dynamic security policies to the PSGs. *Id.* at 5:21–23, 5:42–47, Fig. 1. The PSGs perform packet transformation functions on received packets according to rules in a dynamic security policy in which “[e]ach rule may specify criteria and one or more packet transformation functions that should be performed for packets associated with the specific criteria.” *Id.* at 7:31–33. The patent explains that:

> The specified criteria may take the form of a five-tuple of values selected from packet header information, specifying a protocol type of the data section of the IP packet (e.g., TCP, UDP, ICMP, or any other protocol), one or more source IP addresses, one or more source port values, one or more destination IP addresses, and one or more destination ports.

*Id.* at 7:33–39, Fig. 3.

The ’906 patent describes packet transformation functions that forward packets into the network, drop packets, or perform functions other than forwarding or dropping the packets. Ex. 1001, 3:1–10, 6:35–51. For example, rules in a dynamic security policy may specify a transformation function that routes or switches packets to a network address corresponding to a monitoring device by encapsulating the packet with a header that corresponds to the network address of the monitoring device. *Id.* at 11:32–51. The monitoring device strips the header and copies the packets, or data within the packets, for subsequent review before forwarding the packets to the destination address. *Id.* at 11:44–51.

Various combinations of rules may implement services, such as a network threat awareness service in which a packet transformation function

produces a digest or log of the packet, "e.g., associated network addresses, ports, protocol types, URIs, arrival times, packet sizes, directions, interface names, media access control (MAC) addresses, matching rule IDs, metadata associated with matching rules, enforced policy names, or the like." *Id.* at 11:52–12:5. Such packet logs can employ a logging standard, such as syslog, and be read by awareness application servers that perform transformations to produce awareness information that can be accessed by client applications. *Id.* at 12:6–11.

Figure 11 of the '906 patent is reproduced below.




FIG. 11

"F[igure] 11 [of the '906 patent] illustrates an exemplary method for protecting a secured network that includes identifying packets based on application-layer packet-header information." Ex. 1001, 21:34–36. At step 1102, a plurality of PSGs (e.g., 112, 114, 116, and 118) associated with an SPM (120) receive a dynamic security policy that includes at least one rule (i.e., one or more rules) specifying application-layer packet-header information and a packet transformation function to be performed on packets comprising the application-layer packet-header information. *Id.* at 21:36–42. For example, one or more rules of the dynamic security policy received from the SPM may specify that: (1) the application-layer packet-header information includes information that identifies one or more HTTP packets, and (2) the packet transformation function may accept or deny packets based on the specified application-layer packet-header information. *Id.* at 21:46–52.

At step 1104, a PSG receives packets from a computing device located in one of the protected networks. Ex. 1001, 21:58–60. At step 1106, the PSG identifies those packets associated with the protected network that comprise the specified application-layer packet-header information. *Id.* at 21:61–65. For example, if the rule specifies application-layer packet-header information that identifies one or more HTTP packets (e.g., one or more HTTP packets that comprise an HTTP GET method and/or an HTTP PUT method), the PSG may identify those packets as originating from and/or destined for a network address corresponding to URLs specified in the HTTP GET or HTTP PUT method call. *Id.* at 21:65–22:14.

At step 1108, the PSG performs the packet transformation function on each of the packets identified as comprising the specified application-layer packet-header information. Ex. 1001, 22:14–17. For example, the PSG may

accept and forward the packets to their respective destinations or drop the packets. *Id.* at 22:17–23.

The method illustrated in Figure 12 of the ’906 patent is similar to that illustrated in Figure 11, except that instead of a dynamic security policy that performs a transformation function based on identifying application-layer packet-header information, the method illustrated in Figure 12 performs a transformation function that comprises a packet digest logging function based on specified packet identification criteria (e.g., application-layer packet-header information and/or a five-tuple specifying one or more transport-layer protocols, a range of source addresses, a range of source ports, a range of destination addresses, and a range of destination ports). *See* Ex. 1001 22:24–23:35; *compare id.* at Fig. 11, *with id.* at Fig. 12. The packet digest logging function may generate a record comprising a subset of information for each identified packet, store the data temporarily at the PSG or send it to a different computing device, e.g., the SPMS, and may reformat the data according to a logging system standard. *Id.* at 23:10–35.

## III. ILLUSTRATIVE CLAIM

Claim 1, reproduced below with the paragraph designations used in the Petition, is illustrative of the subject matter of the ’906 patent.

> 1[pre]. A method of filtering packets at a packet security gateway configured for protection of a network and associated with a security policy management server external from the network, the method comprising:
>
> [1.a] receiving, by the packet security gateway, a dynamic security policy comprising a first set of packet filtering rules from the security policy management server, wherein each packet filtering rule of the first set of packet filtering rules comprises at least one packet matching criterion and a corresponding packet transformation function, and wherein one or more first packet filtering rules of the first

set of packet filtering rules were automatically created or altered by the security policy management server based on malicious traffic information received from a malicious host tracker service;

[1.b] performing, on a packet by packet basis, packet filtering on a first portion of packets associated with the network protected by the packet security gateway based on the first set of packet filtering rules by performing at least one of multiple packet transformation functions specified by at least one packet filtering rule of the first set of packet filtering rules on the first portion of packets,

[1.c] wherein at least one of the multiple packet transformation functions specified by the at least one packet filtering rule of the first set of packet filtering rules corresponds to a packet digest logging function that supports a network communications awareness service and comprises:

[1.c.i] identifying a subset of information specified by a packet matching the packet matching criterion of a packet filtering rule that specified the packet digest logging function;

[1.c.ii] generating a record comprising the subset of information specified by the packet;

[1.c.iii] reformatting the subset of information specified by the packet in accordance with a logging system standard;

and

[1.c.iv] routing, by the packet security gateway, the packet to a monitoring device;

[1.d] receiving, by the packet security gateway and after performing packet filtering on the first portion of the packets, an updated second set of packet filtering rules for the dynamic security policy from the security policy management server, wherein the updated second set of packet filtering rules comprises an update to the first set of packet filtering rules and was generated by the security policy management server based on updated malicious traffic information received from the malicious host tracker service; and

> [1.e] performing, on a packet by packet basis, packet filtering on a second portion of the packets associated with the network protected by the packet security gateway based on the updated second set of packet filtering rules.

Ex. 1001, 25:23–26:19

## IV. CLAIM CONSTRUCTION

### *A. Application of previous constructions*

In our Decision to Institute, we construed the following terms to be consistent with constructions we applied in previous IPRs: "rule(s)," "packet transformation function," "dynamic security policy," "security policy management server (SPMS)," "packet security gateway (PSG)," and "monitoring device." Dec. to Inst. 21–23. We also construed the term "network [communications/security threat] awareness service." *Id.* at 23. Although Patent Owner contends that the disputes in these proceedings do not turn on these constructions and therefore are not necessary, Patent Owner also contends that the preambles of the challenged claims are limiting because they incorporate some of these terms. PO Resp. 11–12. Patent Owner states that, for purposes of this proceeding, it applies the constructions adopted in the Decision to Institute. *Id*. at 14. Petitioner does not propose any other constructions for the above-identified terms. For the above-identified terms, we apply the constructions we applied in the Decision to Institute.

### *B. Claim preambles as limiting*

Patent Owner contends that the preambles of independent claims 1, 8, and 13 are limiting because they give life and meaning to the claim limitations by providing antecedent basis for the terms "packet security gateway," "network," and "security policy management server (SPMS)." PO Resp. 11–12. Petitioner does not explicitly dispute that the preambles of

the independent claims of the '906 patent are limiting. We agree the preambles of independent claims are limiting and treat them accordingly in this Decision.

*C. Malicious traffic information received from a malicious host tracker service*

Patent Owner notes that each of the independent claims recites "malicious traffic information received from a malicious host tracker service." PO Resp. 12. Patent Owner asserts that the term "malicious host tracker service" should be accorded its plain and ordinary meaning, which Patent Owner defines as "a service that identifies and provides identifying information about network hosts that have been determined to be associated with malicious network traffic." *Id.* at 12 (citing Ex. 2030 ¶¶ 44–45). Patent Owner then attempts to further narrow its proposed construction of "malicious host tracker service" by arguing that a person of ordinary skill "would understand that a 'malicious host tracker service' refers to a service that tracks 'malicious hosts' and provides identifying information about those 'malicious hosts' such as the hosts' network addresses, to an SPMS so the traffic from malicious hosts may be blocked." *Id.* at 13 (citing Ex. 1001, 3:33–40, 15:7–55, 23:36–64, Fig. 13; Ex. 2020, 11, 412–417, 439–443, Figs. 5-45, 5-56; Ex. 2031, 318; Ex. 2032, 176; Ex. 2030, Goodrich Decl. ¶¶ 47–48).

Petitioner argues that Patent Owner attempts to impose limitations on the claimed "malicious traffic information" provided from the "malicious host traffic service" that are not supported by the record. Reply 6. According to Petitioner, "[w]hat the claims require and the specification supports is a service that provides malicious traffic information (without limitation as to that information's form), upon which 'rules' (without

limitation on their criteria) were created/altered." *Id.* (citing Ex. 1001, 15:10–29, claim 1). Petitioner urges us to reject Patent Owner's attempt to read in a requirement of "information about network hosts" to the claimed "malicious traffic information" noting that, unlike the claims in other patents obtained by Patent Owner that limit the malicious traffic information to one or more network addresses, the claims of the '906 patent, broadly recite malicious traffic information without limiting it to any specific form. *Id.* at 6–8.

Claim 1 also recites that the PSG receives from the SPMS a security policy with packet filtering rules that comprise packet matching criteria and corresponding transformation functions. Ex. 1001, claim 1. Claim 1 does not limit the packet matching criteria to any particular form. Claim 1 further recites that the packet filtering rules are automatically created or altered by the SPMS based on malicious traffic information received from a malicious host tracker service. *Id.* Claim 1 does not recite the specifics of the malicious traffic information the SPMS receives from the host tracker service. *Id.* Thus, we agree with Petitioner that the independent claims are not limited to the packet identification features Patent Owner asserts.

Additional evidence that claim 1 is not limited to the packet identification features asserted by Patent Owner is found in the claim's further recitation of packet transformation functions specified by packet filtering rules that include a packet digest logging function, logging "e.g., associated network addresses, ports, protocol types, URIs, arrival times, packet sizes, directions, interface names, media access control (MAC) addresses, matching rule IDs, metadata associated with matching rules, enforced policy names, or the like." *Id.* at 11:52–12:5.

Finally, we note that Petitioner argues the challenged claims are obvious even if we apply Patent Owner's unduly narrow construction. Reply 8–14. We address this issue further in our analysis of claim 1.

## V. GROUNDS OF INSTITUTION

Trial was instituted on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s) |
|---|---|---|
| 1–3, 5–10, 12–15, 17 | 103[1] | Jungck[2], Shah[3] |
| 4, 11, 16 | 103 | Jungck, Shah, Ke[4] |
| 1–3, 5–10, 12–15, 17 | 103 | Jungck, Shah, Sarathy[5] |
| 4, 11, 16 | 103 | Jungck, Shah, Ke, Sarathy |

## VI. ANALYSIS OF PRIOR ART CHALLENGES

### *A. Issue Preclusion*

In its unpatentability analysis, Petitioner argues that collateral estoppel precludes Patent Owner from disputing that Jungck teaches various limitations recited in claims of the '906 patent that are similar to those in claims of patents addressed in previously decided proceedings, e.g.,

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), amended 35 U.S.C. § 103, effective March 16, 2013. Because the application from which the '906 patent issued was filed after this date, the AIA version of § 103 applies

[2] U.S. Patent Publication No. 2009/0262741 pub. Oct. 22, 2009 A1 (Ex. 1051).

[3] U.S. Patent No. 6,678,835 B1 iss. Jan. 13, 2004 (Ex. 1077).

[4] U.S. Patent No. 7,095,716 B1 iss. Aug. 22, 2006 (Ex. 1078).

[5] U.S. Patent Publication No. 2009/0249482 A1, pub. Oct 1, 2009 (Ex. 1063).

IPR2018-01386 (“the -01386 IPR”[6]), IPR2018-01443 (“the -01443 IPR”[7]), IPR2018-01444 (“the -01444 IPR”[8]), IPR2018-01512 (“the -01513 IPR”[9]), IPR2018-01513 (“the -01513 IPR”[10]) *See, e.g.*, Pet. 28, 34–36, 40, 44, 53, 56, 58, 59, 67. In response, Patent Owner argues that collateral estoppel does not apply because the claims are not identical and the issues in the cases are different and were not previously decided. PO Resp. 15–18.

“Issue preclusion [i.e., collateral estoppel] is appropriate only if: (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action”; and (4) the party defending against preclusion “had a full and fair opportunity to litigate the issue in the first

---

[6] *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01386 Final Written Decision (Paper 31) (PTAB Jan. 23, 2020) (finding claims 1–16 of U.S. Patent No. 9,565,213 B2 unpatentable) (Ex. 1018), *aff'd*, 847 F. App'x 927 (Fed. Cir. 2021) (Ex. 1023).

[7] *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01443 Final Written Decision (Paper 25) (PTAB Feb. 11, 2020) (finding claims 1, 4, 12–17, 20, 28–33, 36, 44–48, and 91–96 of U.S. Patent No. 9,137,205 B2 unpatentable) (Ex. 1014); *aff'd*, 847 F. App'x 929 (Fed. Cir. 2021) (Ex. 1022).

[8] *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01444 Final Written Decision (Paper 32) (PTAB Feb. 11, 2020) (finding claims 1–3, 5–11, 17–19, 21–27, 33–35, and 37–43 of U.S. Patent No. 9,137,205 B2 unpatentable) (Ex. 1016), *aff'd*, 847 F. App'x 929 (Fed. Cir. 2021) (Ex. 1022).

[9] *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01512 Final Written Decision (Paper 32) (PTAB Mar. 19, 2020) (finding claims 1–16 of U.S. Patent No. 9,565,213 B2 unpatentable) (Ex. 1024), *aff'd*, 847 F. App'x 927 (Fed. Cir. 2021) (Ex. 1023).

[10] *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01513 Final Written Decision (Paper 26) (PTAB Mar. 31, 2020) (finding claims 1–20 of U.S. Patent No. 9,560,077 B2 unpatentable) (Ex. 1012), *aff'd*, 847 F. App'x 929 (Fed. Cir. 2021) (Ex. 1022).

action." *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994); *see also MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1376 (Fed. Cir. 2018) (holding that issue preclusion applies in the administrative context). Patent Owner argues that Petitioner does not attempt to establish that all four of these factors are met for any particular issue. PO Resp. 16. Patent Owner also notes that in the prior proceedings, the Board applied the broadest reasonable claim construction standard, not the narrower *Phillips* standard that we now apply. *Id.* at 16. We addressed that issue in our Decision to Institute, where we applied the *Philips* claim construction standard. Dec. to Inst. 20–23.

In this Decision, we evaluate the arguments and evidence presented in this proceeding to determine whether Petitioner has demonstrated unpatentability by a preponderance of the evidence. Where appropriate, we consider the parties' citations to the record in previous cases that are part of the evidence of record in this proceeding.

*B. Claims 1–3, 5–10, 12–15, and 17 as Obvious over Jungck and Shah*

Independent claim 1 recites a method of filtering packets; independent claim 8 recites a packet security gateway with a memory and processor that carries out steps generally corresponding to those of claim 1; and independent claim 13 recites computer-readable non-transitory media comprising instructions that, when executed, carry out steps generally corresponding to those recited in claim 1. Petitioner analyzes these claims together. Patent Owner does not present separate arguments for independent claims 8 and 13. We analyze claim 1 as representative of claims 1, 8, and 13.

*1. Jungck (Exhibit 1051)*

Petitioner cites Jungck as disclosing a packet interceptor apparatus that applies to intercepted packets one or more rules that execute one or more functions on a dynamically specified portion of the packet and takes one or more actions with the packets. Pet. 19 (citing Ex. 1051 ¶¶ 111, 126, 152, 157). Jungck states that "[t]he apparatus is capable of analyzing any portion of the packet including the header and payload" and that the actions "include releasing the packet unmodified, deleting the packet, modifying the packet, logging/storing information about the packet or forwarding the packet to an external device for subsequent processing." Ex. 1051, Abstract. Jungck's rules may be "dynamically modified" by the external devices. *Id.*

Petitioner cites the third (Emb#3), fourth (Emb#4), and fifth (Emb#5) embodiments of Jungck ("the Jungck Embodiments") as disclosing various elements of the claims of the '906 patent. Pet. 21–30. Petitioner notes that common to Emb#3, Emb#4, and Emb#5 is the network shown in Figure 1 having network 100 surrounded by a first boundary with points-of-presence (POPs) 116 and a second boundary with POPs 114. *Id.* at 20. According to Petitioner, Emb#3 discloses an edge server at every service provider or major network intersection to provide coverage of every POP. *Id.* at 21–23. Figure 6 of Jungck, as annotated by Petitioner, is shown below.




Pet. 22. Figure 6 shows edge servers 602A, B monitoring packets for malicious program code that may be identified by server 108 or a third party such as a virus watch service. *Id.* at 22. Petitioner notes that if the packet could not have come from a downstream network or POP, the edge server prevents that packet from reaching the protected network but valid packets are transmitted to their intended server, so it can respond to a client with the requested content. *Id.*

Petitioner cites Emb#4 as disclosing a packet interceptor adaptor that provides additional analysis capabilities beyond those of Emb#3. *Id.* at 23 (citing Ex. 1051 ¶ 126). Petitioner cites Figure 7 of Jungck as disclosing a packet interceptor system with a router and packet interceptor adapter. *Id.* Figure 7 of Jungck, as annotated by Petitioner, is shown below.

IPR2021-01157
Patent 10,749,906 B2

FIG. 7




*Id*. Petitioner notes that Jungck's packet interceptor adapter 720 (shown in blue) includes packet analyzer 712, buffer 714 and rules processor 716, operating such that packets 704 flowing into router 702 first flow through packet interceptor adapter 720 via network interface 710 and are temporarily diverted to the analyzer, where they are stored in the buffer for processing by the rules processor, before they are routed towards their intended destination. *Id*. at 24 (citing Ex. 1051 ¶¶ 130–131, 152; Ex. 1004, Madisetti Decl. ¶ 197)). Each rule 732 consists of a function, e.g., comparing packet header data to predefined values, and an action to be taken based on the result of the function e.g., capturing, releasing, logging, or deleting the packet. *Id*. (citing Ex. 1051 ¶¶ 131, 152–153). The rules are defined and modified statically and dynamically via external device interface 718 that couples packet interceptor adapter 720 to external devices 724 (shown in

purple) as well as management interface 722 that interfaces with an external management device (not shown, but illustrated by purple dashes). Ex. 1051 ¶¶ 157–158.

Petitioner cites Figure 8 of Jungck as disclosing a more detailed implementation of the adapter shown in Jungck's Figure 7. Figure 8 of Jungck, as annotated by Petitioner, is shown below.




Pet. 26. Petitioner notes that Figure 8 shows system 800 has management controller 722/832 (shown in purple) that interfaces with "an external management device (not shown) for controlling and managing the adapter 720 via interface 846." Pet. 25 (citing Ex. 1051 ¶ 160). Petitioner further notes that "[t]he adapter may receive commands from an external management device (via interface 846 (red arrow)) or from external devices 724 (via interfaces 734/836 (red arrows)). *Id.* (citing Ex. 1051 ¶¶ 160, 175).

Petitioner cites Emb#5 as disclosing a device with "Intelligent Packet Adaptors" with multiple processors to perform "stateful processing tasks," e.g., determining that packets for a certain network address are consistently

malicious and adding that network address to a filtering list. *Id.* at 27; *see* Ex. 1051 ¶¶ 263–269. According to Petitioner, Emb#5 also discloses an external management device for programming, controlling, and maintaining the device. Pet. 27 (citing Ex. 1051 ¶ 273).

Patent Owner argues that Jungck does not teach an SPMS that satisfies the following three claimed limitations: (1) is external to the network protected by Jungck's alleged PSG, (claim1.pre), *see, e.g.*, PO Resp. 18–26; (2) generates (or updates) rules based on malicious traffic information received from a malicious host tracker service (claim limitations 1.a and 1.d), *see, e.g.*, *id.* at 26–43, 51–58; and (3) creates (or updates) rules automatically (claim limitation 1.a), *see, e.g.*, *id.* at 43–58. We address each of these issues below. *See* Section V.A.4 herein.

*2. Shah*

Petitioner cites Shah as disclosing a unified policy management system for an organization in which a policy server defines policies including security, firewall, administration, and bandwidth policies, that are enforced by policy enforcers. Pet. 30–31. Figure 3 of Shah, as annotated by Petitioner, is shown below.




FIG. 3

Pet. 31. Petitioner notes that in Shah policy server 122 receives log files from policy enforcers 124, 126. *Id.* (citing Ex. 1077, 19:12–14). A policy server reports module 316 (illustrated in pink) with a policy server 122 uses collected logs and archives to generate reports and each policy in force or creates and maintains a log file with information collected about the flow of traffic through that policy enforcers. *Id.* at 32 (citing Ex. 1077, 6:45–57, 16:42–61, 18:16–29). Petitioner notes that a network administrator may specify whether log files be archived by the policy enforcer or the policy server and that the log files include information about the packet, e.g., source IP address and port number, in a predefined common log format. *Id.* (citing Ex. 1077, 18:23–64, 19:6–11, Fig. 22).

*3. Reasons to Combine the Teachings of Jungck and Shah*

Petitioner notes the Federal Circuit's affirmance of our conclusions in the -01443 IPR and the -01444 IPR that a person of ordinary skill would have been motivated to combine the teachings of Jungck's Emb#3, Emb#4, and Emb#5. Pet. 28. Petitioner further argues that Jungck's embodiments are applied to the same network environment and architecture in connection with Figure 1, and that the packet security gateways in each of its embodiments operate in a similar manner and perform similar functions to address similar problems. *Id.* at 29. Petitioner further emphasizes that Emb#4 merely extends Emb#3 to provide "a scalable and reliable connection for multiple edge/packet interception devices to the routing equipment of the Internet Service Provider." *Id.* at 23 (citing Ex. 1051 ¶¶ 120–126). Petitioner contends a person of ordinary skill would have been motivated to combine Emb#3 and Emb#4 because Jungck expressly describes providing a generic packet interception and pre-processing engine that can be utilized in parallel multiple edge devices and a standard interface

to a network, such as the Internet, for connecting edge type or packet intercepting devices, to make it easier for an ISP or carrier to offer services to different providers without introducing additional network latency or potential failure points as packet interception devices are added. *Id*. at 29– 30 (citing Ex. 1051 ¶ 126). Petitioner further argues a person of ordinary skill would have been motivated to combine Jungck's Emb#3 and Emb#4 with Emb#5 because Emb#5 is directed to similar functionality in features that address higher traffic volume in the context of the optical Internet. *Id.* at 30 (citing Ex. 1051 ¶¶ 263–269, 275; Ex. 1004, Madisetti Decl. ¶¶ 229–232).

Petitioner notes that Jungck does not provide implementation details for logging packets and states that a person of ordinary skill would have looked to Shah for standard logging techniques for such implementation details. Pet. 33 (citing Ex. 1004, Madisetti Decl. ¶¶ 234–237). Petitioner notes that Shah specifies known techniques for packet logging and report generation and that a person of ordinary skill would have had reason to use the techniques disclosed in Shah to predictably implement the functionality described in Jungck. *Id.* at 33–34 (citing Ex. 1004, Madisetti Decl. ¶ 238).

Our Decision to Institute finds that Petitioner demonstrated a person of ordinary skill would have had reason to combine the teachings of Jungck and Shah. Dec. to Inst. 40–42. Patent Owner does not further address motivation to combine in its post institution papers. For the reasons discussed in our Decision to Institute, we find that Petitioner has shown by a preponderance of the evidence that an ordinarily skilled artisan would have had reason to combine the teachings of Jungck and Shah.

*4. Claim 1*

*a) Preamble 1.pre*

The preamble of claim 1 recites a method of filtering packets at a PSG that is configured to protect a network and is associated with a security policy management server external from the network. Ex. 1001, claim 1. Petitioner cites Jungck as disclosing edge server 602 protects network 100 (e.g., a "private intranet") against malicious traffic originating from other private networks, e.g., clients 102, 104, 106. *See* Pet. 36–39 (citing e.g., Ex. 1051 ¶¶ 38–41, 110–111, 127, Fig. 1). Petitioner further cites Jungck's edge servers as intercepting all network traffic and monitoring it for malicious program code using rules 732 and rule sets 726 the edge servers receive from an external device 724, such as a server. *Id*. at 36–37 (citing Ex. 1051 ¶¶ 107, 111, 157, 160). Petitioner notes that Jungck discloses such an external management device may be located locally or remotely and connected to the intercepting device via a local or wide area network. *Id.* at 37 (citing Ex. 1051 ¶¶ 160, 273; Ex. 1004, Madisetti Decl. ¶ 254). Accordingly, Petitioner asserts that an ordinarily skilled artisan would have understood that Jungck discloses, teaches, and suggests locating a policy server external to the protected network, that placing a policy server external to a protected network was well known and would have been nothing more than the use of the known technique to improve similar devices in the same way, and that, at a minimum, such a configuration would have been obvious. *Id*. (citing Madisetti Decl. ¶¶ 255–256).

Patent Owner argues that Petitioner incorrectly assumes a "remote" computer is external to the network protected by Jungck's edge servers. PO Resp. 19 (citing Pet. 37). According to Patent Owner, Petitioner fails to explain where the alleged SPMS could be located in Jungck's system that

would place it outside network 100, i.e., the network allegedly protected by the PSG. *Id*. at 20 (citing Pet. 35). Noting that Jungck explicitly states that all network traffic between various clients and servers is routed through the point of presence (POP) edge servers and network 100, Patent Owner contends that Jungck does not disclose any computers, including external device 724, that are not coupled with network 100. *Id*. (citing Goodrich Decl. ¶ 56). According to Patent Owner, "Jungck's unique network architecture, which uses edge servers to monitor outgoing client traffic destined for network 100, means that network 100 is a protected network, and every device connected to network 100 is part of that protected network." Surreply 3.

Petitioner describes Patent Owner's argument that any external device is necessarily part of Jungck's network 100 and therefore part of the protected network as "far-fetched." Reply 3–4. According to Petitioner, Patent Owner "improperly presumes that Jungck's embodiments apply only to the Internet (where network 100 is the entire Internet), when Jungck expressly states that its embodiments apply equally to, e.g., LANs and private networks." Reply 4 (citing Pet. 36–37).

Describing the Internet as an example of a publicly accessible network, Jungck states that its disclosed embodiments are not limited to the Internet, but apply to "other types of public networks as well as private networks, and combinations thereof, and all such networks are contemplated." Ex. 1051 ¶¶ 31–32. Jungck further refers to a point of presence (POP) as the logical (and possibly physical) point where the public network ends, after which comes the private hardware or private network of the client. *Id*. ¶ 41. As discussed above (*see* Section VI.B.1, herein), Figure 6 of Jungck shows an edge server, e.g., 602A, between POP 116

(e.g., POP2A) and network 100 that intercepts data at the packet level to provide complete isolation of its subscribing server, i.e., 108 (Server 1), such that Jungck's edge server prevents any client (public or private) from direct communication with a subscribing server. Ex. 1051 ¶¶ 107–111. As discussed above in Section VI.B.1, Figure 7 shows an edge adapter and packet interceptor according to a fourth embodiment. Ex. 1051 ¶ 16. Packet interceptor adapter 720 includes packet analyzer 712, buffer 714, rules processor 716 and external device interface 718. *Id.* ¶ 130. Jungck explicitly states "edge adapter 720 may further include a management interface 722 and interfaces 734 for external devices 724." *Id.*

Patent Owner cites the Board's earlier determination in the -01443 IPR that Jungck protects network 100 because edge server 602 monitors transmissions from clients for previously identified malicious code and eradicates them or prevents them from reaching network 100. Surreply 4 (citing Ex. 1014, 27 (finding Jungck discloses receiving packets associated with the network protected by the packet security gateway, as recited in claim 1 of U.S. Patent No. 9,137,205 B2)[11]). This finding stands for the proposition that "network traffic destined for a subscribing server can be intercepted by the edge server and acted upon, providing complete isolation of the subscribing server 108, 110," Ex. 1014, 26–27; it does not mean that Jungck precludes the SPMS from being external to the protected network. In Figure 6, Jungck's edge server, e.g., 602A, is located at the edge between service provider 118, which includes POPs 116 attached to clients, e.g., 102, 104. Edge server 602A intercepts all traffic from clients of service provider 118 destined for network 100. Figure 7 of Jungck illustrates that edge server

[11] -01443 IPR Final Written Decision (affirmed).

602A receives policies from external device 724, e.g., an external management device that provides policies, such as an SPMS. As there is no connection between external management device 724 and protected network 110, Jungck discloses edge server 602A receives management policies from a device external to protected network 100, in the same manner the claimed PSG is associated with an SPMS, as recited in the preamble of claim 1. Ex. 1051, Figs. 6–7. Thus, we find that Petitioner has demonstrated that Jungck discloses the features recited in the preamble of claim 1.

*b) Claim Limitation 1.a*

Claim limitation 1.a recites that the packet security gateway (PSG) receives from the security policy management server (SPMS) a dynamic security policy that includes a set of packet filtering rules. Each packet filtering rule includes at least one packet matching criterion and a corresponding packet transformation function. Claim limitation 1.a further requires that the one or more of the packet filtering rules received by the PSG was automatically created or altered by the SPMS, based on malicious traffic information received from a malicious host tracker service.

Petitioner cites Jungck as disclosing edge server 602 receives rules 732 and performs functions, such as an action to be taken based on a comparing one or more packets with predefined values, e.g., checking a received packet's source IP address against a list of blocked addresses and responding accordingly. Pet. 40–41; *see id.* at 39–44. Petitioner further asserts that it would have been obvious for Jungck's edge devices to receive malicious code identifications from third parties, e.g., a virus watch service, and "to configure Jungck's external devices to dynamically and automatically update rules to correspond to new or changed malicious

program code, such as additional blocked IP addresses or address changes of the sources of malicious program code, identified by the virus watch service" because such sources change. *Id.* at 41 (emphasis omitted). Noting that Jungck's edge servers receive rules from external devices, Petitioner further asserts that a person of ordinary skill would have understood that Jungck teaches any such external devices would define/reset/modify rules automatically or that it would have been obvious to do so. *Id.* (citing Ex. 1004, Madisetti Decl. ¶¶ 270–271; Ex. 1018, 21–22; MPEP § 2144.04).

*(1) SPMS that generates rules based on malicious traffic information received from a malicious host tracker service*

Patent Owner contends that Jungck does not teach an SPMS that generates rules based on malicious traffic information received from a malicious host tracker service. PO Resp. 26–40. A fundamental premise of Patent Owner's argument is that Jungck's virus watch service, which Petitioner maps to the claimed malicious host tracker, is not a service that identifies and provides identifying information about network hosts that have been determined to be associated with malicious traffic. *Id.* at 26 (citing Pet. 40). According to Patent Owner, (i) malicious code identified by Jungck's virus watch service does not include spoofed network addresses (*id.* at 26–29), (ii) Jungck's edge server, not a virus watch service, identifies packets with spoofed addresses (*id.* at 29–37), (iii) Petitioner does not explain how or why a person of ordinary skill would have modified Jungck, and (iv) Jungck does not teach other limitations requiring the first set of packet filtering rules (*id.* at 39–40). Petitioner urges us to reject Patent Owner's rebuttal arguments, which focus on the form of malicious traffic information, because the claims require and the specification supports a

service that provides malicious traffic information, without limitation as the information's form. Reply 6 (citing PO Resp. 12–13; Ex. 1001, 15:10–29, claim 1).

As to point (i), Patent Owner notes Petitioner's assertion that one example of Jungck's edge servers monitoring data transmitted by clients for malicious code pertains to spoofed source addresses. PO Resp. 26–27 (citing Pet. 41). Patent Owner argues that spoofed addresses are not malicious code. *Id.* at 27. Although we address the construction of "malicious traffic information" in Section IV.C herein, we now turn to Patent Owner's more specific arguments concerning spoofed source addresses. Patent Owner's arguments depart from the claim language, i.e., "malicious traffic information," referring instead to "malicious program code" and "malware."

As the term "malicious traffic information" first appears in claim 1, we look to the Specification to determine the types of information that the '906 patent refers to as malicious. The Specification discloses

> In some embodiments, the dynamic security policy may include a rule generated based, at least in part, on a list of known network addresses associated with malicious network traffic. In some embodiments, the list of known network addresses associated with malicious network traffic may be received from a subscription service that aggregates information associated with malicious network traffic.

Ex. 1001, 3:33–40. Thus, the Specification explicitly describes malicious traffic information as including a list of known addresses associated with malicious network traffic, e.g., lists of addresses associated with malicious traffic aggregated by and received from a subscription service. As Petitioner points out, Jungck discloses receiving rules 732 and taking actions based on comparing the packets to predefined values, e.g., checking a received

packet's source IP address against a list of blocked addresses and responding accordingly. Pet. 40–41; *see id.* at 39–44.

Petitioner further notes that, even applying Patent Owner's narrow interpretation of malicious traffic information, in the -01443 IPR, we determined that Jungck teaches an SPMS receiving from a subscription service aggregated malicious network traffic information, e.g., a list of network addresses known to be associated with malicious network traffic, and rejected previous arguments that Jungck's third-party services identify only malware and cannot identify malicious hosts. Reply 8–9 (citing -01443 IPR FWD, 14, 46–48). In this context, our findings in the -01443 IPR as to what Jungck discloses apply to the language of the claims before us in this proceeding and we find that Jungck discloses a packet security gateway, e.g., Jungck's edge server, receiving malicious traffic information from a malicious host tracking service, as claimed.

As to point (ii), Patent Owner contends that Jungck's third party virus watch services cannot provide rules that assist in identifying packets with spoofed source addresses. PO Resp. 29 (citing Pet. 40–41; Ex. 2030, Goodrich Decl. ¶ 72). Petitioner replies that, in order to attack a strawman, Patent Owner "pretends" that the Petition's challenge grounds are limited to Jungck's disclosure of a virus watch service and only the identification of spoofed network addresses. Reply 10. According to Petitioner, identification of spoofed IP addresses is merely a non-limiting example of malicious program code. *Id.* We agree that neither the claims nor Petitioner's challenge are limited to address spoofing. Petitioner persuasively points out Jungck's express disclosure of third-party services that identify malware as well as other unauthorized data. *Id.* (citing Ex. 1051 ¶ 111, disclosing that edge server 602 provides a packet level filter

that can monitor the data transmission, e.g., from clients 102, 104, for program code previously identified by a third party, such as a virus watch service, as harmful or destructive). Based on Jungck's disclosure, we find these arguments by Patent Owner unavailing.

Patent Owner's additional spoofing-based arguments are similarly unavailing. According to Patent Owner, whether protected network 100 is a public or private network, because an internet service provider (ISP) or other network interconnection point assigns IP addresses to its connected computers, the corresponding edge server knows which network addresses are and are not valid and the list is particular to each POP/edge server. PO Resp. 30–32. Based on this analysis, Patent Owner asserts that the edge server alone identifies packets having spoofed addresses without any involvement from the virus watch service or any other party. *Id.* at 33 (citing Ex. 1051 ¶ 111 for the proposition that Jungck's edge server 602A can identify as forgeries data packets originating from addresses that could not have been downstream from the POP). Patent Owner asserts that, because third party watch services like Jungck's virus watch service are not positioned between Jungck's clients and the network, the edge server would have no way of knowing whether a packet's source IP address indicates the true origin of the packet. *Id.* This portion of Patent Owner's analysis fails because it assumes that an external management device 722 does not provide such spoofing detection information in the form of rule sets 726 that identify potential spoofed addresses. Ex. 1051 ¶¶ 152–157, Fig. 7; Pet. 42–43. Patent Owner addresses third party identification of spoofed addresses as ineffective by further asserting that if a third party virus service identified a client network address as malicious, the edge server would block legitimate traffic from that address. PO Resp. 34–35.

Patent Owner reads into Jungck rules that Jungck does not articulate. We agree with Patent Owner that a virus service's identification of an IP address as a spoofed IP address does not mean that every packet including that IP address is malicious. *Id.* A virus service's identification of a spoofed IP address indicates that traffic from that address is suspect, not necessarily malicious. *See* Reply 13 (citing Ex. 1063 ¶ 40 for the proposition that Sarathy (asserted in challenge ground 3) discloses a security management service may provide lists of known sources of malware or known suspicious IP addresses). Jungck discloses that, using the rules provided from the management device, packet analyzer 720 is capable of analyzing or examining any part of a packet, including any data from the header data layer 706 or application data layer 708, or other layers, and may route a copy of the packet to one or more external devices for further processing and subsequent action. Ex. 1051 ¶¶ 152–158; *see also id.* ¶¶ 172–173 (disclosing a rule set structured to make a quick initial determination whether to hold or release a packet from the buffer and take further action depending upon the outcome of additional analysis). Jungck discloses that a virus service can provide the edge server a list of suspect addresses, i.e., spoofed addresses, that the packet analyzer in the edge server can further assess and act on accordingly. Thus, Patent Owner's argument that Jungck's third party virus watch services cannot provide rules that assist in identifying packets with spoofed source addresses is unavailing.

As to points (iii) and (iv), Petitioner notes Patent Owner's "mis-parsing" of Jungck's disclosure and Patent Owner's attempt to limit Petitioner's challenge to address spoofing. Reply 12–13. As discussed above, Patent Owner characterizes Petitioner's challenge based on Jungck in

a way that implies modifications to Jungck that Petitioner does not assert and are not required to establish Petitioner's challenge.

Having considered the arguments and evidence of record, we find that Petitioner has demonstrated that Jungck teaches this feature of claim limitation 1.a to a person of ordinary skill in the art.

*(2) Lists of blocked IP addresses as the claimed set of rules*[12]

Patent Owner contends that Jungck's lists of blocked IP addresses is not the claimed first (claim limitation 1.a) or updated second (claim limitation 1.d) set of packet filtering rules based on malicious tracking information. PO Resp. 51–58. Patent Owner argues that Petitioner does not explain how or why Jungck's external devices, i.e., the SPMS, would perform such a task when Jungck's edge server maintains a list set by a default rule, i.e., one built into the program. *Id.* at 52. In support of this position, Patent Owner first contends that Jungck does not teach providing to the edge server rules based on a list of blocked IP addresses because such lists are stored in content addressable memory in the edge server that manages and maintains such lists. *Id.* at 52–53. Noting that the edge server uses these block lists to check IP addresses of incoming packets and block packets from matching sources, Patent Owner contends that a person of ordinary skill would have understood that Jungck does not contemplate new or updated rules to perform this pre-programmed functionality and that

[12] Claim limitation 1.a recites creating a first set of packet filtering rules; claim limitation 1.d recites creating an updated second set of packet filtering rules. As the parties address these limitations together, we address both limitations in this sub-section of the Decision.

Petitioner points to no such disclosure in Jungck. *Id.* at 53–54 (citing Ex. 2030, Goodrich Decl. ¶¶ 114–115).

Petitioner contends that Patent Owner mis-states the asserted grounds, which "rely on Jungck's disclosed functionality of creating and dynamically modifying rules ***by an external device***, which rules are received and executed by the edge server." Reply 18. Petitioner contends that Patent Owner's assertions contradict previous Board findings that Jungck teaches rules can be created or modified by external devices and that the edge server receives rules based on blocked IP addresses. *Id.* at 17 (citing Pet. 39–44, -01143 FWD (Ex. 1014), 42–43 (stating that Jungck teaches receiving at least one rule specifying a set of network addresses for which packets should be dropped), 46–48 (stating that the SPMS receives from a subscription service a list of network addresses known to be associated with malicious network traffic).

Patent Owner also contends that changing the effect of a rule applied by Jungck's edge server does not require an updated rule be sent from Jungck's external devices. PO Resp. 54–58. Patent Owner argues that Jungck maintains rules separate from block lists by storing rules in non-volatile memory 812 and block lists in content addressable memory 816. *Id.* at 55–56 (citing Ex. 1051 ¶¶ 130, 159, 165, 176, 177, Figs. 7–8; Ex. 2030, Goodrich Decl. ¶ 118). Petitioner contrasts Jungck's implementation with packet filtering rules described in the '906 patent that include a specific network address to allow or block. *Id.* at 56. According to Patent Owner, both Jungck and the '906 patent contradict the Board's statement that rules are not independent of the data they assess given that Jungck's rule set is independent of the block list it assesses packets against. *Id.* Patent Owner also argues that our example of a rule being changed to reverse from

blocking source A and not source B to blocking source B and not source A wrongly focuses on the variable outcome of an existing rule, rather than any changes to the rule or the blocking function of the rule itself. *Id.* at 57–58 (citing Ex. 2030, Goodrich Decl. ¶¶ 120–121).

Patent Owner's arguments about Jungck are similar to ones that Patent Owner advanced and we rejected in the -01443 IPR. In the -01443 IPR Patent Owner argued that Jungck does not disclose a router receiving a plurality of dynamic policies, because once a rule set is defined on a router, the router receives only modifications to the rule set already implemented. Ex. 1014, 16–17. Patent Owner's arguments in this case are similarly unavailing because they rely on implementation details that are not recited in the claims. How a rule is initially implemented to perform a function and updated to perform a similar function in a different way to generate a different result does not alter the fact that the rule or set of rules is set and updated and, when updated, the outcome of a rule's application differs from that of the initial rule.

Having considered the evidence and arguments of record, we find that Petitioner has demonstrated that Jungck teaches this feature of the claim limitations 1.a and 1.d to one of ordinary skill in the art.

*(3) SPMS automatically creating or altering rules*

Claim limitation 1.a also recites that the first set of packet filtering rules were automatically created by the SPMS based on the malicious traffic information received from a malicious host tracker service. Ex. 1001, claim 1. Petitioner asserts that, because it is known that malicious sources and malicious code frequently change, it would have been obvious from Jungck's teachings to configure Jungck's external devices to dynamically

and automatically update rules they provide Jungck's edge servers to correspond to new or changed malicious program code. Pet. 41–42 (citing Ex. 1004, Madisetti Decl. ¶¶ 268–269); *id*. at 43 (citing Ex. 1051 ¶ 157 (rules sets and rules may be defined by external devices and may be redefined or reset dynamically by rules processor 716 or the external device 724, as needed)).

Patent Owner acknowledges that Jungck discloses that rules may be reset or redefined dynamically, but contends that Petitioner cites no teaching in Jungck that such dynamic resetting or redefining is automatic. PO Resp. 43. Patent Owner argues that the district court previously defined a dynamic security policy as "a ***changeable set*** of one or more rules" and in the -01443 IPR the Board "noted that 'dynamic' can refer to rules that ***may be revised manually by an administrator***." PO Resp. 44 (citing Pet. 18 n.11; Ex. 1014, 7; Ex. 2030, Goodrich Decl. ¶ 97). Neither of these references precludes changing or updating the rules automatically. Patent Owner further states that, notwithstanding our statement in the -01386 IPR that "dynamic nature of the policy does not change, even if the actual updating of the policy is characterized as static or dynamic depending upon whether that updating is performed ***manually or automatically,"*** because the dynamic security policy in that case was deemed to include a user manually changing or updating policies, "the Board was not asked to decide obviousness of automatically identified rules." *Id.* at 45 (citing Ex. 1018, 20–22). Patent Owner fails to cite the previous sentence from the -01386 IPR that explicitly states "[a] security policy is a dynamic security policy if it can be changed either manually or automatically." Ex. 1018, 22.

We further note that Jungck's rule sets 726 and rules 732 may be redefined or reset dynamically by rules processor 716 or external devices

724, as needed, to implement their desired functionality. Ex. 1051 ¶ 157. Jungck's rules processor can also interface with external devices 724 and management interface to enable definition and modification/re-definition of rules 732 and rule set 726 both statically and dynamically. *Id.* The implication of the rules being reset or redefined by a rules processor is that the redefinition or resetting of the rules is performed automatically, i.e., the rules are redefined or reset by a program executed by the processor to perform the desired function.

Having considered the evidence and arguments of records, we find that Petitioner has demonstrated that Jungck discloses this feature of claim limitation 1.a to a person of ordinary skill in the art.

*c) Claim Limitation 1.b*

Claim limitation 1.b recites performing on a packet by packet basis packet filtering on a first portion of the packets protected by the PSG based on a first set of packet filtering rules, by performing at least one of the multiple packet transformation functions specified by a rule. Petitioner cites Jungck as disclosing edge servers that intercept traffic at the packet level and perform packet filtering using rules that comprise a function and an action. Pet. 44–46 (citing Ex. 1051 ¶¶ 39, 108, 113, 132, 152–153; Ex. 1004 ¶¶ 276–283, 414, 433). Patent Owner does not respond explicitly to Petitioner's contentions concerning claim limitation 1.b.

Having considered the evidence and arguments of record, we find that Petitioner has demonstrated Jungck discloses claim limitation 1.b.

*d) Claim Limitation 1.c*

Claim limitation 1.c recites that at least one of the transformation functions is a packet digest logging function. The transformation function (i.e., the packet digest logging function) supports a network communications

awareness service and comprises: (i) "identifying a subset of information specified by a packet" that matches the packet filtering criteria of a packet filtering rule that specified the packet logging function; (ii) generating a record comprising the subset of information; (iii) reformatting the subset of information in accordance with a logging system standard; and (iv) by the PSG, routing the packet (i.e., the packet that matched the criterion of the rule that specified the logging) to a monitoring device.

Petitioner cites Jungck as disclosing packet analyzer 720 as a device that can log or otherwise store information about packets, including storing a copy of the packet itself. Pet. 46 (citing Ex. 1051 ¶ 153). Petitioner notes the ability of Jungck's packet analyzer to perform compound actions that are a combination of basic actions. *Id.* (citing Ex. 1051 ¶¶ 153, 251–253).

Petitioner further cites Shah as disclosing a unified policy management system in which local network 102 includes policy server 122 for defining and managing an organization's policies using policy enforcers 124, 126. Pet. 47 (citing Ex. 1077, 4:13–33, Fig. 1). Shah's policy enforcers maintain log files of information collected about received packets and generate exportable reports formatted for use by other products. *Id.* at 48–50 (citing Ex. 1077, 19:23–31).

As to claim limitation 1.c.i, Petitioner cites rules 732 in Jungck as allowing an edge server to identify and store a subset of information to be captured, e.g., attributes about malformed packets. Pet. 50 (citing Ex. 1051 ¶ 153; Ex. 1004, Madisetti Decl. ¶¶ 299–301). Petitioner further cites Shah as one implementation of Jungck that identifies specific packet information to capture, e.g., source IP address and port number. *Id.* at 50–51 (citing Ex. 1077, 18:30–42).

Petitioner cites both Jungck's state memory and Shah's log entry as disclosing the storing feature recited in claim limitation 1.c.ii. *Id.* at 51–52 (citing Ex. 1051 ¶¶ 153–154; Ex. 1004, Madisetti Decl. ¶¶ 308–317, 417, 436).

Petitioner further cites Jungck's disclosure of a "syslog" and Shah's disclosure of storing packet information in a predefined common log format, or standard log format, as teaching the reformatting recited in claim limitation 1.c.iii. *See* Pet. 52–53.

As to claim limitation 1.c.iv, Petitioner cites Jungck as disclosing packet analyzer 720 routing a packet from an edge server to external device 724 for further processing an analysis. Pet. 53–54 (citing Ex. 1051 ¶¶ 153, 180). Petitioner states that a person of ordinary skill would have been motivated to route a packet to an external device for copying information for further processing to offload tasks, such as statistical analysis, without hindering packet filtering and logging functions of the PSG. *Id.* (citing Ex. 1051 ¶¶ 108, 122, 129, 153, 280, 252; Ex. 1004, Madisetti Decl. ¶¶ 330–337, 419, 438).

Patent Owner does not present separate arguments drawn specifically to the features of claim limitation 1.c. Having considered the evidence and arguments of record, we find that Petitioner has demonstrated that a person of ordinary skill would have had reason to combine the teachings of Jungck and Shah and that in combination, Jungck and Shah teach the features recited in claim limitation 1.c.

*e) Claim Limitations 1.d and 1.e*

Claim limitation 1.d recites that, after performing packet filtering on a first portion of packets, the PSG receives from the SPMS an updated set of packet filtering rules that the SPMS generated based on updated malicious

traffic information received from the host tracker server. Claim limitation 1.e recites performing packet filtering on a second portion of the packets based upon the updated second set of packet filtering rules.

Petitioner cites Jungck as disclosing that rules sets 726 and 732 are redefined or reset dynamically by the external devices 724 or by a management device. Pet. 55 (citing Ex. 1051 ¶¶ 157, 160, 185). Petitioner asserts that it would have been obvious for Jungck's virus watch service to push updated malicious source information to Jungck's external devices that create/alter rules dynamically to protect the network from newly identified threats and to forward those rules to the edge server. *Id.* at 54–55 (citing Ex. 1004, Madisetti Decl. ¶¶ 342–344).

Patent Owner argues that Jungck does not teach this limitation for reasons similar to those above, i.e., that Jungck does not disclose an SPMS that generates (or updates) rules based on malicious traffic information received from a malicious tracking service. PO Resp. 40–43. Patent Owner contends that Petitioner has not demonstrated that the PSG receives from a malicious source tracking service an updated set of packet filtering rules based on updated malicious traffic information for the same reasons Petitioner has not demonstrated Jungck discloses a PSG initially receiving such information. Patent Owner's arguments are unavailing. As discussed above, based on the evidence and arguments of record, we find that Jungck discloses the PSG receiving initial packet filtering rules and updated packet filtering rules from the SPMS based on malicious traffic information received from a malicious source tracker service, as recited in claim limitation 1.d. *See* Section VI.B.4.b.2 herein.

*f) Objective Indicia*

*(1) Introduction*

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). Objective indicia are only relevant to the obviousness inquiry if there is a nexus between the claimed invention and the objective indicia of nonobviousness. *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017). A rebuttable presumption of nexus applies only "when [a patent owner] shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with [the claims].'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Polaris Indus. Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, a patent owner is not entitled to a presumption of nexus if the patented invention is only a component of a commercially successful machine or process. *Id.* (reaffirming the importance of the "coextensiveness" requirement).

Applying *Fox Factory*, the Board uses a two-step analysis in evaluating nexus between the claimed invention and objective evidence of nonobviousness, also referred to as secondary considerations. *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential). We consider whether Patent Owner has demonstrated "that its products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus. *Id.* at 33. If not, that "does not end the inquiry into secondary considerations"; "the patent owner is still afforded an opportunity to prove nexus by showing that the

evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* (quoting *Fox Factory*, 944 F.3d at 1373–75). Patent Owner does not characterize its objective considerations analysis as based on coextensivity or a correspondence between individual claim limitations and its products. *See* PO Resp. 56–67. For the reasons discussed below, we find that Patent Owner has not demonstrated that its products are coextensive with the challenged claims and has not demonstrated the requisite nexus with evidence that the secondary considerations are the direct result of the unique characteristics of the claimed invention.

*(2) Long-felt Need*

Citing its RuleGATE® ("RuleGATE") and CleanINTERNET® ("CleanINTERNET") products as embodying the claimed packet filtering devices, Patent Owner asserts that the '906 patent satisfied a long-felt but unresolved need and received significant praise for doing so. PO Resp. 56–67. According to Patent Owner, new solutions were required because signature behavior-based systems were unable to keep up with emerging threats. *Id.* at 5, 60–61 (citing Ex. 2024, Presentation by Stanley Chincheck titled "Computer Network Defense Information/Assurance (CND/IA) Enabling Capability (EC) Industry Day" in 2010) ("Chincheck presentation"), 5–6; Ex. 2030, Goodrich Decl. ¶ 127). Exemplary independent claim 1 of the '906 patent recites a method of filtering packets at a packet security gateway, i.e., as they enter the network. *See, e.g.*, Ex. 1001, Fig.1, 5:63–65 ("packet security gateway 112 may be located at network boundary 200 between network A 102 and network E 110"). In contrast, the Chincheck presentation refers to Sensors and Gateways as "[c]omponents located throughout the network [that] ensure network

awareness by providing information regarding network traffic back to the decision support system" and a "[s]ystem that aggregates, correlates, fuses, and visualizes the network security posture information into a holistic view." Ex. 2024, 8–9. The Chincheck presentation cited by Patent Owner makes no mention of either RuleGATE or CleanINTERNET. *See generally id*. The Chincheck presentation explicitly states that "I will not comment on a specific approach, technology, etc. being considered by an Offeror." Ex. 2024, 3; Reply 21. The Chincheck presentation was directed to soliciting whitepapers describing technological approaches that improve computer security for further evaluation as part of an Enabling Capability Program. Ex. 2024, 13–21. Chincheck does not mention the features of the claims of the '906 patent. As such, Chincheck did not endorse any particular approach and does not suggest that the subject matter of the claims before us satisfied an unresolved, long-felt need.

As further evidence that the claimed subject matter addressed a long-felt need, Patent Owner cites a White Paper entitled "Centripetal Networks Threat Intelligence Gateway" by the Enterprise Strategy Group. PO Resp. 61 (Ex. 2025 ("ESG Paper")). Because the ESG Paper states that "[t]his ESG White Paper was commissioned by Centripetal Networks" (Ex. 2025, 1), we assign only limited weight to the assertion that "ESG validated that Centripetal Networks CleanINTERNET managed security service normalizes third-party threat intelligence feeds, blocks alerts and known threats in real time, in line with the network, and provides visualization and process management." PO Resp. 63 (citing Ex. 2025, 8; Ex. 2030, Goodrich Decl. ¶ 129). The ESG Paper discusses threat intelligence gateways that "live between an edge router and a firewall," accommodate "highly dynamic policy management for threat-intelligence based rules," and "leverage a

wide variety of threat intelligence." Ex. 2025, 5–6. The ESG Paper's generalized statements do not attribute the performance of Patent Owner's products to specific claims of the '906 patent. As the Petition points out, Jungck discloses a similar approach, i.e., using edge servers that receive threat information from external devices and act to block identified threats. *See generally* Pet. 19–71. Thus, we find that the generalized assertions in the ESG Paper do not demonstrate a nexus between the claimed subject matter and a long-felt, but unsatisfied, need.

Patent Owner also cites an IBM case study article. PO Resp. 63 (citing Ex. 2026). The IBM article discusses the use by RuleGATE and CleanINTERNET of IBM's Security X-Force Exchange Commercial API feed as a source of threat intelligence. *See generally* Ex. 2026. Petitioner notes that the IBM case study fails to establish how either of Patent Owner's CleanINTERNET or RuleGATE products is tied to the '906 patent claim features. Reply 23. Patent Owner argues that the IBM article stands for the proposition that Patent Owner's products operationalize threat intelligence by allowing the processing of large numbers of records in real time. PO Resp. 63–64. Although the IBM article mentions that "Centripetal used the IBM Security X-Force and other threat intelligence data to shield against malicious activity at a large hospital system" (Ex. 2026, 6), Patent Owner does not identify any subject matter in the article that addresses the subject matter claimed in the '906 patent.

Based on our review of the arguments and evidence of record, we find that, for purposes of establishing non-obviousness based on satisfying an unresolved, long-felt need, Patent Owner has not established the requisite nexus by showing coextensiveness of its RuleGATE and CleanINTERNET products and the subject matter recited in the claims of the '906 patent or by

demonstrating a long-felt need was satisfied as a direct result of the unique characteristics of the claimed invention.

*(3) Industry Praise*

Patent Owner also asserts objective evidence of nonobviousness of the challenged claims in the form of industry praise of its RuleGATE device and CleanINTERNET servers, "which embody features of the '906 Patent claims." PO Resp. 65–67 (citing Ex. 2030, Goodrich Decl. ¶ 133). Patent Owner again cites its self-commissioned ESG Paper as praising the CleanINTERNET enforcement point for providing automated threat intelligence to reduce security event volume and workload more than is possible with firewalls and other systems that are not designed for processing millions of indicators from thousands of feeds. *Id.* at 65 (citing Ex. 2030, Goodrich Decl. ¶ 133). Petitioner points out that such generic statements fail to relate the claimed features to the asserted praise and do not associate the specific limitations of the challenged claims to the alleged performance. Reply 23. Patent Owner does not attempt to demonstrate coextensiveness, e.g., that RuleGATE or CleanINTERNET implement the packet logging function or reformat the information specified by the packets in accordance with a logging system, as recited in claim 1. The ESG Paper's generalized statements do not praise Patent Owner's products as a direct result of the claimed invention. For reasons similar to those discussed above, the ESG Paper, commissioned by Patent Owner, does not establish a nexus between Patent Owner's products and the claimed subject matter based on industry praise.

As further evidence of industry praise, Patent Owner cites R. Contu, L. Pingree, D. Kish, D. Gardner, "Cool Vendors in Security for Technology and Service Providers, [May 4,] 2017" ("Gardner Paper"). PO Resp. 61;

Ex. 2027, 5–6. Patent Owner cites the Gardner Paper as praising Patent Owner (Centripetal) for its unique ability to detect and prevent malicious network connections based on millions of threat indicators at 10 gigabit speeds and as unique because Patent Owner enables internal or external threat feeds to be integrated. *Id.* at 66 (citing Ex. 2027, 7; Ex. 2030 Goodrich Decl. ¶ 134). Patent Owner further cites the comments of a "security blogger" praising RuleGATE for "filter[ing] a ton of attacks that would normally hit the Firewall" and comments in the IBM article that CleanINTERNET makes threat intelligence actionable with no firewall or security stack device involvement due to the RuleGATE gateway. *Id.* (citing Ex. 2029, 1–2; Ex. 2026, 4; Ex. 2030 Goodrich Decl. ¶¶ 135–136).

The Gardner Paper, the security blogger, and the IBM Paper speak in generalities, noting that Patent Owner's service synchronizes and normalizes threat intelligence from third parties, but none of this evidence describes the claimed methodology or attributes the performance to the subject matter claimed in the '906 patent.

Having considered the evidence and arguments of record, we find the record evidence insufficient to establish the requisite nexus between Patent Owner's evidence of industry praise and the challenged claims of the '906 patent based on coextensiveness or as the direct result of the claimed subject matter.

Having considered the arguments and evidence of record, for the reason discussed above, we find Petitioner has demonstrated that a person of ordinary skill would have had reason to combine the subject matter disclosed in the references and that in combination they teach the limitations recited in the challenged claims. We further find insufficient evidence to establish the

requisite nexus between Patent Owner's evidence of objective indicia of non-obviousness and the challenged claims of the '906 patent.

*g) Conclusion Concerning Clams 1, 8, and 13*

In consideration of the above, we find that Petitioner has demonstrated a person of ordinary skill would have had reason to combine the teachings of Emb#3, Emb#4, and Emb#5 of Jungck and the teachings of Shah and that their combined teachings would have disclosed the limitations of claim 1 to a person of ordinary skill in the art. As claim 1 is representative of the subject matter of claims 8 and 13, we reach the same conclusion concerning claims 8 and 13.

*5. Claims 2, 9, and 14*

Claims 2, 9, and 14 depend from claims 1, 8, and 13, respectively, and recite that at least one packet matching criterion comprises at least one network address associated with an indication of malicious network traffic. Petitioner notes that it would have been obvious for Jungck's external devices to receive malicious code identification from third-party watch services and cites Jungck as disclosing edge server 602 can monitor data transmission generated by clients for malicious program code. Pet. 57–58. Patent Owner does not respond explicitly to Petitioner's contentions concerning these claim limitations. We find that Petitioner has demonstrated a person of ordinary skill would have had reason to combine the teachings of Jungck and Shah and that the combined teachings of Jungck and Shah would have disclosed the limitations recited in claims 2, 9, and 14 to a person of ordinary skill.

*6. Claims 3, 10, and 15*

Claims 3, 10, and 15 depend from claims 1, 8, and 13, respectively, and recite that at least one packet transformation function comprises a

network protective action. Petitioner cites Jungck as disclosing that in the case of a match between rule 732 and a packet, the edge server will take the desired course of action dictated by the rule, such as releasing, forwarding, or deleting the packet. Pet. 58 (citing Ex. 1051 ¶ 153). Patent Owner does not respond explicitly to Petitioner's contentions concerning these claim limitations. We find that Petitioner has demonstrated a person of ordinary skill would have had reason to combine the teachings of Jungck and Shah and the combined teachings of Jungck and Shah would have disclosed the limitations recited in claims 3, 10, and 15 to a person of ordinary skill.

*7. Claims 5, 12, and 17*

Claims 5, 12, and 17 depend from claims 1, 8, and 13, respectively, and recite that the packet security gateway receives packets in a network layer transparent manner, using an interface that is not addressed at the network layer, and performs the at least one multiple packet transformation function at the network layer. Noting that Jungck's edge server needs no network address, Petitioner cites Jungck as disclosing edge servers that intercept all network traffic via network interface 710, modify the IP address and payload of captured packet 704, and release the modified packet to routing logic 730 of router 702. Pet. 58–59 (citing Ex. 1051 ¶¶ 107, 130, 152). Petitioner cites Jungck as disclosing packet interceptor system 700 integrated into edge server 602 is selectively transparent to the network, such that addressability may be disabled to make the device invisible to other network devices. *Id.* at 58 (citing Ex. 1051 ¶ 126). Patent Owner does not respond explicitly to Petitioner's contentions concerning these claim limitations. We find that Petitioner has demonstrated a person of ordinary skill would have had reason to combine the teachings of Jungck and Shah

and the combined teachings of Jungck and Shah would have disclosed the limitations recited in claims 5, 12, and 17 to a person of ordinary skill.

*8. Claim 6*

Claim 6 depends from claim 1 and recites that the network communications service comprises a network security awareness service or a network threat awareness service. Petitioner cites Jungck as disclosing an enterprise firewall that may implement a provisioned rule set and report alerts and logs to a central station. Pet. 60 (citing Ex. 1051 ¶¶ 251–252). Patent Owner does not respond explicitly to Petitioner's contentions concerning these claim limitations. We find that Petitioner has demonstrated a person of ordinary skill would have had reason to combine the teachings of Jungck and Shah and the combined teachings of Jungck and Shah would have disclosed the limitations recited in claim 6 to a person of ordinary skill.

*9. Claim 7*

Claim 7 depends from claim 1 and recites that the network communications service is provided based on one or more criteria that are indicative of packet communications of interest to an organization that operates the secured network. Petitioner cites Jungck as disclosing a comparison operation that compares a portion of the packet with predefined values, for example, against a list of IP addresses blocked by an organization. Pet. 62–64. Patent Owner does not respond explicitly to Petitioner's contentions concerning these claim limitations. We find that Petitioner has demonstrated a person of ordinary skill would have had reason to combine the teachings of Jungck and Shah and the combined teachings of Jungck and Shah would have disclosed the limitations recited in claim 7 to a person of ordinary skill.

*C. Claims 4, 11, and 16 as Obvious over Jungck in View of Shah and Ke*

Claims 4, 11, and 16 depend from claims 1, 8, and 13, respectively. Claims 4, 11, and 16 recite the additional limitations that the dynamic security policy specifies a first set of packets that should be placed in a first forwarding queue and a second set of packets that should be placed in a second forwarding queue with the first forwarding queue having a higher forwarding rate than the second forwarding queue; the packet security gateway sends the first set of packets in the first forwarding queue and the second set of packets in the second forwarding queue. Petitioner cites Ke as disclosing a priority queuing logic unit 335 used to buffer packets, determine if the packet is a session control packet, and queue packets so that certain packets, e.g., session control packets, are prioritized over others to ensure quality of service and high throughput. Pet. 67 (citing Ex. 1078, 4:50–57, Fig. 3).

Patent Owner does not respond explicitly to Petitioner's contentions concerning these claim limitations. We find that Petitioner has demonstrated a person of ordinary skill would have had reason to combine the teachings of Jungck, Shah and Ke and their combined teachings would have disclosed the limitations of claim 4, 11, and 16 to a person of ordinary skill.

*D. Claims 1–3, 5–10, 12–15, and 17 as Obvious over Jungck in View of Shah and Sarathy*

In this Ground 3, Petitioner cites Sarathy to the extent further disclosure of a security policy management server external from the network is required to meet the limitations of the claims. Pet. 68. Noting that Jungck Shah, and Sarathy are in the same field of endeavor, i.e., network security via packet inspection, Petitioner cites Sarathy as teaching a threat

management facility that stores as block lists access permissions of an enterprise network. Petitioner cites Jungck as disclosing rule sets are dynamically redefined or reset by external devices 724 (an external management device) or server 108 located external to the network. Petitioner notes that Sarathy teaches a threat management facility that stores access permissions as block lists, black lists, allowed lists, or white lists and contends that a person of ordinary skill would have understood that Sarathy teaches or at least renders obvious that the threat management facility (e.g., a policy server) communicates policy and rule updates to the enterprise facility via the Internet, such that the two facilities are in separate networks. *Id.* at 69–70.

Patent Owner argues that Sarathy does not cure the deficiencies of Jungck. PO Resp. 22–24. According to Patent Owner, Sarathy's "threat management facility" is not external to the alleged protected network because it is responsible to provide protection to the enterprise networks and clients that have traveled outside the enterprise network, even in embodiments where the threat management facility is integrated with a third party product. *Id.* at 22. Patent Owner also contends that implementing Sarathy's teachings within Jungck's system places threat management facility within the network protected by Jungck's various devices and that Petitioner has not articulated any reason to exempt the threat management system from the protection it would receive. *Id.* at 25.

Figure 1 of Sarathy, as annotated by Petitioner, and Figure 1 of the '906 patent are shown below side by side. Pet. 69; Ex. 1001, Fig. 1.

Sarathy Figure 1




’906 Patent Figure 1




Shaded in pink in the middle, Sarathy Figure 1 shows the Internet; shaded in purple on the upper left, Sarathy Figure 1 shows Threat Management Facility 100 having policy management facility 112 that updates policies of corporate computing assets, including access permissions of clients connecting to the Internet in enterprise network 102 (highlighted in yellow on the lower left of the Sarathy Figure 1). *Id.* (citing Ex. 1063 ¶¶ 34, 37–38, 45; Ex. 1004, Madisetti Decl. ¶¶ 476–479). Figure 1 of the ’906 patent shows Network E (the Internet) in the middle with a line connected to SPM 120 and lines connected to PSGs, e.g., the line connected to PSG 116 on the left between the Internet and a LAN on the lower left portion of the figure. As Petitioner points out, the configurations in Figure 1 of Sarathy and Figure 1 of the ’906 patent are substantively almost identical.

In our discussion of challenge ground 1, we found that Jungck teaches an SPMS external from the protected network. *See* Section VI.5.a herein. In this ground, we further find that, even if Petitioner failed to demonstrate Jungck disclosed this feature, based on the striking similarity between Figure 1 of Sarathy and Figure 1 of the ’906 patent and Dr. Goodrich’s acknowledgement that SMP 120 in Figure 1 of the ’906 is involved in providing protection to the networks, Sarathy discloses the claimed security

policy management server external to the network as recited in independent claims 1, 8, and 13.

As Patent Owner presents no additional arguments concerning the remaining dependent claims, we apply the same analysis as that discussed above in Section VI.B and make the same findings.

Having considered the evidence and arguments of record, we find that a person of ordinary skill would have had reason to combine the teachings of Jungck, Shah, and Sarathy and that their combined teachings would have disclosed the limitations of claims 1–3, 5–10, 12–15, and 17 to a person of ordinary skill.

### *E. Claims 4, 11, and 16 as Obvious over Jungck in View of Shah, Ke, and Sarathy*

In Ground 4, Petitioner cites Sarathy for the same teachings Petitioner relies on Sarathy as disclosing in Ground 3. Patent Owner does not respond explicitly to Petitioner's contentions concerning these claim limitations. Having considered the evidence and arguments of record, we find that Petitioner has demonstrated a person of ordinary skill would have had reason to combine the teachings of Jungck, Shah, Ke, and Sarathy and that their combined teachings would have disclosed the limitations of claim 4, 11, and 16 to one of ordinary skill.

## VII. CONCLUSION[13]

Having considered all the evidence and arguments of record, we conclude that Petitioner has demonstrated by a preponderance of the evidence that challenged claims 1–17 are unpatentable.

[13] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice*

In summary:

| Claims | 35 U.S.C. § | Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5–10, 12–15, 17 | 103 | Jungck, Shah | 1–3, 5–10, 12–15, 17 | |
| 4, 11, 16 | 103 | Jungck, Shah, Ke | 4, 11, 16 | |
| 1–3, 5–10, 12–15, 17 | 103 | Jungck, Shah, Sarathy | 1–3, 5–10, 12–15, 17 | |
| 4, 11, 16 | 103 | Jungck, Shah, Sarathy, Ke | 4, 11, 16 | |
| **Overall Outcome** | | | 1–17 | |

## VIII. ORDER

In consideration of the above it is:

ORDERED that claims 1–17 of the ’906 patent are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

*Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.* *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

For PETITIONER:

Scott McKeown
Mark D. Rowland
James R. Batchelder
Andrew Radsch
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
mark.rowland@ropesgray.com
james.batchelder@ropesgray.com
andrew.radsch@ropesgray.com

For PATENT OWNER:

James Hannah
Jeffrey Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jhannah@kramerlevin.com
jprice@kramerlevin.com

Bradley Wright
Scott Kelly
Blair Silver
BANNER & WITCOFF, LTD.
bwright@bannerwitcoff.com
skelly@bannerwitcoff.com
bsilver@bannerwitcoff.com

US010749906B2

(12) **United States Patent**
**Rogers et al.**

(10) **Patent No.: US 10,749,906 B2**
(45) **Date of Patent: *Aug. 18, 2020**

(54) **METHODS AND SYSTEMS FOR PROTECTING A SECURED NETWORK**

(71) Applicant: **Centripetal Networks, Inc.**, Portsmouth, NH (US)

(72) Inventors: **Steven Rogers**, Leesburg, VA (US); **Sean Moore**, Hollis, NH (US); **David K. Ahn**, Winston-Salem, NC (US); **Peter P. Geremia**, Portsmouth, NH (US)

(73) Assignee: **Centripetal Networks, Inc.**, Portsmouth, NH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/448,969**

(22) Filed: **Jun. 21, 2019**

(65) **Prior Publication Data**

US 2019/0312911 A1 Oct. 10, 2019

**Related U.S. Application Data**

(60) Continuation of application No. 16/158,868, filed on Oct. 12, 2018, which is a continuation of application (Continued)

(51) **Int. Cl.**
***H04L 29/06*** (2006.01)
***H04L 29/08*** (2006.01)

(52) **U.S. Cl.**
CPC .......... ***H04L 63/20*** (2013.01); ***H04L 63/0209*** (2013.01); ***H04L 63/0218*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ..... H04L 63/20; H04L 63/0263; H04L 67/02; H04L 63/0218; H04L 63/1425; H04L 63/0236; H04L 63/0209; H04L 63/168
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,098,172 A 8/2000 Coss et al.
6,147,976 A 11/2000 Shand et al.
(Continued)

FOREIGN PATENT DOCUMENTS

AU 2005328336 B2 9/2011
AU 2006230171 B2 6/2012
(Continued)

OTHER PUBLICATIONS

Mar. 16, 2018 (EP) Communication Pursuant to Rule 164(2)(b) and Aritcle 94(3) EPC—App. 15722292.8.
(Continued)

*Primary Examiner* — Cheng-Feng Huang
(74) *Attorney, Agent, or Firm* — Banner & Witcoff, Ltd.

(57) **ABSTRACT**

Methods and systems for protecting a secured network are presented. For example, one or more packet security gateways may be associated with a security policy management server. At each packet security gateway, a dynamic security policy may be received from the security policy management server, packets associated with a network protected by the packet security gateway may be received, and at least one of multiple packet transformation functions specified by the dynamic security policy may be performed on the packets.

**17 Claims, 13 Drawing Sheets**



**Related U.S. Application Data**

No. 15/414,117, filed on Jan. 24, 2017, now Pat. No. 10,142,372, which is a division of application No. 14/253,992, filed on Apr. 16, 2014, now Pat. No. 9,565,213.

(52) **U.S. Cl.**
CPC ...... ***H04L 63/0236*** (2013.01); ***H04L 63/0263*** (2013.01); ***H04L 63/1425*** (2013.01); ***H04L 67/02*** (2013.01); *H04L 63/168* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


6,226,372 B1 5/2001 Beebe et al.
6,279,113 B1 8/2001 Vaidya
6,317,837 B1 11/2001 Kenworthy
6,400,707 B1 6/2002 Baum et al.
6,484,261 B1 11/2002 Wiegel
6,611,875 B1 8/2003 Chopra et al.
6,662,235 B1 12/2003 Callis et al.
6,678,827 B1 * 1/2004 Rothermel .............. H04L 29/06 709/223
6,826,694 B1 11/2004 Dutta et al.
6,907,042 B1 * 6/2005 Oguchi ................... H04L 47/30 370/230
6,971,028 B1 11/2005 Lyle et al.
7,089,581 B1 8/2006 Nagai et al.
7,095,716 B1 8/2006 Ke et al.
7,107,613 B1 9/2006 Chen et al.
7,143,438 B1 11/2006 Coss et al.
7,152,240 B1 12/2006 Green et al.
7,185,368 B2 2/2007 Copeland, III
7,215,637 B1 5/2007 Ferguson et al.
7,225,269 B2 5/2007 Watanabe
7,227,842 B1 6/2007 Ji et al.
7,237,267 B2 6/2007 Rayes et al.
7,263,099 B1 8/2007 Woo et al.
7,296,288 B1 11/2007 Hill et al.
7,299,353 B2 11/2007 Le Pennec et al.
7,331,061 B1 2/2008 Ramsey et al.
7,478,429 B2 1/2009 Lyon
7,499,412 B2 3/2009 Matityahu et al.
7,539,186 B2 5/2009 Aerrabotu et al.
7,610,621 B2 10/2009 Turley et al.
7,684,400 B2 3/2010 Govindarajan et al.
7,710,885 B2 5/2010 Ilnicki et al.
7,721,084 B2 5/2010 Salminen et al.
7,792,775 B2 9/2010 Matsuda
7,814,158 B2 10/2010 Malik
7,814,546 B1 10/2010 Strayer et al.
7,818,794 B2 10/2010 Wittman
7,849,502 B1 12/2010 Bloch et al.
7,913,303 B1 3/2011 Rouland et al.
7,954,143 B2 5/2011 Aaron
8,004,994 B1 8/2011 Darisi et al.
8,009,566 B2 8/2011 Zuk et al.
8,037,517 B2 10/2011 Fulp et al.
8,042,167 B2 10/2011 Fulp et al.
8,117,655 B2 2/2012 Spielman
8,156,206 B2 4/2012 Kiley et al.
8,176,561 B1 5/2012 Hurst et al.
8,219,675 B2 7/2012 Ivershen
8,271,645 B2 9/2012 Rajan et al.
8,306,994 B2 11/2012 Kenworthy
8,307,029 B2 11/2012 Davis et al.
8,331,234 B1 12/2012 Newton et al.
8,422,391 B2 4/2013 Zhu
8,495,725 B2 7/2013 Ahn
8,510,821 B1 8/2013 Brandwine et al.
8,726,379 B1 5/2014 Stiansen et al.
8,789,135 B1 * 7/2014 Pani .................... H04L 63/0209 370/229
8,806,638 B1 8/2014 Mani
8,832,832 B1 9/2014 Visbal
8,839,417 B1 9/2014 Jordan
8,856,926 B2 10/2014 Narayanaswamy et al.
8,935,785 B2 1/2015 Pandrangi
9,094,445 B2 7/2015 Moore et al.
9,124,552 B2 9/2015 Moore
9,137,205 B2 9/2015 Rogers et al.
9,154,446 B2 10/2015 Gemelli et al.
9,160,713 B2 10/2015 Moore
9,172,627 B2 10/2015 Kjendal et al.
9,419,942 B1 8/2016 Buruganahalli et al.
9,531,672 B1 12/2016 Li et al.
9,634,911 B2 4/2017 Meloche
9,686,193 B2 6/2017 Moore
2001/0039579 A1 11/2001 Trcka et al.
2001/0039624 A1 11/2001 Kellum
2002/0016858 A1 2/2002 Sawada et al.
2002/0038339 A1 3/2002 Xu
2002/0049899 A1 4/2002 Kenworthy
2002/0083345 A1 6/2002 Halliday et al.
2002/0112188 A1 8/2002 Syvanne
2002/0152209 A1 10/2002 Merugu et al.
2002/0164962 A1 11/2002 Mankins et al.
2002/0165949 A1 11/2002 Na et al.
2002/0186683 A1 12/2002 Buck et al.
2002/0198981 A1 12/2002 Corl et al.
2003/0005122 A1 1/2003 Freimuth et al.
2003/0014665 A1 1/2003 Anderson et al.
2003/0018591 A1 1/2003 Komisky
2003/0035370 A1 2/2003 Brustoloni
2003/0051026 A1 3/2003 Carter et al.
2003/0088787 A1 5/2003 Egevang
2003/0097590 A1 5/2003 Syvanne
2003/0105976 A1 6/2003 Copeland
2003/0118038 A1 6/2003 Jalava et al.
2003/0120622 A1 6/2003 Nurmela et al.
2003/0123456 A1 7/2003 Denz et al.
2003/0142681 A1 7/2003 Chen et al.
2003/0145225 A1 7/2003 Bruton et al.
2003/0154297 A1 8/2003 Suzuki et al.
2003/0154399 A1 8/2003 Zuk et al.
2003/0188192 A1 10/2003 Tang et al.
2003/0212900 A1 11/2003 Liu et al.
2003/0220940 A1 11/2003 Futoransky et al.
2004/0010712 A1 1/2004 Hui et al.
2004/0015719 A1 1/2004 Lee et al.
2004/0073655 A1 4/2004 Kan et al.
2004/0088542 A1 5/2004 Daude et al.
2004/0093513 A1 5/2004 Cantrell et al.
2004/0098511 A1 5/2004 Lin et al.
2004/0114518 A1 6/2004 MacFaden et al.
2004/0123220 A1 6/2004 Johnson et al.
2004/0131056 A1 7/2004 Dark
2004/0148520 A1 7/2004 Talpade et al.
2004/0151155 A1 8/2004 Jouppi
2004/0172529 A1 9/2004 Culbert
2004/0172557 A1 9/2004 Nakae et al.
2004/0177139 A1 9/2004 Schuba et al.
2004/0181690 A1 * 9/2004 Rothermel .............. H04L 29/06 726/1
2004/0193943 A1 9/2004 Angelino et al.
2004/0199629 A1 10/2004 Bomer et al.
2004/0205360 A1 10/2004 Norton et al.
2004/0250124 A1 12/2004 Chesla et al.
2005/0010765 A1 1/2005 Swander et al.
2005/0024189 A1 2/2005 Weber
2005/0071650 A1 3/2005 Jo et al.
2005/0076227 A1 4/2005 Kang et al.
2005/0108557 A1 5/2005 Kayo et al.
2005/0114704 A1 5/2005 Swander
2005/0117576 A1 6/2005 McDysan et al.
2005/0125697 A1 6/2005 Tahara
2005/0138204 A1 6/2005 Iyer et al.
2005/0138353 A1 6/2005 Spies et al.
2005/0141537 A1 6/2005 Kumar et al.
2005/0183140 A1 8/2005 Goddard
2005/0229246 A1 10/2005 Rajagopal et al.
2005/0249214 A1 11/2005 Peng
2005/0251570 A1 11/2005 Heasman et al.
2005/0283823 A1 12/2005 Okajo et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS


2005/0286522 A1 12/2005 Paddon et al.
2006/0031928 A1 2/2006 Conley et al.
2006/0048142 A1 3/2006 Roese et al.
2006/0053491 A1 3/2006 Khuti et al.
2006/0070122 A1 3/2006 Bellovin
2006/0080733 A1 4/2006 Khosmood et al.
2006/0085849 A1 4/2006 Culbert
2006/0104202 A1 5/2006 Reiner
2006/0114899 A1 6/2006 Toumura et al.
2006/0123481 A1* 6/2006 Bhatnagar ............. H04L 63/168 726/24
2006/0133377 A1 6/2006 Jain
2006/0136987 A1 6/2006 Okuda
2006/0137009 A1 6/2006 Chesla
2006/0146879 A1 7/2006 Anthias et al.
2006/0159028 A1 7/2006 Curran-Gray et al.
2006/0195896 A1 8/2006 Fulp et al.
2006/0212572 A1 9/2006 Afek et al.
2006/0248580 A1 11/2006 Fulp et al.
2006/0262798 A1 11/2006 Joshi et al.
2007/0056038 A1 3/2007 Lok
2007/0083924 A1* 4/2007 Lu ....................... H04L 63/0227 726/13
2007/0118894 A1 5/2007 Bhatia
2007/0147380 A1* 6/2007 Ormazabal ......... H04L 65/1006 370/392
2007/0211644 A1 9/2007 Ottamalika et al.
2007/0240208 A1 10/2007 Yu et al.
2007/0291789 A1 12/2007 Kutt et al.
2008/0005795 A1 1/2008 Acharya et al.
2008/0028467 A1 1/2008 Kommareddy et al.
2008/0043739 A1 2/2008 Suh et al.
2008/0072307 A1 3/2008 Maes
2008/0077705 A1 3/2008 Li et al.
2008/0080493 A1 4/2008 Weintraub et al.
2008/0086435 A1 4/2008 Chesla
2008/0101234 A1 5/2008 Nakil et al.
2008/0163333 A1 7/2008 Kasralikar
2008/0201772 A1 8/2008 Mondaeev et al.
2008/0229415 A1 9/2008 Kapoor et al.
2008/0235755 A1 9/2008 Blaisdell et al.
2008/0279196 A1 11/2008 Friskney et al.
2008/0301765 A1 12/2008 Nicol et al.
2008/0313738 A1 12/2008 Enderby
2008/0320116 A1 12/2008 Briggs
2009/0028160 A1 1/2009 Eswaran et al.
2009/0138938 A1 5/2009 Harrison et al.
2009/0150972 A1 6/2009 Moon et al.
2009/0150996 A1 6/2009 Haswell
2009/0172800 A1 7/2009 Wool
2009/0222877 A1 9/2009 Diehl et al.
2009/0240698 A1 9/2009 Shukla et al.
2009/0262723 A1 10/2009 Pelletier et al.
2009/0262741 A1 10/2009 Jungck et al.
2009/0300759 A1* 12/2009 Wang .................... H04L 63/101 726/22
2009/0328219 A1 12/2009 Narayanaswamy
2010/0011433 A1 1/2010 Harrison et al.
2010/0011434 A1 1/2010 Kay
2010/0082811 A1 4/2010 Van Der Merwe et al.
2010/0095367 A1 4/2010 Narayanaswamy
2010/0107240 A1 4/2010 Thaler et al.
2010/0115621 A1 5/2010 Staniford et al.
2010/0132027 A1 5/2010 Ou
2010/0195503 A1 8/2010 Raleigh
2010/0199346 A1 8/2010 Ling et al.
2010/0202299 A1 8/2010 Strayer et al.
2010/0211678 A1 8/2010 McDysan et al.
2010/0232445 A1 9/2010 Bellovin
2010/0242098 A1 9/2010 Kenworthy
2010/0268799 A1 10/2010 Maestas
2010/0296441 A1 11/2010 Barkan
2010/0303240 A1 12/2010 Beachem et al.
2011/0055916 A1* 3/2011 Ahn .................... H04L 63/0263 726/13
2011/0055923 A1 3/2011 Thomas
2011/0088092 A1 4/2011 Nguyen et al.
2011/0141900 A1 6/2011 Jayawardena et al.
2011/0154470 A1* 6/2011 Grimes ................... H04L 41/12 726/11
2011/0185055 A1 7/2011 Nappier et al.
2011/0214157 A1* 9/2011 Korsunsky .............. G06F 21/55 726/1
2011/0270956 A1 11/2011 McDysan et al.
2011/0277034 A1 11/2011 Hanson
2012/0023576 A1 1/2012 Sorensen et al.
2012/0084866 A1 4/2012 Stolfo
2012/0106354 A1 5/2012 Pleshek et al.
2012/0113987 A1 5/2012 Riddoch et al.
2012/0240135 A1 9/2012 Risbood et al.
2012/0240185 A1* 9/2012 Kapoor ............... H04L 63/1425 726/1
2012/0264443 A1 10/2012 Ng et al.
2012/0311693 A1 12/2012 Horman et al.
2012/0314617 A1 12/2012 Erichsen et al.
2012/0331543 A1 12/2012 Bostrom et al.
2013/0047020 A1 2/2013 Hershko et al.
2013/0059527 A1 3/2013 Hasesaka et al.
2013/0061294 A1 3/2013 Kenworthy
2013/0081102 A1 3/2013 Beauvais et al.
2013/0104236 A1 4/2013 Ray et al.
2013/0117852 A1 5/2013 Stute
2013/0139236 A1 5/2013 Rubinstein et al.
2013/0254766 A1 9/2013 Zuo et al.
2013/0291100 A1 10/2013 Ganapathy et al.
2013/0305311 A1 11/2013 Puttaswamy Naga et al.
2014/0075510 A1 3/2014 Sonoda et al.
2014/0082204 A1 3/2014 Shankar et al.
2014/0082730 A1 3/2014 Vashist et al.
2014/0115654 A1 4/2014 Rogers et al.
2014/0150051 A1 5/2014 Bharali et al.
2014/0201123 A1 7/2014 Ahn et al.
2014/0215561 A1 7/2014 Roberson et al.
2014/0215574 A1 7/2014 Erb et al.
2014/0245423 A1* 8/2014 Lee ..................... H04L 63/0218 726/12
2014/0259170 A1 9/2014 Amsler
2014/0281030 A1 9/2014 Cui et al.
2014/0283004 A1 9/2014 Moore
2014/0283030 A1 9/2014 Moore et al.
2014/0317397 A1 10/2014 Martini
2014/0317737 A1* 10/2014 Shin .................... H04L 63/1408 726/23
2014/0337613 A1 11/2014 Martini
2014/0365372 A1 12/2014 Ross et al.
2014/0366132 A1 12/2014 Stiansen et al.
2015/0033336 A1 1/2015 Wang et al.
2015/0052601 A1 2/2015 White et al.
2015/0106930 A1 4/2015 Honda et al.
2015/0128274 A1 5/2015 Giokas
2015/0135325 A1 5/2015 Stevens et al.
2015/0207809 A1 7/2015 MacAulay
2015/0237012 A1 8/2015 Moore
2015/0244734 A1 8/2015 Olson et al.
2015/0256431 A1 9/2015 Buchanan et al.
2015/0304354 A1 10/2015 Rogers et al.
2015/0334125 A1 11/2015 Bartos et al.
2015/0341389 A1 11/2015 Kurakami
2015/0350229 A1 12/2015 Mitchell
2015/0372977 A1 12/2015 Yin
2015/0373043 A1 12/2015 Wang et al.
2016/0020968 A1 1/2016 Aumann et al.
2016/0028751 A1 1/2016 Cruz Mota et al.
2016/0065611 A1 3/2016 Fakeri-Tabrizi et al.
2016/0112443 A1 4/2016 Grossman et al.
2016/0119365 A1 4/2016 Barel
2016/0127417 A1 5/2016 Janssen
2016/0191558 A1 6/2016 Davison
2016/0205069 A1 7/2016 Blocher et al.
2016/0219065 A1 7/2016 Dasgupta et al.
2016/0285706 A1 9/2016 Rao

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2016/0294870 | A1 | 10/2016 | Banerjee et al. |
| 2016/0366099 | A1 | 12/2016 | Jordan |
| 2017/0223046 | A1 | 8/2017 | Singh |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2600236 | A1 | 10/2006 |
| EP | 1006701 | A2 | 6/2000 |
| EP | 1313290 | A1 | 5/2003 |
| EP | 1484884 | A2 | 12/2004 |
| EP | 1677484 | A2 | 7/2006 |
| EP | 2385676 | A1 | 11/2011 |
| EP | 2498442 | A1 | 9/2012 |
| EP | 1864226 | B1 | 5/2013 |
| KR | 20010079361 | A | 8/2001 |
| WO | 2005046145 | A1 | 5/2005 |
| WO | 2006093557 | A2 | 9/2006 |
| WO | 2006105093 | A2 | 10/2006 |
| WO | 2007109541 | A2 | 9/2007 |
| WO | 2011038420 | A2 | 3/2011 |
| WO | 2012146265 | A1 | 11/2012 |

OTHER PUBLICATIONS

Mar. 21, 2018 (AU) First Examination Report—App. 2015382393.
Mar. 8, 2018 (US) Non-Final Office Action—U.S. Appl. No. 14/745,207.
May 25, 2018 (US) Notice of Allowance—U.S. Appl. No. 15/413,834.
Nov. 14, 2018 (US) Final Office Action—U.S. Appl. No. 14/745,207.
Oct. 12, 2018 (US) Non-Final Office Action—U.S. Appl. No. 16/039,896.
Oct. 4, 2018 (US) Non-Final Office Action—U.S. Appl. No. 16/030,374.
Oct. 4, 2018 (US) Notice of Allowance—U.S. Appl. No. 15/827,477.
Sep. 27, 2018 (WO) International Search Report and Written Opinion—App. PCT/US2018/043367.
Sep. 4, 2018 (WO) International Search Report and Written Opinion—App. PCT/US2018/041355.
Sep. 27, 2018 (US) Non-Final Office Action—U.S. Appl. No. 15/614,956.
Apr. 8, 2019 (US) Final Office Aciton—U.S. Appl. No. 15/413,947.
Feb. 21, 2019 (US) Final Office Action—U.S. Appl. No. 15/382,806.
Feb. 6, 2019 (US) Final Office Action—U.S. Appl. No. 15/413,750.
Feb. 6, 2019 (US) Notice of Allowance and Fees Due—U.S. Appl. No. 16/039,896.
Jan. 24, 2019 (US) Notice of Allowance—U.S. Appl. No. 15/610,995.
Mar. 11, 2019 (US) Final Office Action—U.S. Appl. No. 16/030,354.
Mar. 18, 2019 (AU) First Examination Report—App. 2016379156.
Mar. 8, 2019 (US) Notice of Allowance and Fees Due—U.S. Appl. No. 16/030,374.
Mar. 8, 2019 (US) Notice of Allowance and Fees Due—U.S. Appl. No. 16/060,374.
A. Feldmann et al., "Tradeoffs for Packet Classification", Proceedings of the IEEE INFOCOM, 397-413, 2000.
A. Hari et al., "Detecting and Resolving Packet Filter Conflicts", Proceedings of IEEE INFOCOM, 1203-1212, 2000.
Acharya et al, "OPTWALL: A Hierarchical Traffic-Aware Firewall," Department of Computer Science, Telecommunications Program, University of Pittsburgh, pp. 1-11 (2007).
Anonymous: "The Distribution of Malicious Domains," The DomainTools Report, 2016 Edition, Mar. 9, 2016 (Mar. 9, 2016), pp. 1-11, XP055502306, Retrieved from: https://www.domaintools.com/resources/white-papers/the-domaintools-report-the-distribution-of-malicious-domains.
Bellion, "High Performance Packet Classification", http://www.hipac.org (Publication Date Unknown).
Blake, et al, "An Architechture for Differentiated Services," Network Working Group RFC 2475, Dec. 1998, 36 pages.
Blake, et al., "An Architecture for Differentiated Services," also known as the Diffserv architecture, as defined in RFC 2475, Network Working Group, Dec. 1998, 36 pages.
C. Benecke, "A Parallel Packet Screen for High Speed Networks", Proceedings of the 15th Annual Computer Security Applications Conference, 1999.
Chen et al, "Research on the Anomaly Discovering Alogrithm of the Packet Filtering Rule Sets," Sep. 2010, First Interntional Conferernce on Pervasive Computing, Signal Processing and Applications, pp. 362-366.
D. Comer, "Analysis of a Heuristic for Full Trie Minimization", ACM Transactions on Database Systems, 6(3): 513-537, Sep. 1981.
D. Decasper et al., "Router Plugins: A Software Architecture for Next-Generation Routers", IEEE/ACM Transactions on Networking, 8(1): Feb. 2000.
D. Eppstein et al., "Internet Packet Filter Management and Rectangle Geometry", Proceedings of the Symposium on Discrete Algorithms, 827-835, 2001.
E. Al-Shaer et al., "Firewall Policy Advisor for Anomaly Discovery and Rule Editing", Proceedings of the IFIP/IEEE International Symposium on Integrated Network Management, 2003.
E. Al-Shaer et al., "Modeling and Management of Firewall Policies", IEEE Transactions on Network and Service Management, 1(1): 2004.
E. Fulp et al., "Network Firewall Policy Tries", Technical Report, Computer Science Department, Wake Forest University, 2004.
E. Fulp, "Optimization of Network Firewall Policies Using Ordered Sets and Directed Acyclical Graphs", Technical Report, Computer Solent Department, Wake Forest University, Jan. 2004.
E. Fulp, "Preventing Denial of Service Attacks on Quality of Service", Proceedings of the 2001 DARPA Information Survivability Conference and Exposition II, 2001.
E.L. Lawler, "Sequencing Jobs to Minimize Total Weighted Completion Time Subject to Precedence Constraints", Annals of Discrete Mathematics, 2: 75-90, 1978.
E.W. Fulp, "Firewall Architectures for High Speed Networks", U.S. Department of Energy Grant Application, Funded Sep. 2003.
Frahim, et al., "Cisco ASA: All-in-One Firewall, IPS, and VPN Adaptive Security Appliance," Indiana: Cisco Press: 2006, 54 pages.
Fulp, "Trie-Based Policy Representations for Network Firewalls," Proceedings of the IEEE International Symposium on Computer Communications (2005).
Fulp, Errin: "CV: Errin Fulp," XP002618346, www.cs.wfu.edu/fulp/ewfPub.html, pp. 1-5 (Copyright 2010).
G. Brightwell et al., "Counting Linear Extensions is #P-Complete", Proceedings of the Twenty-Third Annual ACM Symposium on Theory of Computing, 1991.
G.V. Rooij, "Real Stateful TCP Packet Filtering in IP Filter", Proceedings of the 10th USENIX Security Symposium, 2001.
Greenwald, Michael; "Designing an Academic Firewall: Policy, Practice, and Experience with SURF"; IEEE, Proceedings of SNDSS, 1996.
J. Xu et al., "Design and Evaluation of a High-Performance ATM Firewall Switch and Its Applications", IEEE Journal on Selected Areas in Communications, 17(6): 1190-1200, Jun. 1999.
J.K. Lenstra et al., "Complexity of Scheduling Under Precedence Constraints", Operations Research, 26(1): 22-35,1978.
Kindervag, et al. "Build Security Into Your Network's DNA: The Zero Trust Network Architecture," Forrester Research Inc.; Nov. 5, 2010, pp. 1-26.
L. Qui et al., "Fast Firewall Implementations for Software and Hardware-Based Routers", Proceedings of ACM Sigmetrics, Jun. 2001.
Lee et al., "Development Framework for Firewall Processors," IEEE, pp. 352-355 (2002).
Aug. 3, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of Third Petition for Inter Partes Review of U.S. Pat. No. 9,560,077—IPR2018-01513.
Apr. 2, 2019 (US) Decision—Institution of Inter Partes Review of U.S. Pat. No. 9,560,077—IPR 2018-01513.
Aug. 10, 2018 (US) Petition for Inter Partes Review of Claims 1-20 of U.S. Pat. No. 9,560,077—IPR2018-01515.
Jun. 3, 2019 (US) Final Office Action—U.S. Appl. No. 15/614,956.
May 23, 2019 (US) Non-Final Office Action—U.S. Appl. No. 14/745,207.

(56) **References Cited**

OTHER PUBLICATIONS

May 24, 2019 (US) Non-Final Office Action—U.S. Appl. No. 16/111,524.
Jun. 3, 2019 (EP) Communication pursuant to Article 94(3) EPC—Third Examination Report—App. 13765547.8.
Jul. 26, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of Second Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01444.
Nichols, et al, "Definition of the Differentiated Services Field (DS Field) in the IPv4 and IPv6 Headers," Network Working Group RFC 2474, Dec. 1998, 20 pages.
Jul. 26, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of First Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01443
Perkins, "IP Encapsulation with IP," Network Working Group RFC 2003, Oct. 1996, 14 pages.
Jul. 12, 2018 (US) Petition for Inter Partes Review of U.S. Pat. No. 9,565,213—IPR2018-01386.
Jul. 20, 2018 (US) Petition for Inter Partes Review of U.S. Pat. No. 9,160,713—IPR2018-01437.
Jul. 20, 2018 (US) Petition for Inter Partes Review of U.S. Pat. No. 9,124,552—IPR2018-01436.
Jul. 27, 2018 (US) Second Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01444.
Jul. 27, 2018 (US) First Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01443.
Aug. 9, 2018 (US) Non-Final Office Action—U.S. Appl. No. 15/413,947.
Aug. 20, 2018 (US) Petition for Inter Partes Review of U.S. Pat. No. 9,565,213—IPR2018-01512.
Aug. 15, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,565,213—IPR2018-01512.
"Cisco ACNS Softward Configuration Guide for Centrally Managed Deployments," Release 55. Text Part No. OL-9136-01, Ciswco Systems, Inc., 2006, 944 pages.
Blake, et al., "An Architecture for Differentiated Services," also known as the Diffsery architecture, as defined in RFC 2475, Network Working Group, Dec. 1998, 36 pages.
"Examining SSL-encrypted Communications: Netronome SSL InspectorTM Solution Overview," Jan. 1, 2008, XP055036015, retrieved from <http://www.infosecurityproductsguide.com/technology/2008/Netronome_Examining_SSL-encrypted_Communications.pdf>, 8 pages.
Aug. 29, 2018 (CA) Office Action—App. 2,888,935.
Dec. 18, 2018 (US) Final Office Action—U.S. Appl. No. 15/610,995.
Sep. 17, 2018 (US) Petition for Inter Partes Review of U.S. Pat. No. 9,560,176 (First)—IPR 2018-01654.
Sep. 17, 2018 (US) Declaration of Narasimha Reddy Ph.D., in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,560,176 (First)—IRP2018-01654.
Sep. 17, 2018 (US) Petition for Inter Partes review of U.S. Pat. No. 9,560,176 (Second)—IPR2018-01655.
Sep. 17, 2018 (US) Declaration of Narasimha Reddy Ph.D., in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,560,176 (Second)—IRP2018-01655.
Reddy, A.L.(2012) A.L. Narasimha Reddy Curriculum Vitae. Retrieved from https://cesg.tamu.edu/wp-content/uploads/2012/02/res_ext032.pdf, 16 pages.
Mar. 8, 2019 (US) Decision, Institution of Inter Partes Review of U.S. Pat. No. 9,674,148 B2—Case IPR2018-01454.
Aug. 21, 2018 (US) Petition for Inter Partes Review of U.S. Pat. No. 9,686,193—IPR2018-01559.
Aug. 15, 2018 (US) Declaration of Staurt Staniford, PhD in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,686,193—IPR2018-01556.
Jan. 24, 2019 (US) Decision—Institution of Inter Partes Review of U.S. Pat. No. 9,160,713 B2—IPR 2018-01437.
Jan. 24, 2019 (US) Decision—Institution of Inter Partes Review of U.S. Pat. No. 9,124,552 B2—IPR 2018-01436.
Aug. 10, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of Fourth Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01506.
Aug. 10, 2018 (US) Fourth Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01506.
Aug. 3, 2018 (US) Third Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01505.
Aug. 3, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of Third Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01505.
Apr. 15, 2016—(US) Notice of Allowance—U.S. Appl. No. 14/855,374.
Apr. 26, 2016—(US) Office Action—U.S. Appl. No. 14/745,207.
Dec. 5, 2016—(US) Notice of Allowance—U.S. Appl. No. 14/714,207.
Feb. 24, 2016—(AU) Office Action—App 2014228257.
Feb. 25, 2016—(AU) Office Action—App 2014249055.
Feb. 26, 2016—(US) Non Final Office Action—U.S. Appl. No. 14/253,992.
Jan. 11, 2016—(US) Non Final Rejection—U.S. Appl. No. 14/698,560.
Jan. 28, 2016—(WO) International Search Report and Written Opinion—App PCT/US2015/062691.
Jul. 11, 2016—(EP) Office Action—App 14720824.3.
Jul. 20, 2016—(AU) Office Action—App 2013335255.
Jul. 22, 2016—(US) Office Action—U.S. Appl. No. 14/921,718.
Jun. 9, 2016—(WO) International Search Report—PCT/US2016/026339.
Jun. 14, 2016—(US) Office Action—U.S. Appl. No. 14/625,486.
Jun. 16, 2016—(CA) Office Action—App 2,888,935.
May 6, 2016—(US) Office Action—U.S. Appl. No. 14/714,207.
May 13, 2016—(US) Office Action—U.S. Appl. No. 13/940,240.
Nov. 21, 2016—(US) Office Action—U.S. Appl. No. 14/745,207.
Oct. 5, 2016—(US) Notice of Allowance—U.S. Appl. No. 14/698,560.
Oct. 26, 2016—(US) Office Action—U.S. Appl. No. 13/940,240.
Sep. 13, 2016—(CA) Office Action—App 2,902,206.
Sep. 14, 2016—(CA) Office Action—App 2,897,737.
Sep. 26, 2016—(CA) Office Action—App 2,902,158.
Apr. 12, 2017—(US) Office Action—U.S. Appl. No. 14/757,638.
Aug. 15, 2017 (WO) International Preliminary Report on Patentability—App. PCT/US2015/062691.
Aug. 21, 2017 (AU) First Examination Report—App 2015248067.
Feb. 10, 2017—(US) Notice of Allowance—U.S. Appl. No. 14/625,486.
Feb. 15, 2017—(US) Notice of Allowance—U.S. Appl. No. 14/921,718.
Jul. 20, 2017 (US) Complaint for Patent Infringement—Case No. 2:17-cv-00383-HCN-LRL, Document 1, 38 pages.
Jun. 7, 2017—(US) Office Action—U.S. Appl. No. 14/745,207.
Jun. 7, 2017—(WO) International Search Report and Written Opinion—App PCT/US2016/067111.
Mar. 6, 2017—(WO) International Search Report and Written Opinion—App PCT/US2016/068008.
Nov. 21, 2017 (US) Notice of Allowance—U.S. Appl. No. 14/690,302.
Nov. 3, 2017 (US) Non-Final Office Action—U.S. Appl. No. 15/413,834.
Oct. 17, 2017 (WO) International Preliminary Report on Patentability—App. PCT/US2016/026339.
Sep. 5, 2017 (US) Defendant Ixia's Partial Answer to Complaint for Patent Infringement—Case No. 2:17-cv-00383-HCN-LRL, Document 29, 14 pages.
Sep. 5, 2017 (US) Memorandum in Support of Defendant's Ixia and Keysight Techonologies, Inc's Motion to Dismiss for Unpatentability Under 35 U.S.C. § 101—Case No. 2:17-cv-00383-HCM-LRL, Document 21, 29 pages.
Sep. 5, 2017 (US) Request for Judicial Notice in Support of Defendants Ixia and Keysight Technologies, Inc's Motion to Dismiss for Unpatentability under 35 U.S.C. § 101—Case No. 2:17-cv-00383-HCN-LRL, Document 22, 3 pages.
Sep. 29, 2017 (CA) Examination Report—App. 2,772,630.
Apr. 17, 2018 (US) Non-Final Office Action—U.S. Appl. No. 15/610,995.
Jul. 11, 2018 (US) Declaration of Kevin Jeftay, PhD in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,565,213—IPR2018-01386.
Jul. 13, 2018 (US) Notice of Allowance—U.S. Appl. No. 15/414,117.
Jul. 27, 2018 (US) Non-Final Office Action—U.S. Appl. No. 15/382,806.

(56) **References Cited**

OTHER PUBLICATIONS

Jul. 5, 2018 (US) Non-Final Office Action—U.S. Appl. No. 15/413,750.
Mar. 15, 2018 (EP) Second Communication pursuant to Article 94(3) EPC—App. 13765547.8.
M. Al-Suwaiyel et al., "Algorithms for Tile Compaction", ACM Transactions on Database Systems, 9(2): 243-263, Jun. 1984.
M. Christiansen et al., "Using IDDs for Packet Filtering", Technical Report, BRICS, Oct. 2002.
M. Degermark et al., "Small Forwarding Tables for Fast Routing Lookups", Proceedings of ACM SIGCOMM, 4-13, 1997.
Mizuno et al., A New Remote Configurable Firewall System for Home-use Gateways, Jan. 2005. Second IEEE Consumer Communications and Networking Conference, pp. 599-601.
Moore, S, "SBIR Case Study: Centripetal Networks: How CNI Leveraged DHS S&T SBIR Funding to Launch a Successful Cyber Security Company," 2012 Principal Investigators' Meeting, Cyber Security Division, Oct. 10, 2014.
O. Paul et al., "A full Bandwidth ATM Firewall", Proceedings of the 6th European Symposium on Research in Computer Security ESORICS'2000, 2000.
P. Warkhede et al., "Fast Packet Classification for Two-Dimensional Conflict-Free Filters", Proceedings of IEEE INFOCOM, 1434-1443, 2001.
Palo Alto Networks; "Designing a Zero Trust Network With Next-Generation Firewalls"; pp. 1-10; last viewed on Oct. 21, 2012.
R. Funke et al., "Performance Evaluation of Firewalls in Gigabit-Networks", Proceedings of the Symposium on Performance Evaluation of Computer and Telecommunication Systems, 1999.
R. Rivest, "On Self-Organizing Sequential Search Heuristics", Communications of the ACM, 19(2): 1976.
R.L. Graham et al., "Optimization and Approximation in Deterministic Sequencing and Scheduling: A Survey", Annals of Discrete Mathematics, 5: 287-326, 1979.
Reumann, John; "Adaptive Packet Filters"; IEEE, 2001, Department of Electrical Engineering and Computer Science, The University of Michigan, Ann Arbor, MI.
S,M. Bellovin et al., "Network Firewalls", IEEE Communications Magazine, 50-57, 1994.
S. Goddard et al., "An Unavailability Analysis of Firewall Sandwich Configurations", Proceedings of the 6th IEEE Symposium on High Assurance Systems Engineering, 2001.
S. Suri et al., "Packet Filtering in High Speed Networks", Proceedings of the Symposium on Discrete Algorithms, 969-970, 1999.
Singh, Rajeev et al. "Detecting and Reducing the Denial of Service attacks in WLANs", Dec. 2011, World Congress on Information and Communication TEchnologies, pp. 968-973.
Sourcefire 3D System User Guide, Version 4.10, Mar. 16, 2011, 2123 pages.
Statement RE: Related Application, dated Jul. 24, 2015.
Tarsa et al., "Balancing Trie-Based Policy representations for Network Firewalls," Department of Computer Science, Wake Forest University, pp. 1-6 (2006).
U. Ellermann et al., "Firewalls for ATM Networks", Proceedings of INFOSEC'COM, 1998.
V. Srinivasan et al., "Fast and Scalable Layer Four Switching", Proceedings of ACM SIGCOMM, 191-202, 1998.
V.P. Ranganath, "A Set-Based Approach to Packet Classification", Proceedings of the IASTED International Conference on Parallel and Distributed Computing and Systems, 889-894, 2003.
W.E. Leland et al., "On the Self-Similar Nature of Ethernet Traffic", IEEE Transactions on Networking, 2(1); 15, 1994.
W.E. Smith, "Various Optimizers for Single-Stage Productions", Naval Research Logistics Quarterly, 3: 59-66, 1956.
X. Gan et al., "LSMAC vs. LSNAT: Scalable Cluster-based Web servers", Journal of Networks, Software Tools, and Applications, 3(3): 175-185, 2000.
Ylonen, et al, "The Secure Shell (SSH) Transport Layer Protocol," SSH Communication Security Corp, Newtork Norking Group RFC 4253, Jan. 2006, 32 pages.
Bellion, "High Pertormance Packet Classification", http://www.hipac.org (Publication Date Unknown).
Chen, et al, "Research on the Anomaly Discovering Alogrithm of the Packet Filtering Rule Sets," Sep. 2010, First Intemtional Conferernce on Pervasive Computing, Signal Processing and Applications, pp. 362-366.
D. Comer, "Analysis of a Heuristic for Full Tile Minimization", ACM Transactions on Database Systems, 6(3): 513-537, Sep. 1981.
E. Al-Shaer et al., "Firewall Policy Advisor for Anomaly Discovery and Rule Editing", Proceedings of the IFIP/IEEE ntemational Symposium on Integrated Network Management, 2003.
E. Fulp, "Optimization of Network Firewall Policies Using Ordered Sets and Directed Acyclical Graphs", Technical Report, Computer Scient Department, Wake Forest University, Jan. 2004.
J. Ellermann et al., "Firewalls for ATM Networks", Proceedings of INFOSEC'COM, 1998.
Jul. 11, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,565,213—IPR2018-01386.
Ylonen, et al, "The Secure Shell (SSH) Transport Layer Protocol," SSH Communication Security Corp, Newtork Working Group RFC 4253, Jan. 2006, 32 pages.
Jul. 20, 2018 (US) Declaration of Dr. Stuart Staniford in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,160,713—IPR2018-01437.
Jul. 20, 2018 (US) Declaration of Dr. Stuart Staniford in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,124,552—IPR2018-01436.
"Control Plane Policing Implementation Best Practices"; Cisco Systems; Mar. 13, 2013; <https://web.archive.org/web/20130313135143/http:www.cisco.com/web/about/security/intelligence/coppwp_gs.html>.
Sep. 11,2006—(WO) Written Opinion of the International Searching Authority—App PCT/US05/47008.
Aug. 31, 2007—(EP) Communication Pursuant to Rules 109 and 110—App 05857614.1.
Jul. 3, 2008—(WO) Written Opinion of the International Searching Authority—App PCT/US06/11291.
Jun. 24, 2009—(US) Office Action—U.S. Appl. No. 11/390,976.
Sep. 14, 2009 (US) Office Action—U.S. Appl. No. 11/316,331.
Apr. 29, 2010—(US) Interview Summary—U.S. Appl. No. 11/390,976.
Aug. 20, 2010—(AU) Office Action—App 2005328336.
Jun. 23, 2010—(US) Final Rejection—U.S. Appl. No. 11/316,331.
Mar. 26, 2010—(US) Final Rejection—U.S. Appl. No. 11/390,976.
Sep. 10, 2010—(AU) Office Action—App 2006230171.
Sep. 30, 2010—(US) Office Action—U.S. Appl. No. 11/390,976.
Apr. 27, 2011 (WO) International Search Report and Written Opinion—App PCT/US2010/054520.
Aug. 25, 2011—(US) Non Final Rejection—U.S. Appl. No. 12/871,806.
Feb. 14, 2011—(EP) Search Report—App 06758213.0.
Jun. 9, 2011—(US) Notice of Allowance—U.S. Appl. No. 11/390,976.
Mar. 3, 2011—(EP) Communication Pursuant to Rules 70(2) and 70a(2)—App 06758213.0.
Mar. 4, 2011—(US) Notice of Allowance—U.S. Appl. No. 11/316,331.
Nov. 11, 2011—(AU) Second Office Action—App 2006230171.
Oct. 18, 2011—(EP) Communication Pursuant to Article 94(3)—App 06 758 213.0.
Aug. 7, 2012—(US) Non Final Rejection—U.S. Appl. No. 12/871,806.
Feb. 6, 2012—(US) Final Rejection—U.S. Appl. No. 12/871,806.
Jun. 9, 2012—(AU) Notice of Acceptance—App 2006230171.
Jun. 26, 2012—(EP) Extended Search Report—App 05857614.1.
Nov. 20, 2012—(EP) Communication under rule 71(3)—App 06 758 213.0.
Nov. 26, 2012—(US) Final Rejection—U.S. Appl. No. 12/871,806.
Apr. 4, 2013 (US) Notice of Allowance—U.S. Appl. No. 12/871,806.
Apr. 18, 2013—(EP) Decision to Grant a European Patent—App 06758212.0.
Jan. 16, 2013—(CA) Office Action—App 2,594,020.
Jan. 17, 2013—(CA) Office Action—App 2,600,236.
Nov. 7, 2013 (WO) International Search Report—App. PCT/US2013/057502.
Jun. 24, 2014 (WO) International Search Report—App. PCT/US2014/023286.

(56) **References Cited**

OTHER PUBLICATIONS

Jun. 26, 2014 (WO) International Search Report—App. PCT/US2014/027723.
Mar. 24, 2014 (WO) International Search Report—App. PCT/US2013/072566.
May 26, 2014—(CA) Office Action—App 2010297968.
Apr. 28, 2015 (WO) International Preliminary Report on Patentability—App. PCT/US2013/057502, dated Apr. 28, 2015.
Dec. 22, 2015—(US) Final Office Action—U.S. Appl. No. 14/714,207.
Jan. 14, 2015—(EP) Extended Search Report—App 10819667.6.
Jul. 10, 2015 (WO) Communication Relating to the Results of the Partial International Search for International App—PCT/US2015/024691.
Jul. 14, 2015—(WO) International Preliminary Report on Patentability—App PCT/US2013/072566.
May 14, 2015—(US) Non Final Rejection—U.S. Appl. No. 13/940,240.
May 25, 2015—(AU) Notice of Acceptance—App 2010297968.
Nov. 2, 2015—(AU) Office Action—App 2013372879.
Nov. 27, 2015—(US) Final Rejection—U.S. Appl. No. 13/940,240.
Sep. 15, 2015 (WO) International Preliminary Report on Patentability—App.—PCT/US2014/027723.
Sep. 15, 2015 (WO) International Preliminary Report on Patentability—App. PCT/US2014/023286.
Sep. 16, 2015 (WO) International Search Report and Written Opinion—App. No. PCT/US2015/024691.
Sep. 4, 2015 (US) Notice of Allowance—U.S. Appl. No. 14/702,755.
Aug. 10, 2018 (US) Petition for Inter Partes Review of Claims 1-20 of U.S. Pat. No. 9,560,077—IPR2018-01513.
Feb. 11, 2020 (US) Final Written Decision Determining All Challenged Claims Unpatentable of U.S. Pat. No. 9,137,205 B2—IPR 2018-01444.
Feb. 11, 2020 (US) Final Written Decision Determining All Challenged Claims Unpatentable of U.S. Pat. No. 9,137,205 B2—IPR 2018-01443.
Mar. 19, 2020 (US) Final Written Decision Determining All Challenged Claims Unpatentable of U.S. Pat. No. 9,565,213 B2—IPR 2018-01512.
Jan. 23, 2020 (US) Final Written Decision Determining All Challenged Claims Unpatentable of U.S. Pat. No. 9,565,213 B2—IPR 2018-01386.
Mar. 31, 2020 (US) Final Written Decision Determining All Challenged Claims Unpatentable of U.S. Pat. No. 9,560,077 B2—IPR 2018-01513.
Jul. 2, 2020—(U.S.) Final Rejection—U.S. Appl. No. 16/158,868.

* cited by examiner


Network B
(e.g., LAN)
104
PSG
114
Network D
(e.g., LAN)
108
PSG
118
SPM
120
Network E
(e.g., Internet)
110
PSG
112
PSG
116
Network A
(e.g., LAN)
102
Network C
(e.g., LAN)
106
100

FIG. 1



Network A
(102)
Network E
(110)
200
Packet Security Gateway (PSG)
208
NI
216
PTF$_1$
PTF$_2$
PTF$_n$
218
220
MI
222
210
Packet
Filter
P
214
212
Processor
Memory
202
204
NI
112
206


FIG. 2

300

five-tuple

| Rule # | Protocol | Source Address | Source Port | Destination Address | Destination Port | Action |
|---|---|---|---|---|---|---|
| 1 (302) | TCP | 140.* | * | 130.* | 20 | Accept |
| 2 (304) | TCP | 140.* | * | * | 80 | Accept |
| 3 (306) | TCP | 150.* | * | 120.* | 90 | Accept & Route to Monitoring Device |
| 4 (308) | UDP | 150.* | * | * | 3030 | Accept |
| 5 (310) | * | * | * | * | * | Deny |

FIG. 3



Network A
(102)
Network E
(110)
200
112
Packet Security Gateway (PSG) System
400
402
404
$PSG_1$
$PSG_2$
$PSG_n$
NI
PF
$P_1$
$P_2$
$P_n$
$PTF_1$
$PTF_2$
$PTF_n$


FIG. 4


Malicious Host Tracker Service
508
Network E
(e.g., Internet)
110
PSG
PSG
PSG
PSG
118
116
114
112
NI
504
Security Policy Manager (SPM)
506
Mgmt. Interface
510
Processor
Memory
500
502
120
100

FIG. 5



114
PSG
110
SPM
Network E
(e.g., Internet)
120
104
606
Network B
SIP Switch
Analysis
App.
UE
612
602
112
PSG
116
PSG
610
604
Network A
SIP Switch
Analysis
App.
UE
102
600
106
608
Network C
Monitoring
Device
100


FIG. 6


SPM
716
PSG
714
PSG
712
Network B
(e.g., WAN)
704
Network C
(e.g., ISP)
706
PSG
710
PSG
708
Network A
(e.g., WAN)
702
700

FIG. 7



SPM B
818
Network B
(e.g., WAN)
804
PSG
814
PSG
812
816
SPM A
810
PSG
Network C
(e.g., Internet)
806
PSG
808
Network A
(e.g., WAN)
802
800


FIG. 8


SPM
PSG
LAN Switch
Host A
Host B
Host C
900
902
904
906
908
910
912

FIG. 9


RECEIVE A DYNAMIC SECURITY POLICY FROM THE SECURITY POLICY MANAGEMENT SERVER
1000
RECEIVE PACKETS ASSOCIATED WITH A NETWORK PROTECTED BY EACH RESPECTIVE PACKET SECURITY GATEWAY
1002
PERFORM A PACKET TRANSFORMATION FUNCTION SPECIFIED BY THE DYNAMIC SECURITY POLICY ON THE PACKETS
1004

FIG. 10


1102
RECEIVE DYNAMIC SECURITY POLICY THAT INCLUDES RULE(S) SPECIFYING APPLICATION-LAYER PACKET-HEADER INFORMATION AND PACKET TRANSFORMATION FUNCTION TO BE PERFORMED ON PACKETS COMPRISING THE APPLICATION-LAYER PACKET-HEADER INFORMATION
1104
RECEIVE PACKETS ASSOCIATED WITH NETWORK PROTECTED BY PACKET SECURITY GATEWAY
1106
IDENTIFY, FROM AMONGST PACKETS ASSOCIATED WITH THE NETWORK PROTECTED BY THE PACKET SECURITY GATEWAY, PACKET(S) COMPRISING THE APPLICATION-LAYER PACKET-HEADER INFORMATION
1108
PERFORM THE PACKET TRANSFORMATION FUNCTION ON EACH OF THE PACKET(S) COMPRISING THE APPLICATION-LAYER PACKET-HEADER INFORMATION

FIG. 11


1202
RECEIVE DYNAMIC SECURITY POLICY THAT INCLUDES RULE(S) SPECIFYING PACKET-IDENTIFICATION CRITERIA AND PACKET TRANSFORMATION FUNCTION COMPRISING PACKET DIGEST LOGGING FUNCTION TO BE PERFORMED ON PACKETS CORRESPONDING TO PACKET-IDENTIFICATION CRITERIA
1204
RECEIVE PACKETS ASSOCIATED WITH NETWORK PROTECTED BY PACKET SECURITY GATEWAY
1206
IDENTIFY, FROM AMONGST PACKETS ASSOCIATED WITH THE NETWORK PROTECTED BY THE PACKET SECURITY GATEWAY, PACKET(S) CORRESPONDING TO THE PACKET-IDENTIFICATION CRITERIA
1208
PERFORM THE PACKET DIGEST LOGGING FUNCTION ON EACH OF THE PACKET(S) CORRESPONDING TO THE PACKET-IDENTIFICATION CRITERIA

FIG. 12


1302
RECEIVE SECURITY UPDATE COMPRISING SET OF NETWORK ADDRESSES FROM COMPUTING DEVICE
1304
UPDATE RULES TO INCLUDE THE SET OF NETWORK ADDRESSES
1306
RECEIVE SECURITY UPDATE COMPRISING DIFFERENT SET OF NETWORK ADDRESSES FROM DIFFERENT COMPUTING DEVICE
1308
DETERMINE THAT THE DIFFERENT SET OF NETWORK ADDRESSES INCLUDES AT LEAST A PORTION OF NETWORK ADDRESSES INCLUDED IN THE SET OF NETWORK ADDRESSES
1310
IDENTIFY THE AT LEAST A PORTION OF NETWORK ADDRESSES INCLUDED IN THE SET OF NETWORK ADDRESSES
1312
IDENTIFY RULE(S) THAT SPECIFY RANGE OF NETWORK ADDRESSES COMPRISING THE AT LEAST A PORTION OF NETWORK ADDRESSES
1314
UPDATE THE RULE(S) TO INCLUDE OTHER NETWORK ADDRESS(ES) INCLUDED IN THE DIFFERENT SET OF NETWORK ADDRESSES

FIG. 13

# METHODS AND SYSTEMS FOR PROTECTING A SECURED NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/158,868, filed Oct. 12, 2018, and entitled "METHODS AND SYSTEMS FOR PROTECTING A SECURED NETWORK," which is a continuation of U.S. patent application Ser. No. 15/414,117, filed Jan. 24, 2017, and entitled "METHODS AND SYSTEMS FOR PROTECTING A SECURED NETWORK," which is divisional of and claims priority to U.S. patent application Ser. No. 14/253,992 (now U.S. Pat. No. 9,565,213), filed Apr. 16, 2014, and entitled "METHODS AND SYSTEMS FOR PROTECTING A SECURED NETWORK," the disclosures of which are incorporated by reference herein in their entirety.

## BACKGROUND

The TCP/IP network protocols (e.g., the Transmission Control Protocol (TCP) and the Internet Protocol (IP)) were designed to build large, resilient, reliable, and robust networks. Such protocols, however, were not originally designed with security in mind. Subsequent developments have extended such protocols to provide for secure communication between peers (e.g., Internet Protocol Security (IPsec)), but the networks themselves remain vulnerable to attack (e.g., Distributed Denial of Service (DDoS) attacks).

Most existing approaches to protecting such networks are reactive rather than proactive. While reactive approaches may identify the source of an attack and assist in subsequent mitigation efforts, in most instances, the attack will have already been successfully launched.

Proactive solutions, however, have often been deemed untenable due to an inability to scale to larger networks. A significant challenge associated with building a scalable proactive solution is the need to filter substantially all network traffic at a high resolution. In a large network, where traffic volumes may be enormous, the time required to provide high resolution filtering has traditionally been thought to render a proactive solution infeasible.

## SUMMARY

The following presents a simplified summary in order to provide a basic understanding of some aspects of the disclosure. It is neither intended to identify key or critical elements of the disclosure nor to delineate the scope of the disclosure. The following summary merely presents some concepts in a simplified form as a prelude to the description below.

Aspects of this disclosure relate to protecting a secured network. In some embodiments, one or more packet security gateways are associated with a security policy management server. At each of the packet security gateways, a dynamic security policy may be received from the security policy management server, packets associated with a network protected by the packet security gateway may be received, and at least one of multiple packet transformation functions specified by the dynamic security policy may be performed on the packets. Performing the at least one of multiple packet transformation functions specified by the dynamic security policy on the packets may include performing at least one packet transformation function other than forwarding or dropping the packets.

In some embodiments, two or more of the packet security gateways may be configured in series such that packets forwarded from a first of the packet security gateways are received by a second of the packet security gateways. In some embodiments, the dynamic security policy may include two rules requiring sequential execution. A first of the packet security gateways may perform a packet transformation function specified by one of the rules on the packets and a second of the packet security gateways may subsequently perform a packet transformation function specified by the other of the rules on packets received from the first packet security gateway.

In some embodiments, the dynamic security policy may include a rule specifying a set of network addresses for which associated packets should be dropped and a rule specifying that all packets associated with network addresses outside the set should be forwarded. Additionally or alternatively, the dynamic security policy may include a rule specifying a set of network addresses for which associated packets should be forwarded and a rule specifying that all packets associated with network addresses outside the set should be dropped. In some embodiments, the security policy management server may receive information associated with one or more Voice over Internet Protocol (VoIP) sessions and the set of network addresses for which associated packets should be forwarded may be created or altered utilizing the information associated with the one or more VoIP sessions.

In some embodiments, the packet security gateways may receive three or more dynamic security policies from the security policy management server. A first of the dynamic security policies may specify a first set of network addresses for which packets should be forwarded. A second of the dynamic security policies may be received after the first and may specify a second set of network addresses, which includes more network addresses than the first set, for which packets should be forwarded. A third of the dynamic security policies may be received after the second and may specify a third set of network addresses, which includes more network addresses than the second set, for which packets should be forwarded.

In some embodiments, the dynamic security policy may include two rules that each specify a set of network addresses. The dynamic security policy may specify that packets associated with the first set of network addresses should be placed in a first forwarding queue and packets associated with the second set of network addresses should be placed in a second forwarding queue. The first forwarding queue may have a different queueing policy, for example, a higher forwarding rate, than the second forwarding queue.

In some embodiments, the dynamic security policy may include a rule specifying a set of network addresses and an additional parameter. The packet transformation function specified by the dynamic security policy may include routing packets that fall within the specified set and match the additional parameter to a network address different from a destination network address specified by the packets. In some embodiments, the additional parameter may be a Session Initiation Protocol (SIP) Uniform Resource Identifier (URI). The network address different from the destination network address may correspond to a device configured to copy information contained within the packets and forward the packets to the destination network address specified by the packets.

In some embodiments, the packet transformation function may forward the packets into the network protected by the packet security gateway. In some embodiments, the packet transformation function may forward the packets out of the network protected by the packet security gateway. In some embodiments, the packet transformation function may forward the one or more packets to an IPsec stack having an IPsec security association corresponding to the packets. In some embodiments, the packet transformation function may drop the packets.

In some embodiments, the dynamic security policy may include multiple rules. One of the rules may specify the packet transformation function. In some embodiments, one of the rules may specify a five-tuple of values selected from packet header information. The five-tuple may specify one or more protocol types, one or more IP source addresses, one or more source ports, one or more IP destination addresses, and one or more destination ports. In some embodiments, one of the rules may specify a Differentiated Service Code Point (DSCP) that maps to a DSCP field in an IP header of one of the packets.

In some embodiments, one of the packet security gateways may operate in a network layer transparent manner. For example, the packet security gateway may send and receive traffic at a link layer using an interface that is not addressed at the network layer and simultaneously perform the packet transformation function at the network layer. Additionally or alternatively, the packet security gateway may include a management interface having a network layer address. Access to the management interface may be secured at the application level.

In some embodiments, the dynamic security policy may include a rule generated based, at least in part, on a list of known network addresses associated with malicious network traffic. In some embodiments, the list of known network addresses associated with malicious network traffic may be received from a subscription service that aggregates information associated with malicious network traffic.

In some embodiments, the packets associated with the network protected by the packet security gateway may originate within the network protected by the packet security gateway and may be destined for a network distinct from the network protected by the packet security gateway. Additionally or alternatively, the packets associated with the network protected by the packet security gateway may originate within a network distinct from the network protected by the packet security gateway and may be destined for a host within the network protected by the packet security gateway.

In some embodiments, one of the packet security gateways may be located at each boundary between a protected network associated with the security policy management server and an unprotected network.

Other details and features will be described in the sections that follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present disclosure is pointed out with particularity in the appended claims. Features of the disclosure will become more apparent upon a review of this disclosure in its entirety, including the drawing figures provided herewith.

Some features herein are illustrated by way of example, and not by way of limitation, in the figures of the accompanying drawings, in which like reference numerals refer to similar elements.



FIG. **1** illustrates an exemplary network environment in which one or more aspects of the disclosure may be implemented.

FIG. **2** illustrates an exemplary packet security gateway.

FIG. **3** illustrates an exemplary dynamic security policy.

FIG. **4** illustrates an exemplary configuration of multiple packet security gateways in series.

FIG. **5** illustrates an exemplary security policy management server.

FIG. **6** illustrates an exemplary network environment for implementing a monitoring service.

FIG. **7** illustrates an exemplary network environment that includes a secured network having multiple boundaries with unsecured networks.

FIG. **8** illustrates an exemplary network environment that includes multiple distinct secured networks.

FIG. **9** illustrates an exemplary secure LAN environment.

FIG. **10** illustrates an exemplary method for protecting a secured network.

FIG. **11** illustrates an exemplary method for protecting a secured network that includes identifying packets based on application-layer packet-header information.

FIG. **12** illustrates an exemplary method for protecting a secured network that includes performing a packet digest logging function on packets that correspond to specified packet-identification criteria.

FIG. **13** illustrates an exemplary method for protecting a secured network that includes receiving security updates from multiple sources.

## DETAILED DESCRIPTION

In the following description of various illustrative embodiments, reference is made to the accompanying drawings, which form a part hereof, and in which is shown, by way of illustration, various embodiments in which aspects of the disclosure may be practiced. It is to be understood that other embodiments may be utilized, and structural and functional modifications may be made, without departing from the scope of the present disclosure.

Various connections between elements are discussed in the following description. These connections are general and, unless specified otherwise, may be direct or indirect, wired or wireless. In this respect, the specification is not intended to be limiting.

FIG. **1** illustrates an exemplary network environment in which one or more aspects of the disclosure may be implemented. Referring to FIG. **1**, network environment **100** may include networks A-E **102**, **104**, **106**, **108**, and **110**. One or more networks within network environment **100** may be a Local Area Network (LAN) or a Wide Area Network (WAN). Such a LAN or WAN may be associated, for example, with an organization (e.g., a company, university, enterprise, or government agency). For example, networks A-D **102**, **104**, **106**, and **108** may be LANs, any combination of which may be associated with one or more organizations. One or more networks within network environment **100** may interface with one or more other networks within network environment **100**. For example, network environment **100** may include a WAN that interfaces one or more LANs within network environment **100** or network environment **100** may include one or more Internet Service Providers (ISPs) that interface one or more LANs or WANs within network environment **100** via the Internet. For example, network E **110** may comprise the Internet and may interface networks A-D **102**, **104**, **106**, and **108**.

As used herein, a packet security gateway includes any computing device configured to receive packets and perform a packet transformation function on the packets. Optionally, a packet security gateway may further be configured to perform one or more additional functions as described herein. As used herein, a security policy management server includes any computing device configured to communicate a dynamic security policy to a packet security gateway. Optionally, a security policy management server may further be configured to perform one or more additional functions as described herein. As used herein, a dynamic security policy includes any rule, message, instruction, file, data structure, or the like that specifies criteria corresponding to one or more packets and identifies a packet transformation function to be performed on packets corresponding to the specified criteria. Optionally, a dynamic security policy may further specify one or more additional parameters as described herein.

Network environment **100** may include one or more packet security gateways and one or more security policy management servers. For example, network environment **100** may include packet security gateways **112**, **114**, **116**, and **118**, and security policy management server **120**. One or more security policy management servers may be associated with a protected network. For example, networks A-D **102**, **104**, **106**, and **108** may each be distinct LANs associated with a common organization and may each form part of a protected network associated with security policy management server **120**. Many network protocols route packets dynamically, and thus the path a given packet may take cannot be readily predicted. Accordingly it may be advantageous to locate a packet security gateway at each boundary between a protected network and an unprotected network. For example, packet security gateway **112** may be located at the boundary between network A **102** and network E **110**. Similarly, packet security gateway **114** may be located at the boundary between network B **104** and network E **110**; packet security gateway **116** may be located at the boundary between network C **106** and network E **110**; and packet security gateway **118** may be located at the boundary between network D **108** and network E **110**. As will be described in greater detail below, each of one or more packet security gateways associated with a security policy management server may be configured to receive a dynamic security policy from the security policy management server, receive packets associated with a network protected by the packet security gateway, and perform a packet transformation function specified by the dynamic security policy on the packets. For example, each of packet security gateways **112**, **114**, **116**, and **118** may be configured to receive a dynamic security policy from security policy management server **120**. Each of packet security gateways **112**, **114**, **116**, and **118** may also be configured to receive packets respectively associated with networks A-D **102**, **104**, **106**, and **108**. Each of packet security gateways **112**, **114**, **116**, and **118** may further be configured to perform a packet transformation function specified by the dynamic security policy received from security policy management server **120** on the packets respectively associated with networks A-D **102**, **104**, **106**, and **108**.

FIG. **2** illustrates an exemplary packet security gateway according to one or more aspects of the disclosure. Referring to FIG. **2**, as indicated above, packet security gateway **112** may be located at network boundary **200** between network A **102** and network E **110**. Packet security gateway **112** may include processor **202**, memory **204**, network interfaces **206** and **208**, packet filter **214**, and management interface **222**.



Processor **202**, memory **204**, network interfaces **206** and **208**, packet filter **214**, and management interface **222** may be interconnected via data bus **210**. Network interface **206** may connect packet security gateway **112** to network E **110**. Similarly, network interface **208** may connect packet security gateway **112** to network A **102**. Memory **204** may include one or more program modules that when executed by processor **202**, configure packet security gateway **112** to perform various functions as described herein.

Packet security gateway **112** may be configured to receive a dynamic security policy from security policy management server **120**. For example, packet security gateway **112** may receive dynamic security policy **212** from security policy management server **120** via management interface **222** (i.e., out-of-band signaling) or network interface **206** (i.e., in-band signaling). Packet security gateway **112** may include one or more packet filters or packet discriminators, or logic for implementing one or more packet filters or packet discriminators. For example, packet security gateway **112** may include packet filter **214**, which may be configured to examine information associated with packets received by packet security gateway **112** and forward the packets to one or more packet transformation functions based on the examined information. For example, packet filter **214** may examine information associated with packets received by packet security gateway **112** (e.g., packets received from network E **110** via management interface **222** or network interface **206**) and forward the packets to one or more of packet transformation functions 1-N **216**, **218**, and **220** based on the examined information.

As will be described in greater detail below, dynamic security policy **212** may include one or more rules and the configuration of packet filter **214** may be based on one or more of the rules included in dynamic security policy **212**. For example, dynamic security policy **212** may include one or more rules specifying that packets having specified information should be forwarded to packet transformation function **216**, while all other packets should be forwarded to packet transformation function **218**. Packet transformation functions 1-N **216**, **218**, and **220** may be configured to perform one or more functions on packets they receive from packet filter **214**. For example, packet transformation functions 1-N **216**, **218**, and **220** may be configured to forward packets received from packet filter **214** into network A **102**, forward packets received from packet filter **214** to an IPsec stack having an IPsec security association corresponding to the packets, or drop packets received from packet filter **214**. In some embodiments, one or more of packet transformation functions 1-N **216**, **218**, and **220** may be configured to drop packets by sending the packets to a local "infinite sink" (e.g., the /dev/null device file in a UNIX/LINUX system).

In some embodiments, packet security gateway **112** may be configured in a network layer transparent manner. For example, packet security gateway **112** may be configured to utilize one or more of network interfaces **206** and **208** to send and receive traffic at the link layer. One or more of network interfaces **206** and **208**, however, may not be addressed at the network layer. Because packet filter **214** and packet transformation functions 1-N **216**, **218**, and **220** operate at the network layer, PSG **112** may still perform packet transformation functions at the network layer. By operating in a network layer transparent manner, packet security gateway **112** may insulate itself from network attacks (e.g., DDoS attacks) launched at the network layer because attack packets cannot be routed to the network interfaces **206** and **208**. In some embodiments, packet security gateway **112** may include management interface **222**.

Management interface **222** may be addressed at the network level in order to provide packet security gateway **112** with network level addressability. Access to management interface **222** may be secured, for example, at the application level by using a service such as SSH, or secured at the transport level using, e.g., TLS, or secured at the network level by attaching it to a network with a separate address space and routing policy from network A **102** and network E **110**, or secured at the link level, e.g., using the IEEE 802.1X framework, etc.

The flows illustrated by FIG. **2** are merely exemplary and show packets that originate within a network distinct from network A **102** and are destined for a host within network A **102** in order to simplify the illustration. Packet security gateway **112** may be configured to receive and filter packets that originate within a network other than network A **102** (e.g., networks B-E **104**, **106**, **108**, or **110**) and are destined for a host within network A **102**, as well as packets that originate within network A **102** destined for a network distinct from network A **102** (e.g., network B-D **104**, **106**, **108**, or **110**). That is, packet security gateway **112** may be configured to filter and perform one or more packet transformation functions on packets flowing in either direction and may thus be utilized, for example, to both protect network A **102** from malicious network traffic and to prevent malicious network traffic from leaving network A **102**.

FIG. **3** illustrates an exemplary dynamic security policy in accordance with one or more embodiments. Referring to FIG. **3**, dynamic security policy **300** may include rules 1-5 **302**, **304**, **306**, **308**, and **310**. Each rule may specify criteria and one or more packet transformation functions that should be performed for packets associated with the specified criteria. The specified criteria may take the form of a five-tuple of values selected from packet header information, specifying a protocol type of the data section of the IP packet (e.g., TCP, UDP, ICMP, or any other protocol), one or more source IP addresses, one or more source port values, one or more destination IP addresses, and one or more destination ports. For example, rule 1 **302** may specify that IP packets containing TCP packets, originating from a source IP address that begins with 140, having any source port, destined for an IP address that begins with 130, and destined for port 20 should have an accept packet transformation function (e.g., the identity function) performed on them. Similarly, rule 2 **304** may specify that IP packets containing TCP packets, originating from a source IP address that begins with 140, having any source port, destined for any IP address, and destined for port 80 should have an accept packet transformation function performed on them; rule 3 **306** may specify that IP packets containing TCP packets, originating from a source IP address that begins with 150, having any source port, destined for any IP address that begins with 120, and destined for port 90 should have an accept packet transformation function performed on them; rule 4 **308** may specify that IP packets containing UDP packets, originating from a source IP address that begins with 150, having any source port, destined for any IP address, and destined for port 3030 should have an accept packet transformation function performed on them; and rule 5 **310** may specify that IP packets containing any data, originating from any source IP address, having any source port, destined for any IP address, and destined for any port should have a deny packet transformation function performed on them. One or more rules included in dynamic security policy **300** may be specified in IP version 4 or IP version 6. In some embodiments, the specified criteria may comprise values selected from application-layer packet-header information. For example, application-layer hypertext transfer protocol (HTTP) packets, which transfer information between instances of web client applications (e.g., web browsers) and web server applications (e.g., named web sites such as www.examplewebsite.com), may contain headers that specify methods and/or one or more uniform resource identifiers (URIs) for transferring resources (e.g., files) between client and servers. For example, the HTTP GET method may transfer URI-labeled resources (e.g., hypertext markup language (HTML) files) from a server to a client. Similarly, the HTTP PUT method may transfer resources from a client to a server. A rule may specify that IP packets containing HTTP packets with a GET method and transferring a resource with a particular URI should have an accept packet transformation function performed on them. Another rule may specify that IP packets containing HTTP packets with a PUT method and transferring a resource to a server with a particular URI should have a deny packet transformation function performed on them. Rules may specify criteria comprising values selected from five-tuple header information and/or values selected from application-layer header information.

As will be described in greater detail below, dynamic security policy **300** may include one or more rules that specify a packet transformation function other than forwarding (accepting or allowing) or dropping (denying) a packet. For example, rule 3 **306** may specify that IP packets containing TCP packets, originating from a source IP address that begins with 150, having any source port, destined for any IP address that begins with 120, and destined for port 90 should not only have an accept packet transformation function performed on them, but should also be routed to a monitoring device.

One or more rules within dynamic security policy **300** may be required to execute in a specific order. For example, it may be required that rule 5 **310** be executed last. Because rule 5 **310** specifies that any packet should have a deny packet transformation function performed on it, if it were executed before a rule specifying an accept packet transformation function (e.g., one or more of rules 1-4 **302**, **304**, **306**, or **308**), no packets matching the criteria specified by the rule specifying the accept packet transformation function would pass through a packet security gateway implementing dynamic security policy **300**. Similarly, two or more rules within dynamic security policy **300** may specify overlapping criteria and different packet transformation functions. In such cases, the order-of-application of the rules may determine which rule is applied to a packet that would match the two or more rules. Such rules may be merged together or otherwise transformed into a different set of rules without overlapping criteria, which may produce the same result as the original set of rules, when applied to any packet.

A dynamic security policy may utilize the combination of one or more rules to create policies for governing packets within a network environment or effectuating one or more services within a network environment. For example, a dynamic security policy may include one or more rules, the combination of which may effectuate a blocklist service within a network environment. A dynamic security policy that effectuates a blocklist service within a network environment may include one or more rules specifying criteria (e.g., a set of network addresses) for which associated packets should be blocked, dropped, or denied, and at least one rule specifying that all packets outside the specified block sets should be forwarded, accepted, or allowed. Such a dynamic security policy may be constructed by including one or more rules specifying criteria (e.g., a set of network

addresses) for which associated packets should be dropped, and a wildcard rule, designated to be executed last, and specifying that all packets should be allowed. One or more dynamic security policies that effectuate a blocklist service may be utilized to implement one or more Virtual Private Networks (VPNs).

A dynamic security policy may also include one or more rules, the combination of which may effectuate an allowlist service within a network environment. A dynamic security policy that effectuates an allowlist service within a network environment may include one or more rules specifying criteria (e.g., a set of network addresses) for which associated packets should be forwarded, allowed, or accepted, and at least one rule specifying that all packets outside the specified allow sets should be blocked, denied, or dropped. Such a dynamic security policy may be constructed by including one or more rules specifying criteria (e.g., a set of network addresses) for which associated packets should be forwarded, and a wildcard rule, designated to be executed last, and specifying that all packets should be blocked. For example, dynamic security policy **300** includes rules 1-4 **302**, **304**, **306**, and **308**, each of which specifies a set of network addresses for which packets should be allowed, and rule 5 **310** which specifies that all packets should be dropped. Thus, if rules 1-5 **302**, **304**, **306**, **308**, and **310** are executed in order, dynamic security policy **300** will effectuate an allowlist service.

A dynamic security policy may also include one or more rules, the combination of which may effectuate a VoIP firewall service within a network environment. As will be discussed in greater detail below, a security policy management server may receive information associated with VoIP sessions. For example, a security policy management server may receive information associated with VoIP sessions from one or more softswitches (e.g., H.323 softswitches, SIP IP Multimedia Subsystem (IMS) softswitches) or session border controllers when a VoIP session is initialized or set up. In order to allow packets associated with such a VoIP session within a network protected by one or more packet security gateways associated with the security policy management server, the security policy management server may utilize the received information associated with the VoIP sessions to construct one or more rules for allowing the packets associated with the VoIP session. When the VoIP session is terminated or torn down, the softswitch or session border controller may notify the security policy management server, which may create or alter one or more rules to reflect the termination of the VoIP session (e.g., to deny future packets which may match criteria previously associated with the VoIP session).

A dynamic security policy may also include one or more rules or rule sets, the combination of which may effectuate a phased restoration service within a network environment. Such a phased restoration service may be used in the event of a network attack (e.g., a DDoS attack). When an attack occurs a network may be overwhelmed with network traffic and be unable to route all or any of the traffic. In the event of such an attack, it may be beneficial to utilize a dynamic security policy which effectuates a phased restoration service. Such a dynamic security policy may include one or more rules or rule sets configured for execution in time-shifted phases. Each of the rules or rule sets may specify progressively larger sets of network addresses. For example, a dynamic security policy may include three rules or rule sets which may be configured for execution in time-shifted phases. A first of the rules or rule sets may specify a relatively small set of network addresses for which packets should be forwarded (e.g., network addresses corresponding to mission critical network devices). A second of the rules or rule sets may specify a relatively larger set of network addresses for which packets should be forwarded (e.g., network addresses corresponding to trusted network devices). A third of the rules or rule sets may specify an even larger set of network addresses for which packets should be forwarded (e.g., network addresses corresponding to all network devices that would be allowed under ordinary circumstances). The dynamic security policy may specify that the rules or rule sets should be implemented in time-shifted phases. That is, the dynamic security policy may specify that the first rule or rule set should be executed first, and that the second rule or rule set should be executed at a time after the time at which the first rule or rule set is executed, and the third rule or rule set should be executed at a time after the time at which the second rule or rule set is executed. Such a dynamic security policy may assist a network in recovering from an attack, by allowing the network to isolate itself from the attack or recover in a controlled manner.



A dynamic security policy may also include one or more rules, the combination of which may effectuate an enqueueing service within a network environment. A dynamic security policy that effectuates an enqueueing service may include one or more rules that specify sets of network addresses and packet transformation functions that queue packets in one or more queues corresponding to the sets. These queues may then be serviced at varying rates. For example, a dynamic security policy may include two rules, each of which specify a set of network addresses. A first of the rules may specify that packets corresponding to its specified set should be queued in a first forwarding queue. A second of the rules may specify that packets corresponding to its specified set should be queued in a second forwarding queue. The first forwarding queue may be serviced at a higher forwarding rate than the second forwarding queue. Such an enqueueing service may be utilized during or following a network attack, or generally to provide prioritized service to critical network devices (e.g., when network resources are strained). In some embodiments, one or more rules contained within a dynamic security policy may include an arbitrary selector which may correspond to one or more parameters or fields associated with a packet. For example, a dynamic security policy rule may include a Differentiated Service Code Point (DSCP) selector that corresponds to a DSCP field in an IP header. Thus, two packets having different values within the specified DSCP field may correspond to two distinct rules within a dynamic security policy and have different packet transformation functions performed on them. For example, two otherwise identical packets having different values within the specified DSCP field may be queued in two different forwarding queues that have different forwarding rates, and may thus receive differentiated service.

A dynamic security policy may also include one or more rules, the combination of which may effectuate a multi-dimensional routing service or a multi-dimensional switching service within a network environment. For example, in some embodiments, a dynamic security policy may include one or more rules that specify a set of network addresses and an additional parameter. Such rules may further specify a packet transformation function configured to route packets within the specified set of network addresses that match the additional parameter to a network address distinct from the packets' respective destination network addresses. For example, the packet transformation function may be con-

figured to encapsulate such packets (e.g., as described by Internet Engineering Task Force (IETF) Request For Comment (RFC) 2003) with an IP header specifying a network address different from their respective destination addresses. The packets may then be routed to the network address specified by the encapsulating IP header, which may correspond to a network device configured to utilize such packets or data contained within them, strip the IP header from the packets, and forward the packets to their respective destination addresses. In some embodiments, the packet transformation function may be configured to alter or modify the destination address of the packets, which may then be routed to the altered or modified destination address. Additionally or alternatively, the packet transformation function may be configured to assign such packets to a particular Layer-2 VLAN (e.g., as described by IEEE 802.1Q). The packets may then be switched to another device on the same VLAN, which may or may not be on the IP-layer path that the packet would have taken if it were routed according to the packet's destination IP address instead of being switched through the VLAN.

As will be described in greater detail below, in some embodiments a dynamic security policy may include one or more rules, the combination of which may effectuate an implementation of a multi-dimensional routing service for performing a monitoring service within a network environment. For example, a dynamic security policy may include one or more rules that specify a set of network addresses (e.g., a set of network addresses from which a call that is to be monitored is expected to originate within) and an additional parameter (e.g., a SIP URI corresponding to a caller to be monitored). As indicated above, such rules may further specify a packet transformation function configured to route or switch packets within the specified set of network addresses that match the additional parameter (e.g., the SIP URI) to a network address corresponding to a monitoring device. The network address corresponding to the monitoring device may be different from the packets' destination network address (e.g., an address corresponding to the called party or a softswitch associated with the called party). For example, the packet transformation function may be configured to encapsulate the packets with an IP header specifying the network address corresponding to the monitoring device. The packets may then be routed (or rerouted) to the monitoring device, which may be configured to copy the packets or data contained within them (e.g., for subsequent review by a law enforcement or national security authority), strip the IP header from them, and then forward the packets to their destination address (e.g., the address corresponding to the called party or softswitch associated with the called party).

In some embodiments, a dynamic security policy may include one or more rules, the combination of which may effectuate an implementation of an informational service for performing a network communications awareness service, a network security awareness service, and/or a network threat awareness service (e.g., for a particular network environment). For example, a dynamic security policy may include one or more rules that specify criteria such as one or more network addresses, protocol types, method types, and/or directions (e.g., inbound, outbound, or the like) that are indicative of packet communications that are of interest to an organization that operates the secured network. Such rules may further specify a packet transformation function that, when applied to a packet that matches such a rule, produces a digest version, or log, of the packet. This packet log (or digest) may contain selected packet information



and/or system information (e.g., associated network addresses, ports, protocol types, URIs, arrival times, packet sizes, directions, interface names, media access control (MAC) addresses, matching rule IDs, metadata associated with matching rules, enforced policy names, or the like). The associated packet security gateway may store and/or forward packet logs using a logging system based on a standard (e.g., syslog, or the like). Awareness application servers may read packet logs and perform various transformations on the logs to produce awareness information, which may be accessed by client applications.

As indicated above, a significant challenge associated with building a scalable proactive solution for protecting a secured network, is the need to filter substantially all network traffic at a high resolution. Filtering traffic at a high resolution often requires the use of many rules. In a large network, where traffic volumes may be enormous, the time required to provide high resolution filtering (e.g., the time required to apply a large number of rules to a large volume of traffic) has traditionally been thought to render proactive network protection solutions infeasible. This concern may be particularly acute in network environments that utilize low-latency applications (e.g., VoIP).

Recent advances in packet filtering technology have reduced the time required to apply large rule sets to network traffic. For example, U.S. Patent Application Publication Nos. 2006/0195896 and 2006/0248580 to Fulp et al., and U.S. Patent Application Publication No. 2011/0055916 to Ahn, describe advanced packet filtering technologies, and are each incorporated by reference herein in their entireties.

One approach to providing high resolution filtering, while reducing the number of rules applied to network traffic, may be utilized when a dynamic security policy is combinatorially complete. For example, a dynamic security policy may be configured to allow bi-directional communication between a set of N internal hosts $\{I_1, I_2, \ldots, I_N\}$ within a protected network and a set of M external hosts $\{E_1, E_2, \ldots, E_M\}$ outside the protected network. To enable communications between the internal hosts and the external hosts, the dynamic security policy may be constructed to include a set of rules containing each possible combination of internal hosts and external hosts (e.g., $\{\{I_1, E_1\}, \{I_1, E_2\}, \ldots \{I_1, E_M\}, \{I_2, E_1\}, \{I_2, E_2\}, \ldots \{I_2, E_M\}, \ldots, \{I_N, E_1\}, \{I_N, E_2\}, \ldots \{I_N, E_M\}\}$), each of the rules being associated with an allow packet transformation function. Such a dynamic security policy would have N*M rules for allowing communication between the internal hosts and the external hosts that originate from one of the internal hosts and are destined for one of the external hosts, and an additional N*M rules for allowing communications between the internal hosts and the external hosts that originate from one of the external hosts and are destined for one of the internal hosts. An equivalent result may be achieved, however, by constructing two smaller dynamic security policies: a first dynamic security policy that includes rules specifying the N internal hosts (e.g., $\{\{I_1\}, \{I_2\}, \ldots, \{I_N\}\}$), each rule being associated with an accept packet transformation function; and a second dynamic security policy that includes rules specifying the M external hosts (e.g., $\{\{E_1\}, \{E_2\}, \ldots, \{E_M\}\}$), each rule being associated with an accept packet transformation function. Such a construct of dynamic security policies may be implemented using a system of packet security gateways configured in series.

FIG. **4** illustrates an exemplary configuration of multiple packet security gateways connected in series. Referring to FIG. **4**, packet security gateway **112** may include one or more packet security gateways configured in series. For

example, packet security gateway **112** may include packet security gateways 1-N **400**, **402**, and **404**. Packet security gateways 1-N **400**, **402**, and **404** may be configured so that packets forwarded by packet security gateway 1 **400** are received by packet security gateway 2 **402**, and packets forwarded by packet security gateway 2 **402** are received by the next packet security gateway in the series, all the way through packet security gateway N **404**. Each of packet security gateways 1-N **400**, **402**, and **404** may include a packet filter, similar to packet filter **214** described above with respect to FIG. **2**, and one or more packet transformation functions, similar to packet transformation functions 1-N **216**, **218**, and **220** described above with respect to FIG. **2**. Packet security gateways 1-N **400**, **402**, and **404** may be utilized to implement a construct of dynamic security policies similar to that described above.

For example, packet security gateway 1 **400** may be configured to implement $P_1$, which may include rules specifying M external hosts (e.g., $\{\{E_1\}, \{E_2\}, \ldots, \{E_M\}\}$), each rule being associated with an accept packet transformation function. Packet security gateway 2 **402** may be configured to implement $P_2$, which may include rules specifying N internal hosts (e.g., $\{\{I_1\}, \{I_2\}, \ldots, \{I_N\}\}$), each rule being associated with an accept packet transformation function. A packet received by packet security gateway **112** may be initially received via packet security gateway 1 **400**'s network interface. Packet security gateway 1 **400** may apply one or more of the rules in $P_1$ to the received packet until the packet matches criteria specified by a rule in $P_1$, at which point packet security gateway 1 **400** may perform a packet transformation function specified by the rule on the packet. For example, a packet may be received by packet security gateway **112** that originates from external host $E_5$ (e.g., a host within network E **110**) and is destined for internal host $I_7$ (e.g., a host within network A **102**). Packet security gateway 1 **400** may apply one or more of the rules in $P_1$ (e.g., $\{\{E_1\}, \{E_2\}, \ldots, \{E_M\}\}$) to the received packet and the received packet may match the criteria specified by one of the rules in $P_1$ (e.g., $\{\{E_5\}\}$). The rule may specify that an accept packet transformation function should be performed, and packet security gateway 1 **400** may utilize one or more of its packet transformation functions to perform the accept packet transformation function on the packet and forward the packet to packet security gateway 2 **402**. Packet security gateway 2 **402** may apply one or more of the rules in $P_2$ (e.g., $\{\{I_1\}, \{I_2\}, \ldots, \{I_N\}\}$) to the packet and the packet may match the criteria specified by one of the rules in $P_2$ (e.g., $\{\{I_7\}\}$). The rule may specify that an accept packet transformation function should be performed, and packet security gateway 2 **402** may utilize one or more of its packet transformation functions to perform the accept packet transformation function on the packet and forward the packet to network A **102**.

It will be appreciated that utilizing multiple packet security gateways in series to implement dynamic security policy constructs may increase performance and decrease memory resource requirements. For example, in the described scenario packet security gateway 1 **400** may have only been required to compare the packet to five rules and packet security gateway 2 **402** may have only been required to compare the packet to seven rules. In a worst case scenario, packet security gateway 1 **400** may have only been required to compare the packet to M rules and packet security gateway 2 **402** may have only been required to compare the packet to N rules. Moreover, the series configuration may enable packet security gateway 1 **400** to begin implementing $P_1$ with respect to a subsequently received packet, while packet security gateway 2 **402** simultaneously implements $P_2$ with respect to the packet forwarded by packet security gateway 1 **400**. Furthermore, the memory requirements for this scenario with packet security gateways in series may be comparable to M+N, whereas originally the combinatorially complete set of rules contained in a single packet security gateway may have required memory comparable to N*M.

FIG. **5** illustrates an exemplary security policy management server. Referring to FIG. **5**, security policy management server **120** may include processor **500**, memory **502**, and network interface **504**. One or more of processor **500**, memory **502**, and network interface **504** may be interconnected via data bus **506**. Network interface **504** may interface security policy management server **120** with network E **110**. Memory **502** may include one or more program modules that when executed by processor **500**, configure security policy management server **120** to perform functions described herein. It will be appreciated that as used herein the term "server" designates one or more computing devices configured to perform one or more functions described herein. The term "server" should not be construed to imply that a client/server relationship (e.g., a relationship in which a request is received from a client and then serviced by a server) necessarily exists.

Security policy management server **120** may be configured to communicate one or more dynamic security policies to one or more packet security gateways within network environment **100**. For example, security policy management server **120** may communicate one or more dynamic security policies stored in memory **502** to one or more of packet security gateways **112**, **114**, **116**, and **118**. For example, security policy management server **120** may be configured to communicate one or more dynamic security policies to one or more of packet security gateways **112**, **114**, **116**, and **118** on a periodic basis, under specified network conditions, whenever security policy management server **120** receives a new dynamic security policy, whenever a dynamic security policy stored on security policy management server **120** is changed or altered, or in response to a request from one or more of packet security gateways **112**, **114**, **116**, and **118**.

Security policy management server **120** may also be configured to provide one or more administrators associated with security policy management server **120** with management interface **510**. For example, security policy management server **120** may be configured to provide one or more administrators with a Graphical User Interface (GUI) or Command Line Interface (CLI). An administrator of security policy management server **120** may utilize security policy management server **120**'s management interface **510** to configure security policy management server **120**. For example, an administrator may configure security policy management server **120** in order to associate security policy management server **120** with one or more of packet security gateways **112**, **114**, **116**, and **118**. An administrator of security policy management server **120** may also utilize security policy management server **120**'s management interface **510** to construct one or more dynamic security policies or to load one or more dynamic security policies into security policy management server **120**'s memory **502**. For example, an administrator associated with security policy management server **120** may manually construct one or more dynamic security policies offline and then utilize security policy management server **120**'s management interface **510** to load such dynamic security policies into security policy management server **120**'s memory **502**.

In some embodiments, security policy management server **120** may be configured to add, remove, or alter one or more

dynamic security policies stored in memory **502** based on information received from one or more devices within network environment **100**. For example, security policy management server **120**'s memory **502** may include a dynamic security policy having one or more rules that specify a list of network addresses known to be associated with malicious network traffic. Security policy management server **120** may be configured to automatically create or alter one or more of such rules as new network addresses associated with malicious network traffic are determined. For example, security policy management server **120** may receive updates (e.g. as part of a subscription) from malicious host tracker service **508**. Malicious host tracker service **508** may aggregate information associated with malicious network traffic and updates received from malicious host tracker service **508** may include one or more network addresses that have been determined to be associated with malicious network traffic. Security policy management server **120** may be configured to create or alter one or more rules included within a dynamic security policy associated with malicious host tracker service **508** to block traffic associated with the network addresses received from malicious host tracker service **508**. Additionally or alternatively, as indicated above, security policy management server **120** may be configured to create or alter one or more dynamic security policies, or one or more rules included in one or more dynamic security policies, to account for VoIP sessions being initiated or terminated by a network device within network environment **100**.

In some embodiments, security policy management server **120** may be configured to add, remove, and/or alter one or more dynamic security policies stored in memory **502** based on information received from two or more devices within network environment **100**. For example, security policy management server **120** may receive updates (e.g., as part of a subscription) from malicious host tracker service **508** and/or one or more other services. The updates from the two or more services may be correlated (e.g., by security policy management server **120**). For example, a network address received from host tracker service **508** may be a duplicate of a network address received from another (e.g., different) service (e.g., a range of network addresses received from host tracker service **508** may overlap with a range of network addresses received from another service). Security policy management server **120** may combine the rules associated with these correlated updates from two or more services within one or more dynamic security policies. Security policy management server **120** may be configured to reduce the size of and/or to de-correlate dynamic security policies (e.g., because the performance of a packet security gateway may be dependent on the size of and/or correlations within dynamic security policies). For example, duplicate network addresses may be removed, and/or overlapping ranges of network addresses may be combined into one or more new network address ranges.

As indicated above, a dynamic security policy may include one or more rules, the combination of which may effectuate an implementation of a multi-dimensional routing service for performing a monitoring service within a network environment. FIG. **6** illustrates an exemplary network environment for implementing a monitoring service in accordance with one or more embodiments. Referring to FIG. **6**, a user of network environment **100** (e.g., a law enforcement or national security authority) may desire to obtain a copy of packets associated with one or more VoIP sessions (e.g., sessions associated with SIP URI exampleuser@exampledomain.com) within network environment **100**. Because many SIP-signaled services are designed to address sessions dynamically, it may not be possible to determine, prior to a session being set up, a particular network address and port from which packets should be copied. Moreover, due to privacy concerns, regulators may require that only packets associated with the specified VoIP sessions (e.g., sessions associated with SIP URI exampleuser@exampledomain.com) be copied.

For example, a user associated with SIP URI exampleuser@exampledomain.com may utilize User Equipment (UE) **600** within network A **102** to place a VoIP call to a user utilizing UE **602** within network B **104**. SIP switch **604** may be utilized by an operator of network A **102** for switching SIP signals within network A **102**. Similarly, SIP switch **606** may be utilized by an operator of network B **104** for switching SIP signals within network B **104**. One or more of SIP switches **604** and **606** may include an analysis application configured to monitor SIP signals and publish SIP messages associated with specified users to one or more subscribers. For example, the operator of network A **102** may have installed analysis application **610** on SIP switch **604** (e.g., accessed via a SIP IMS Service Control (ISC) interface associated with SIP switch **604**) and configured analysis application **610** to search for and publish SIP messages associated with SIP URI exampleuser@exampledomain.com to security policy management server **120**. Similarly, the operator of network B **104** may have installed analysis application **612** on SIP switch **606** and configured analysis application **612** to publish SIP messages associated with SIP URI exampleuser@exampledomain.com to security policy management server **120**.

When the user associated with SIP URI exampleuser@exampledomain.com utilizes UE **600** to place a VoIP call to the user utilizing UE **602**, analysis application **610** may detect one or more SIP signaling messages associated with the call (e.g., SIP signaling messages for setting up the call) and publish the messages to security policy management server **120**. Security policy management server **120** may extract one or more network addresses and port numbers from the SIP signaling messages (e.g., a network address and port number utilized by UE **600** for placing the VoIP call to UE **602**). Security policy management server **120** may utilize the extracted network addresses and port numbers to create a new dynamic security policy or alter one or more rules within an existing dynamic security policy. For example, security policy management server **120** may construct a new dynamic security policy that includes a rule specifying one of the extracted network addresses and port numbers, as well as a packet transformation function configured to route associated packets to monitoring device **608**. Security policy management server **120** may communicate the new or modified dynamic security policy to packet security gateway **112**.

When packets associated with the VoIP call between UE **600** and UE **602** are received by packet security gateway **112**, packet filter **214** may identify the packets as matching the criteria specified by the dynamic security policy received from security policy management server **120** (e.g., packets addressed to or from the extracted address and port number) and may perform the packet transformation function configured to route the packets to monitoring device **608**. For example, the packet transformation function configured to route the packets to monitoring device **608** may be packet transformation function 2 **218**. When packet transformation function 2 **218** receives the packets from packet filter **214**, it may encapsulate them with an IP header having an address

corresponding to monitoring device **608** and may then forward them to network E **110**. Once forwarded, the packets may be routed based on the address specified by the encapsulating header, and may thus be communicated to monitoring device **608**. When the packets are received by monitoring device **608**, monitoring device **608** may copy the packets or data contained within them, and strip the encapsulating header from them. Monitoring device **608** may then forward the packets, without the encapsulating header, to network E **110**. Network E **110** may receive the packets forwarded by monitoring device **608** and may route them based on their destination address (e.g., to UE **602**).

In some embodiments, packet security gateway **112** may be configured to perform multiple packet transformation functions on the packets associated with the VoIP call between UEs **600** and **602**. For example, packet filter **214** may identify the packets as matching the criteria specified by the dynamic security policy received from security policy management server **120** and may forward the packets to packet transformation functions 1 **216** and 2 **218**. Packet transformation function 1 **216** may be configured to forward the packets to their destination address (e.g., to UE **602**) and packet transformation function 2 **218** may be configured to encapsulate the packets (or a copy of the packets) with an IP header having an address corresponding to monitoring device **608** and then forward the encapsulated packets to network E **110**. Once forwarded, the encapsulated packets may be routed based on the address specified by the encapsulating header, and may thus be communicated to monitoring device **608**, which may store the packets or data contained within them for subsequent review or analysis (e.g., by a law enforcement or national security authority). In such embodiments, it may not be necessary for monitoring device **608** to strip the encapsulating header from the packets or route them based on their destination address (e.g., to UE **602**) because packet transformation function 1 **216** may have already forwarded the packets to their destination address (e.g., to UE **602**).

It will be appreciated that SIP switch **604**'s analysis application **610** may similarly detect SIP signaling associated with the termination of the VoIP call between UE **600** and UE **602** and may publish the SIP messages to security policy management server **120**. Security policy management server **120** may utilize one or more network addresses and port numbers within the messages to construct a new dynamic security policy or modify one or more rules within an existing dynamic security policy and communicate the new or modified dynamic security policy to packet security gateway **112** in order to ensure that future packets associated with the network address and port number but not associated with SIP URI exampleuser@exampledomain.com are not routed to monitoring device **608**. Security policy management server **120** may communicate any dynamic security policy constructed or modified based on SIP messages to any of multiple packet security gateways (e.g., packet security gateways **114** and **116**) within network environment **100** in order to ensure that all packets associated with the VoIP call between UE **600** and UE **602** are forwarded to monitoring device **608**.

FIG. **7** illustrates an exemplary network environment that includes a secured network having multiple boundaries with unsecured networks in which one or more embodiments may be implemented. Network environment **700** may include networks A-C **702**, **704**, and **706**. Networks A **702** and B **704** may be a LAN or WAN associated with an organization (e.g., a company, university, enterprise, or government agency). One or more networks within network environment



**700** may interface with one or more other networks within network environment **700**. For example, the organizations associated with networks A **702** and B **704** may subscribe to an ISP to provide interconnectivity between their respective networks or allow public access to their respective networks (e.g., via the Internet). Each of networks A **702** and B **704** may be connected to network C **706**, which may be the ISP's network. The ISP may desire to offer an interconnection service between networks A **702** and B **704**, but may also want to enforce one or more dynamic security policies with respect to traffic traversing network C **706**. Accordingly, one or more packet security gateways may be located at each boundary between network A **702** and network C **706**, and each boundary between network B **704** and network C **706**. For example, packet security gateway **708** and packet security gateway **710** may be respectively located at first and second boundaries between networks A **702** and C **706**. Similarly, packet security gateways **712** and **714** may be respectively located at first and second boundaries between networks B **704** and C **706**. Each of packet security gateways **708**, **710**, **712**, and **714** may be associated with security policy management server **716**.

Security policy management server **716** may maintain one or more dynamic security policies configured for protecting network C **706**, and may be managed by the ISP associated with network C **706**. Security policy management server **716** may ensure that each of packet security gateways **708**, **710**, **712**, and **714** protect each of their respective boundaries with network C **706** in a uniform manner. For example, security policy management server **716** may be configured to communicate one or more dynamic security policies it maintains to each of packet security gateways **708**, **710**, **712**, and **714** on a periodic basis, in response to being directed to by a network operator associated with network environment **700**, in response to detected network conditions (e.g., an attack or high resource utilization), or in response to a request from one or more of packet security gateways **708**, **710**, **712**, or **714**.

In some embodiments, security policy management server **716** may be configured to communicate different dynamic security policies to one or more of packet security gateways **708**, **710**, **712**, and **714** based on, for example, their respective locations within network environment **700**. For example, security policy management server **716** may be configured to implement one or more anti-spoofing techniques (e.g., ingress filtering or Best Current Practice (BCP) 38, as described by Internet Engineering Task Force (IETF) Request For Comment (RFC) 2827) with respect to network environment **700**. Effective implementation of such techniques may require that a dynamic security policy be based on the location at which it is being implemented. For example, a dynamic security policy that implements ingress filtering may comprise one or more rules that filter based on a packet's source address, identifying packets having source addresses that could not possibly have originated from a network downstream of the ingress filtering point (e.g., packets having spoofed source addresses). Such rules may vary depending on the boundary point for which they are implemented (e.g., a packet for one boundary may be properly identified as spoofed, yet a packet having the same source address may be legitimate traffic at a different boundary point). Accordingly, security policy management server **716** may be configured to communicate different dynamic security policies to one or more of packet security gateways **708**, **710**, **712**, and **714** based on their respective locations within network environment **700**. For example, security policy management server **716** may communicate a dynamic

security policy to packet security gateways **708** and **710** that includes one or more rules for performing ingress filtering for network A **702** (e.g., for identifying packets having source addresses that could not have originated within network A **702**) and a different dynamic security policy to packet security gateways **712** and **714** that includes one or more rules for performing ingress filtering for network B **704** (e.g., for identifying packets having source addresses that could not have originated within network B **704**).

It will be appreciated that by maintaining uniform dynamic security policies at each boundary between networks A **702** and C **706**, as well as at each boundary between networks B **704** and C **706**, security policy management server **716** and packet security gateways **708**, **710**, **712**, and **714** may aid the ISP associated with network C **706** in protecting network C **706** from network attacks.

FIG. **8** illustrates an exemplary network environment that includes multiple distinct secured networks in which one or more embodiments may be implemented. Referring to FIG. **8**, network environment **800** may include networks A **802**, B **804**, and C **806**. Each of networks A **802** and B **804** may interface with network C **806** at multiple boundaries within network environment **800**. Packet security gateways **808** and **810** may be respectively located at first and second boundaries between networks A **802** and C **806**. Similarly, packet security gateways **812** and **814** may be respectively located at first and second boundaries between networks B **804** and C **806**.

Network A **802** and B **804** may both be associated with a common organization (e.g., a company, university, enterprise, or government agency), or may each be associated with a distinct organization. In the former case, the common organization may desire to utilize one or more dynamic security policies with respect to network A **802** and one or more different dynamic security policies with respect to network B **804**. In the latter case, an organization associated with network A **802** may desire to utilize one or more dynamic security policies with respect to network A **802** and a different organization associated with network B **804** may desire to utilize one or more different dynamic security policies with respect to network B **804**. Network environment **800** may include security policy management servers A **816** and B **818**. Security policy management server A **816** may be associated with network A **802** and may maintain one or more dynamic security policies configured for protecting network A **802**. Similarly, security policy management server B **818** may be associated with network B **804** and may maintain one or more dynamic security policies configured for protecting network B **804**.

Packet security gateways **808** and **810** may be associated with security policy management server A **816**. Similarly, packet security gateways **812** and **814** may be associated with security policy management server B **818**. Security policy management server A **816** may ensure that packet security gateways **808** and **810** protect each of their respective boundaries with network C **806** in a uniform manner. For example, security policy management server A **816** may be configured to communicate one or more dynamic security policies it maintains to packet security gateways **808** and **810** on a periodic basis, in response to being directed to by a network operator associated with network A **802**, in response to detected network conditions (e.g., an attack or high resource utilization), or in response to a request from packet security gateway **808** or **810**. Similarly, security policy management server B **818** may ensure that packet security gateways **812** and **814** protect each of their respective boundaries with network C **806** in a uniform manner.



For example, security policy management server B **818** may be configured to communicate one or more dynamic security policies it maintains to packet security gateways **812** and **814** on a periodic basis, in response to being directed to by a network operator associated with network B **804**, in response to detected network conditions (e.g., an attack or high resource utilization), or in response to a request from packet security gateway **812** or **814**. By utilizing distinct security policy management servers (e.g., security policy management servers A **816** and B **818**), one or more operators associated with distinct networks (e.g., networks A **802** and B **804**) may maintain uniform dynamic security policies at each boundary of their respective networks, while simultaneously enabling different dynamic security policies to be maintained for each network. Similarly, by utilizing distinct security policy management servers (e.g., security policy management servers A **816** and B **818**), one or more operators associated with a single organization that desires to maintain distinct networks (e.g., networks A **802** and B **804**) may maintain uniform dynamic security policies at each boundary of their distinct networks, while simultaneously enabling different dynamic security policies to be maintained for each network.

FIG. **9** illustrates an exemplary secure LAN environment protected in accordance with one or more aspects of the disclosure. Referring to FIG. **9**, network environment **900** may be a LAN, including hosts A **902**, B **904**, and C **906**. It may also include LAN switch **908**. LAN switch **908** may be configured to switch network traffic (e.g., packets) between one or more of hosts A **902**, B **904**, and C **906**. For example, LAN switch **908** may include a switching matrix configured to switch packets received from one or more of hosts A **902**, B **904**, and C **906** to one or more of hosts A **902**, B **904**, and C **906**. LAN switch **908** may be associated with packet security gateway **910**, and network environment **900** may include security policy management server **912**.

In some embodiments, packet security gateway **910** may be embedded within LAN switch **908**. Alternatively, packet security gateway **910** may be a device distinct from LAN switch **908**, and LAN switch **908** may be configured to route network traffic through packet security gateway **910** (e.g., by modifying LAN switch **908**'s switching matrix). Packet security gateway **910** may be configured to receive one or more dynamic security policies from security policy management server **912**. The dynamic security policies received from security policy management server **912** may include one or more rules specifying criteria associated with one or more of hosts A **902**, B **904**, and C **906**, and may further specify one or more packet transformation functions to be performed on packets matching the specified criteria. Packet security gateway **910** may identify packets matching one or more of the criteria specified by the rules and may perform the associated packet transformation functions on the identified packets. By utilizing packet security gateway **910** within network environment **900**, an operator of network environment **900** may be able to protect network environment **900** from network attacks, as well as implement one or more services (e.g., blocklist service, allowlist service, VoIP firewall service, phased restoration service, enqueueing service, multi-dimensional routing service, or monitoring service) within network environment **900**. Network environment **900** may include multiple LAN switches with embedded or associated packet security gateways, each of the packet security gateways configured to receive one or more dynamic security policies from security policy management server **912**.

FIG. **10** illustrates an exemplary method for protecting a secured network in accordance with one or more embodiments. The steps may be performed at each of one or more packet security gateways associated with a security policy management server. For example, each of packet security gateways **112**, **114**, **116**, and **118** may be associated with security policy management server **120**, and the steps may be performed at each of packet security gateways **112**, **114**, **116**, and **118**. At step **1000**, a dynamic security policy is received from the security policy management server. For example, packet security gateway **112** may receive dynamic security policy **300** from security policy management server **120**. At step **1002**, packets associated with a network protected by each respective packet security gateway are received. For example, packet security gateway **112** may receive UDP packets from a device within network E **110** having an address that begins with 150 and that are destined for port 3030 of a device within network A **102**. At step **1004**, a packet transformation function specified by the dynamic security policy is performed on the packets. For example, rule **308** of dynamic security policy **300** may specify that packets using the UDP protocol, coming from a source address that begins with 150, having any source port, destined for any address, and destined for port 3030 should have an accept packet transformation function performed on them, packet filter **214** may identify the UDP packets received from the device within network E **110** as matching the criteria specified by rule **308**, packet transformation function 1 **216** may be configured to forward packets, and packet security gateway **112** may utilize packet transformation function 1 **216** to perform the accept packet transformation function specified by rule **308** on the UDP packets received from the device within network E **110**.

FIG. **11** illustrates an exemplary method for protecting a secured network that includes identifying packets based on application-layer packet-header information. Referring to FIG. **11**, at step **1102**, a plurality of packet security gateways associated with a security policy management server may receive a dynamic security policy that includes at least one rule specifying application-layer packet-header information and a packet transformation function to be performed on packets comprising the application-layer packet-header information. For example, packet security gateways **112**, **114**, **116**, and **118** may be associated with security policy management server **120** and may receive a dynamic security policy that includes one or more rules specifying application-layer packet-header information (e.g., information that identifies one or more HTTP packets) and a packet transformation function to be performed on packets comprising the application-layer packet-header information (e.g., an accept or deny packet transformation function) from security policy management server **120**. At step **1104**, a packet security gateway, of the plurality of packet security gateways associated with the security policy management server, may receive packets associated with a network protected by the packet security gateway. For example, packet security gateway **112** may receive packets associated with network A **102** (e.g., from a computing device located in network A **102**, network B **104**, network C **106**, network D **108**, and/or network E **110**).

At step **1106**, the packet security gateway may identify, from amongst the packets associated with the network protected by the packet security gateway, and on a packet-by-packet basis, one or more packets comprising the application-layer packet-header information. For example, in some embodiments, the rule(s) specifying the application-layer packet-header information may identify one or more HTTP packets (e.g., one or more HTTP packets comprising an HTTP GET method call and/or an HTTP PUT method call), and packet security gateway **112** may identify, from amongst the packets associated with network A **112**, one or more packets comprising the application-layer packet-header information. In some embodiments, identifying the packets comprising the application-layer packet-header information may include the packet security gateway determining that the packets are among the HTTP packets identified by the rule(s) (e.g., the HTTP GET method call and/or the HTTP PUT method call may specify one or more URIs, and packet security gateway **112** may determine that the packet(s) originated from and/or are destined for a network address corresponding to the URI(s)). At step **1108**, the packet security gateway may perform, on a packet-by-packet basis, the packet transformation function on the identified packet(s). For example, if the packet transformation function is an accept packet transformation function, packet security gateway **112** may forward the packet(s) toward their respective destinations. Similarly, if the packet transformation function is a deny packet transformation function, packet security gateway **112** may drop the packet(s).

FIG. **12** illustrates an exemplary method for protecting a secured network that includes performing a packet digest logging function on packets that correspond to specified packet-identification criteria. Referring to FIG. **12**, at step **1202**, each of a plurality of packet security gateways associated with a security policy management server may receive a dynamic security policy that includes at least one rule specifying packet-identification criteria and a packet transformation function comprising a packet digest logging function to be performed on packets corresponding to the packet-identification criteria from the security policy management server. For example, packet security gateways **112**, **114**, **116**, and **118** may be associated with security policy management server **120** and may receive a dynamic security policy that includes one or more rules specifying packet-identification criteria (e.g., application-layer packet-header information and/or a five-tuple specifying one or more transport-layer protocols, a range of source addresses, a range of source ports, a range of destination addresses, and a range of destination ports) and a packet transformation function comprising a packet digest logging function to be performed on packets corresponding to the packet-identification criteria from security policy management server **120**. At step **1204**, a packet security gateway, of the plurality of packet security gateways associated with the security policy management server, may receive packets associated with a network protected by the packet security gateway. For example, packet security gateway **112** may receive packets associated with network A **102** (e.g., from a computing device located in network A **102**, network B **104**, network C **106**, network D **108**, and/or network E **110**).

At step **1206**, the packet security gateway may identify from amongst the packets associated with the network protected by the packet security gateway, and on a packet-by-packet basis, one or more packets corresponding to the packet-identification criteria. For example, packet security gateway **112** may identify from amongst the packets associated with network A **102** one or more packets corresponding to the packet-identification criteria (e.g., by determining that the packet(s) comprise the specified application-layer packet-header information and/or correspond to at least one of the specified transport-layer protocols, have a source address within the specified range of source addresses, have a source port within the specified range of source ports, have

a destination address within the specified range of destination addresses, and/or have a destination port within the specified range of destination ports). At step **1208**, the packet security gateway may perform, on a packet-by-packet basis, the packet digest logging function on each of the packets corresponding to the packet-identification criteria. For example, packet security gateway **112** may perform the packet digest logging function on each of the identified packets.

In some embodiments, performing the packet digest logging function may include identifying a subset of information specified by the packet digest logging function (e.g., a portion of data from the packet, a source address of the packet, a source port of the packet, a destination address of the packet, a destination port of the packet, a transport-protocol type of the packet, a uniform resource identifier (URI) from the packet, an arrival time of the packet, a size of the packet, a flow direction of the packet, an identifier of an interface of the packet security gateway that received the packet, and/or one or more media access control (MAC) addresses associated with the packet) for each of the identified packets, and generating a record comprising the subset of information for each of the identified packets. In some embodiments, packet security gateway **112** may be configured to temporarily store data comprising the subset of information for each of the identified packets, and to utilize the stored data to generate a message comprising the subset of information (or a portion thereof) for each of the identified packets. In such embodiments, packet security gateway **112** may communicate the message to a different computing device (e.g., security policy management server **120**). In some embodiments, the subset of information (or a portion thereof) may be reformatted (e.g., by packet security gateway **112** and/or security policy management server **120**) in accordance with a logging system standard (e.g., syslog).

FIG. **13** illustrates an exemplary method for protecting a secured network that includes receiving security updates from multiple sources. Referring to FIG. **13**, at step **1302**, a security policy management server may receive a security update comprising a set of network addresses from a computing device. For example, security policy management server **120** may receive a security update comprising a set of network addresses (e.g., {network address A, network address B, and network address C}) from malicious host tracker service **508** (or a computing device associated therewith). At step **1304**, the security policy management server may update one or more rules stored in its memory to include the set of network addresses. For example, security policy management server **120** may update one or more rules of dynamic security policy **300** (e.g., a rule specifying a deny packet transformation function) to include the set of network addresses (e.g., network addresses A, B, and C). At step **1306**, the security policy management server may receive a security update comprising a different set of network addresses from a different computing device. For example, security policy management server **120** may receive a security update comprising a different set of network addresses (e.g., {network address B, network address C, network address D, and network address E}) from a different computing device (e.g., a different computing device associated with malicious host tracker service **508** or a computing device associated with a malicious host tracker service different from malicious host tracker service **508**).

At step **1308**, the security policy management server may determine that the different set of network addresses includes at least a portion of network addresses included in the set of network addresses, and, at step **1310**, may identify the at least a portion of network addresses included in the set of network addresses. For example, security policy management server **120** may determine that the different set of network address (e.g., {network address B, network address C, network address D, and network address E}) includes at least a portion of network addresses (e.g., network addresses B and C) included in the set of network addresses (e.g., {network address A, network address B, and network address C}), and may identify the at least a portion of network addresses included in the set of network addresses (e.g., network addresses B and C). At step **1312**, the security policy management server may identify at least one of the rules stored in its memory that specifies a range of network addresses comprising the at least a portion of network addresses. For example, security policy management server **120** may identify the rule(s) of dynamic security policy **300** updated in step **1304** (e.g., the rule(s) updated to include network addresses A, B, and C). At step **1314**, the security policy management server may update the identified rule(s) to include one or more other network addresses included in the different set of network addresses. For example, security policy management server **120** may update the identified rules of dynamic security policy **300** to include one or more other network addresses included in the different set of network addresses (e.g., network addresses D and E).

In some embodiments, the security policy management server may identify two or more rules that each specify a range of network addresses comprising the at least a portion of network addresses. For example, security policy management server **120** may identify two rules of dynamic security policy **300** that each include the at least a portion of network addresses (e.g., a rule that includes network addresses A, B, C, and F, and a rule that includes network addresses A, B, C, and G). In such embodiments, the security policy management server may combine the two or more rules into a rule that specifies a range of network addresses that includes network addresses specified by each of the two or more rules and the one or more other network addresses included in the different set of network addresses. For example, security policy management server **120** may combine the two rules of dynamic security policy **300** that each include the at least a portion of network addresses (e.g., the rule that includes network addresses A, B, C, and F, and the rule that includes network addresses A, B, C, and G) into a rule that specifies a range of network addresses that includes network addresses specified by each of the two identified rules and the one or more other network addresses included in the different set of network addresses (e.g., a range that includes network addresses A, B, C, D, E, F, and G).

The functions and steps described herein may be embodied in computer-usable data or computer-executable instructions, such as in one or more program modules, executed by one or more computers or other devices to perform one or more functions described herein. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types when executed by one or more processors in a computer or other data processing device. The computer-executable instructions may be stored on a computer-readable medium such as a hard disk, optical disk, removable storage media, solid state memory, RAM, etc. As will be appreciated, the functionality of the program modules may be combined or distributed as desired in various embodiments. In addition, the functionality may be embodied in whole or in part in firmware or hardware equivalents, such as integrated circuits, application-specific integrated

circuits (ASICs), field programmable gate arrays (FPGA), and the like. Particular data structures may be used to more effectively implement one or more aspects of the disclosure, and such data structures are contemplated to be within the scope of computer executable instructions and computer-usable data described herein.

Although not required, one of ordinary skill in the art will appreciate that various aspects described herein may be embodied as a method, an apparatus, or as one or more computer-readable media storing computer-executable instructions. Accordingly, those aspects may take the form of an entirely hardware embodiment, an entirely software embodiment, an entirely firmware embodiment, or an embodiment combining software, hardware, and firmware aspects in any combination.

As described herein, the various methods and acts may be operative across one or more computing servers and one or more networks. The functionality may be distributed in any manner, or may be located in a single computing device (e.g., a server, a client computer, etc.).

Aspects of the disclosure have been described in terms of illustrative embodiments thereof. Numerous other embodiments, modifications, and variations within the scope and spirit of the appended claims will occur to persons of ordinary skill in the art from a review of this disclosure. For example, one of ordinary skill in the art will appreciate that the steps illustrated in the illustrative figures may be performed in other than the recited order, and that one or more steps illustrated may be optional.

What is claimed is:

1. A method of filtering packets at a packet security gateway configured for protection of a network and associated with a security policy management server external from the network, the method comprising:

receiving, by the packet security gateway, a dynamic security policy comprising a first set of packet filtering rules from the security policy management server, wherein each packet filtering rule of the first set of packet filtering rules comprises at least one packet matching criterion and a corresponding packet transformation function, and wherein one or more first packet filtering rules of the first set of packet filtering rules were automatically created or altered by the security policy management server based on malicious traffic information received from a malicious host tracker service;

performing, on a packet by packet basis, packet filtering on a first portion of packets associated with the network protected by the packet security gateway based on the first set of packet filtering rules by performing at least one of multiple packet transformation functions specified by at least one packet filtering rule of the first set of packet filtering rules on the first portion of packets, wherein at least one of the multiple packet transformation functions specified by the at least one packet filtering rule of the first set of packet filtering rules corresponds to a packet digest logging function that supports a network communications awareness service and comprises:

identifying a subset of information specified by a packet matching the packet matching criterion of a packet filtering rule that specified the packet digest logging function;

generating a record comprising the subset of information specified by the packet;



reformatting the subset of information specified by the packet in accordance with a logging system standard; and

routing, by the packet security gateway, the packet to a monitoring device;

receiving, by the packet security gateway and after performing packet filtering on the first portion of the packets, an updated second set of packet filtering rules for the dynamic security policy from the security policy management server, wherein the updated second set of packet filtering rules comprises an update to the first set of packet filtering rules and was generated by the security policy management server based on updated malicious traffic information received from the malicious host tracker service; and

performing, on a packet by packet basis, packet filtering on a second portion of the packets associated with the network protected by the packet security gateway based on the updated second set of packet filtering rules.

2. The method of claim 1, wherein the at least one packet matching criterion comprises at least one network address associated with an indication of malicious network traffic.

3. The method of claim 1, wherein at least one packet transformation function comprises a network protective action.

4. The method of claim 1, wherein the dynamic security policy specifies that a first set of the packets should be placed in a first forwarding queue and a second set of the packets should be placed in a second forwarding queue, the first forwarding queue having a higher forwarding rate than the second forwarding queue, the method comprising:

sending, by the packet security gateway, the first set of the packets in the first forwarding queue; and

sending, by the packet security gateway, the second set of the packets in the second forwarding queue.

5. The method of claim 1, further comprising:

receiving, by the packet security gateway, packets in a network layer transparent manner using an interface that is not addressed at the network layer and performing the at least one of the multiple packet transformation functions at the network layer.

6. The method of claim 1, wherein the network communications service comprises a network security awareness service or a network threat awareness service.

7. The method of claim 1, wherein the network communications service is provided based on one or more criteria that are indicative of packet communications that are of interest to an organization that operates the secured network.

8. A packet security gateway configured to protect a network and associated with a security policy management server external from the network, comprising:

at least one processor; and

memory comprising instructions that, when executed by the at least one processor, cause the packet security gateway to:

receive a dynamic security policy comprising a first set of packet filtering rules from the security policy management server, wherein each packet filtering rule of the first set of packet filtering rules comprises at least one packet matching criterion and a corresponding packet transformation function, and wherein one or more first packet filtering rules of the first set of packet filtering rules were automatically created or altered by the security policy management server based on malicious traffic information received from a malicious host tracker service;

perform, on a packet by packet basis, packet filtering on a first portion of packets associated with the network protected by the packet security gateway based on the first set of packet filtering rules by performing at least one of multiple packet transformation functions specified by at least one packet filtering rule of the first set of packet filtering rules on the first portion of the packets, wherein at least one of the multiple packet transformation functions specified by the at least one packet filtering rule of the first set of packet filtering rules corresponds to a packet digest logging function that supports a network communications awareness service and comprises instructions that cause the packet security gateway to:

identify a subset of information specified by a packet matching the packet matching criterion of a packet filtering rule that specified the packet digest logging function;

generate a record comprising the subset of information specified by the packet;

reformat the subset of information specified by the packet in accordance with a logging system standard; and

route the packet to a monitoring device;

receive, after performing packet filtering on the first portion of the packets, an updated second set of packet filtering rules for the dynamic security policy from the security policy management server, wherein the updated second set of packet filtering rules comprises an update to the first set of packet filtering rules and was generated by the security policy management server based on updated malicious traffic information received from the malicious host tracker service; and

perform, on a packet by packet basis, packet filtering on a second portion of the packets associated with the network protected by the packet security gateway based on the updated second set of packet filtering rules.

**9**. The packet security gateway of claim **8**, wherein the at least one packet matching criterion comprises at least one network address associated with an indication of malicious network traffic.

**10**. The packet security gateway of claim **8**, wherein at least one packet transformation function comprises a network protective action.

**11**. The packet security gateway of claim **8**, wherein the dynamic security policy specifies that a first set of the packets should be placed in a first forwarding queue and a second set of the packets should be placed in a second forwarding queue, the first forwarding queue having a higher forwarding rate than the second forwarding queue, the memory further comprising instructions to cause the packet security gateway to:

send the first set of the packets in the first forwarding queue; and

send the second set of the packets in the second forwarding queue.

**12**. The packet security gateway of claim **8**, the memory further comprising instructions that cause the packet security gateway to:

receive packets in a network layer transparent manner using an interface that is not addressed at the network layer and performing the at least one of the multiple packet transformation functions at the network layer.

**13**. One or more non-transitory computer-readable media comprising instructions that, when executed by one or more processors of a packet security gateway configured to protect a network, cause the packet security gateway to:

receive a dynamic security policy comprising a first set of packet filtering rules from a security policy management server external from the network, wherein each packet filtering rule of the first set of packet filtering rules comprises at least one packet matching criterion and a corresponding packet transformation function, and wherein one or more first packet filtering rules of the first set of packet filtering rules is-were automatically created or altered by the security policy management server based on malicious traffic information received from a malicious host tracker service;

perform, on a packet by packet basis, packet filtering on a first portion of packets associated with the network protected by the packet security gateway based on the first set of packet filtering rules by performing at least one of multiple packet transformation functions specified by at least one packet filtering rule of the first set of packet filtering rules on the first portion of the packets, wherein at least one of the multiple packet transformation functions specified by the at least one packet filtering rule of the first set of packet filtering rules corresponds to a packet digest logging function that supports a network communications awareness service and comprises instructions that cause the packet security gateway to:

identify a subset of information specified by a packet matching the packet matching criterion of a packet filtering rule that specified the packet digest logging function;

generate a record comprising the subset of information specified by the packet;

reformat the subset of information specified by the packet in accordance with a logging system standard; and

route the packet to a monitoring device;

receive, after performing packet filtering on the first portion of the packets, an updated second set of packet filtering rules for the dynamic security policy from the security policy management server, wherein the updated second set of packet filtering rules comprises an update to the first set of packet filtering rules and was generated by the security policy management server based on updated malicious traffic information received from the malicious host tracker service; and

perform, on a packet by packet basis, packet filtering on a second portion of the packets associated with the network protected by the packet security gateway based on the updated second set of packet filtering rules.

**14**. The one or more non-transitory computer-readable media of claim **13**, wherein the at least one packet matching criterion comprises at least one network address associated with an indication of malicious network traffic.

**15**. The one or more non-transitory computer-readable media of claim **13**, wherein at least one packet transformation function comprises a network protective action.

**16**. The one or more non-transitory computer-readable media of claim **13**, wherein the dynamic security policy specifies that a first set of the packets should be placed in a first forwarding queue and a second set of the packets should be placed in a second forwarding queue, the first forwarding queue having a higher forwarding rate than the second forwarding queue, the computer-readable media further comprising instructions that cause the packet security gateway to:

send the first set of the packets in the first forwarding queue; and

send the second set of the packets in the second forwarding queue.

**17**. The one or more non-transitory computer-readable media of claim **13**, further comprising instructions that cause the packet security gateway to:

receive packets in a network layer transparent manner using an interface that is not addressed at the network layer and performing the at least one of the multiple packet transformation functions at the network layer.

* * * * *

# CERTIFICATE OF COMPLIANCE WITH RULE 32(B)

1. This brief complies with the type-volume limitation of Fed. Cir. R. 32(b) because this brief contains 7,041 words, exclusive of the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

Dated: July 21, 2023

By: */s/ James Hannah*
James Hannah

*Attorneys for Appellant,*
Centripetal Networks, LLC