**No. 23-1730**

# United States Court of Appeals for the Federal Circuit

CENTRIPETAL NETWORKS, LLC,
Appellant,

v.

PALO ALTO NETWORKS, INC.,
Appellee.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in Proceeding No. IPR2021-01157

## BRIEF OF APPELLEE

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Phone: (202) 508-4600

Andrew T. Radsch
James R. Batchelder
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
Phone: (650) 617-4000

Colin Dunn
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Phone: (212) 596-9000

*Counsel for Appellee Palo Alto Networks, Inc.*

## EXEMPLARY CLAIM

**U.S. Patent No. 10,749,906 (Appx96) (emphasis added)**

1. A method of filtering packets at a packet security gateway configured for protection of a network and associated with a security policy management server external from the network, the method comprising:

receiving, by the packet security gateway, a dynamic security policy comprising a first set of packet filtering rules from the security policy management server, wherein each packet filtering rule of the first set of packet filtering rules comprises at least one packet matching criterion and a corresponding packet transformation function, and wherein one or more first packet filtering rules of the first set of packet filtering rules were automatically created or altered by the security policy management server based on ***malicious traffic information received from a malicious host tracker service***;

performing, on a packet by packet basis, packet filtering on a first portion of packets associated with the network protected by the packet security gateway based on the first set of packet filtering rules by performing at least one of multiple packet transformation functions specified by at least one packet filtering rule of the first set of packet filtering rules on the first portion of packets, wherein at least one of the multiple packet transformation functions specified by the at least one packet filtering rule of the first set of packet filtering rules corresponds to a packet digest logging function that supports a network communications awareness service and comprises:

identifying a subset of information specified by a packet matching the packet matching criterion of a packet filtering rule that specified the packet digest logging function;

generating a record comprising the subset of information specified by the packet;

reformatting the subset of information specified by the packet in accordance with a logging system standard; and

routing, by the packet security gateway, the packet to a monitoring device;

receiving, by the packet security gateway and after performing packet filtering on the first portion of the packets, an updated second set of packet filtering rules for the dynamic security policy from the security policy management server, wherein the updated second set of packet filtering rules comprises an update to the first set of packet filtering rules and was generated by the security policy management server based on updated malicious traffic information received from the malicious host tracker service; and

performing, on a packet by packet basis, packet filtering on a second portion of the packets associated with the network protected by the packet security gateway based on the updated second set of packet filtering rules.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1730

**Short Case Caption** Centripetal Networks, LLC v. Palo Alto Networks, Inc.

**Filing Party/Entity** Palo Alto Networks, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/29/2023

Signature: /s/ Andrew T. Radsch

Name: Andrew T. Radsch

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Palo Alto Networks, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Mark Rowland, Ropes & Gray LLP | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... vii

TABLE OF ABBREVIATIONS .......... x

STATEMENT OF RELATED CASES .......... xi

STATEMENT OF JURISDICTION .......... 1

INTRODUCTION .......... 2

STATEMENT OF THE ISSUES .......... 4

STATEMENT OF THE CASE .......... 6

I. The Challenged ’906 Patent .......... 6

II. The Jungck Prior Art Reference .......... 8

III. Overview of the IPR Proceedings .......... 10

A. Petition .......... 10

B. Patent Owner Preliminary Response .......... 14

C. Institution Decision .......... 14

D. Post-Institution and Final Written Decision .......... 15

SUMMARY OF THE ARGUMENT .......... 19

ARGUMENT .......... 22

I. LEGAL STANDARDS .......... 22

A. Standard Of Review .......... 22

B. Collateral Estoppel .......... 23

II. THE BOARD CORRECTLY REJECTED CENTRIPETAL’S NARROWING CONSTRUCTION OF “MALICIOUS TRAFFIC

**Table of Contents**
**(continued)**

INFORMATION RECEIVED FROM A MALICIOUS HOST TRACKER SERVICE" AS UNSUPPORTED ....25

A. The Board Correctly Rejected Centripetal's Unduly Narrow Construction of "Malicious Host Tracker Service" ....27

1. The Board did not refuse to construe this claim term ....27

2. Centripetal's proposed narrowing claim construction is unsupported by and contrary to the evidence ....31

B. The Board Correctly Did Not Limit "Malicious Traffic Information" to Just One Particular Type of Such Information ....34

III. THE BOARD CORRECTLY FOUND THAT JUNGCK TEACHES "MALICIOUS TRAFFIC INFORMATION RECEIVED FROM A MALICIOUS HOST TRACKER SERVICE"—EVEN UNDER CENTRIPETAL'S PROPOSED CONSTRUCTION ....38

A. Centripetal Is Collaterally Estopped From Relitigating Earlier Fact Findings About Jungck That Satisfy Centripetal's Own Proposed Construction Here ....40

B. Substantial Evidence Supports The Board's Findings With Respect To The Teachings Of Jungck ....43

1. Overwhelming and unrebutted evidence supports the Board's fact findings ....44

2. The Board expressly found that Jungck teaches the claimed malicious host tracker construction under Centripetal's construction ....47

3. Centripetal's attempt to relitigate whether Jungck's "malicious program code" encompasses "malicious traffic information" fails ....49

4. Centripetal's focus only on Jungck's spoofed address example cannot establish that the Board's decision lacked substantial evidence support ....51

**Table of Contents**
**(continued)**

CONCLUSION ..... 56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................28, 29, 30

*ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*,
908 F.3d 1267 (Fed. Cir. 2018) ....................24

*Bot M8 LLC v. Sony Interactive Entertainment LLC*,
66 F.4th 1380 (Fed. Cir. 2023) ....................27

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
847 F. App'x 929 (Fed. Cir. 2021) ....................3, 21, 39, 40

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017) ....................30

*In re Cree, Inc.*,
818 F.3d 694 (Fed. Cir. 2016) ....................55

*In re CSB-Sys. Int'l, Inc.*,
832 F.3d 1335 (Fed. Cir. 2016) ....................22

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261 (2016)....................22

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ....................22

*In re Johnston*,
435 F.3d 1381 (Fed. Cir. 2006) ....................33

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ....................22

*In re Sullivan*,
362 F.3d 1324 (Fed. Cir. 2004) ....................23

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ....................................................................23

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................................................................22

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020) ....................................................................53

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)..........................................................................................53

*MaxLinear, Inc. v. CF CRESPE LLC*,
880 F.3d 1373, 1376 (Fed. Cir. 2018) ........................................................23

*Merck & Co. v. Biocraft Lab'ys, Inc.*,
874 F.2d 804 (Fed. Cir. 1989) ..............................................................50, 53, 54

*Monsanto Tech. LLC v. E.I. DuPont De Nemours & Co.*,
878 F.3d 1336 (Fed. Cir. 2018) ....................................................................55

*Ohio Willow Wood Co. v. Alps South, LLC*,
735 F.3d 1333 (Fed. Cir. 2013) ..............................................................23, 24

*Papst Licensing GmbH & Co. KG v Samsung Elecs. Am., Inc.*,
924 F.3d 1243 (Fed. Cir. 2019) ....................................................23, 24, 39, 41

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013) ....................................................................22

*Snap-On Inc. v. Milwaukee Elec. Tool Corp.*,
722 F. App'x 1041 (Fed. Cir. 2018) ............................................................27

*Stephen Slesinger, Inc. v. Disney Enters., Inc.*,
702 F.3d 640 (Fed. Cir. 2012) ......................................................................23

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)..........................................................................................22

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) ....................................................................29

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
200 F.3d 795 (Fed. Cir. 1999) ....................29, 30

*XY, LLC v. Trans Ova Genetics*,
890 F.3d 1282 (Fed. Cir. 2018) ....................24

**Statutes**

5 U.S.C. § 706 ....................22

5 U.S.C. § 706(2)(A) ....................23

28 U.S.C. § 1295(a)(4)(A) ....................1

35 U.S.C. § 311 ....................1

35 U.S.C. § 318(b) ....................24

35 U.S.C. § 319 ....................1

# TABLE OF ABBREVIATIONS

| **Term** | **Meaning** |
|---|---|
| ’205 patent | U.S. Patent No. 9,137,205 |
| ’906 patent | U.S. Patent No. 10,749,906 |
| AIA | Leahy-Smith America Invents Act |
| Centripetal | Appellant Centripetal Networks, LLC |
| FWD | Final Written Decision |
| Jungck | Prior Art Reference - Patent Application Pub. No. US 2009/0262741 A1 |
| -01443 IPR | IPR2018-01443 |
| PAN | Appellee Palo Alto Network, Inc. |
| POSITA | Person of Ordinary Skill in the Art |
| PSG | Packet Security Gateways |
| PTAB / Board | Patent Trial and Appeal Board |
| PTO | U.S. Patent and Trademark Office |
| SPMS | Security Policy Management Server |

## STATEMENT OF RELATED CASES

Palo Alto Network, Inc.'s ("PAN") counsel is unaware of any related proceedings within the meaning of Federal Circuit Rule 47.5(a).

Pursuant to Federal Circuit Rule 47.5(b), PAN states that the following cases may be directly affected by this Court's decision: *Centripetal Networks, LLC v. Palo Alto Networks, Inc.*, No. 2:21-cv-00137 (E.D. Va.), currently involving (among others), U.S. Patent No. 10,749,906 at issue here, along with U.S. Patent Nos. 10,567,437, 10,785,266, and 10,091,246, each of which is related to the patent at issue here.

## STATEMENT OF JURISDICTION

The U.S. Patent and Trademark Office ("PTO") had jurisdiction over the Petition for Inter Partes Review filed by PAN under 35 U.S.C. § 311 and § 6(a) of the Leahy-Smith America Invents Act ("AIA"). This Court has jurisdiction to review the Final Written Decision ("FWD") entered by the Patent Trial and Appeal Board ("Board") on March 10, 2023, under 28 U.S.C. § 1295(a)(4)(A) and § 6(a) of the AIA as codified at 35 U.S.C. § 319.

# INTRODUCTION

In this appeal, Centripetal seeks to relitigate settled fact findings about the teachings of prior art that were resolved against Centripetal in an earlier PTAB FWD that this Court affirmed. That appellate-affirmed Board decision concerned a related Centripetal patent with a claim limitation nearly identical to the claim limitation at issue here, the same prior art, and factual findings about that prior art that conclusively resolve this appeal.

The ’906 patent at issue here is generally directed to filtering packets in a computer network. The sole issue Centripetal raises on appeal is whether the prior art Jungck reference teaches or suggests to a POSITA a policy server that creates or alters packet filtering rules based on “malicious traffic information received from a malicious host tracker service.” According to Centripetal, the specification describes this feature as “a subscription service that aggregates and disseminates identifying information, such as ‘the list of known network addresses associated with malicious network traffic,’ for hosts associated with malicious network traffic.” Op. Br. 11. Centripetal’s related U.S. Patent No. 9,137,205 (“’205 patent”) similarly recites, in nearly identical words, a policy server receiving “from a subscription service that aggregates information associated with malicious network traffic, a list of network addresses known to be associated with malicious network traffic” and generating one or more rules based on that information. Appx1567 (22:19-27). In

an earlier IPR involving Centripetal and its ’205 patent (IPR2018-01443, hereinafter the “-01443 IPR”), the Board found that Jungck teaches that limitation of the ’205 patent. Appx1850-1852; *see also* Appx1805-1860 (-01443 IPR FWD). Centripetal did not appeal those fact findings, which became final upon this Court’s affirmance of the Board’s FWD. *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 847 F. App’x 929 (Fed. Cir. 2021) (Rule 36 affirmance) (Appx2072-2073). There is no sound basis to relitigate that settled fact finding, which resolves this appeal entirely.

Nevertheless, Centripetal attempts to undo the Board’s decision below based on a series of flawed arguments. Centripetal argues that the Board erred in not construing the claimed “malicious traffic information received from a malicious host tracker service” as being limited to certain exemplary features—namely, ***identifying*** information about malicious network hosts. But the Board did not err in according that term its plain meaning while rejecting Centripetal’s narrowing construction. Regardless, Centripetal’s claim construction arguments are a red herring: the Board already determined, in the appellate-affirmed -01443 IPR FWD involving Centripetal’s related ’205 patent, that Jungck teaches the exact features that Centripetal’s construction would require. Moreover, and contrary to Centripetal’s arguments otherwise, the Board here expressly found that Jungck teaches the “malicious traffic information received from a malicious host tracker service” limitation under Centripetal’s proposed construction, and that decision is supported

by substantial evidence. There is no reasonable dispute that Jungck teaches this limitation under both the term's plain meaning (which Centripetal does not challenge) and Centripetal's proposed narrowing construction.

The Board's decision should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether the Board correctly rejected Centripetal's proposed narrowing construction of the claimed "malicious traffic information received from a malicious host tracker service" because Centripetal's construction sought to add terms and concepts not required by the claims or specification and that deviated from plain meaning.

2. Regardless of the Board's claim construction decision, whether Centripetal is collaterally estopped from relitigating Board fact findings—that Centripetal did not appeal and that have become final—that Jungck teaches a policy server receiving and generating information that identifies malicious network hosts (e.g., a list of network addresses known to be associated with malicious network traffic) from a service that tracks and provides such information (e.g., a subscription service that aggregates information associated with malicious network traffic)—findings that satisfy Centripetal's proposed construction of "malicious traffic information received from a malicious host tracker service."

3. Even if collateral estoppel did not apply here, whether the Board's findings that Jungck teaches the claimed "malicious traffic information received from a malicious host tracker service," including under Centripetal's proposed construction, was supported by substantial evidence.

## STATEMENT OF THE CASE

### I. The Challenged ’906 Patent

The ’906 patent is directed to methods and systems for protecting one or more secure networks (red) using one or more packet security gateways (“PSG”) (blue) to filter packets communicated with the protected networks. Appx64 (Abstract), Appx84 (1:57-2:3), Appx86 (5:31-51), Appx120 (’906, Fig. 1 (annotated)). A PSG may receive a dynamic security policy from a security policy management server (“SPMS”) (purple). Appx80 (Fig. 10), Appx86 (6:10-13), Appx86 (6:21-41), Appx87 (8:23-33), Appx93 (19:57-67).




Appx120 (’906, Fig. 1 (annotated)).

The dynamic security policy may include one or more rules, where each rule specifies criteria and one or more “packet transformation functions that should be

performed for packets associated with the specified criteria" (*e.g.*, forward, drop, or modify the packet). Appx86 (6:10-51), Appx87 (7:27-8:33). The packet filtering rules may specify criteria comprising one or more values found in five-tuple header information (*e.g.*, a protocol type, source IP address, source port, destination IP address, and/or destination port), and/or values found in an application-layer header. Appx73 ('906, Fig. 3), Appx87 (7:33-44, 8:19-33).

The '906 patent further explains that, in some embodiments, the SPMS may use malicious traffic information received from a malicious host tracker service to create or alter the packet filtering rules. Appx91 (15:10-13). The only detail that the '906 patent provides about the "malicious host tracker service" is that it "may aggregate information associated with malicious network traffic." Appx91 (15:13-18). Such information "may include one or more network addresses that have been determined to be associated with malicious network traffic." *Id.*

Claim 1 of the '906 patent, which is exemplary of the other independent claims, recites a method wherein a PSG (1) receives, from an SPMS, a dynamic security policy containing a first set of packet filtering rules, (2) performs packet filtering using the first set of rules, (3) receives an updated second set of packet filtering rules, and (4) performs packet filtering using the second set of rules. Appx96 (25:33-26:20, cl. 1). In claim 1, the first set of packet filtering rules is created or altered by the SPMS "based on malicious traffic information received

from a malicious host tracker service." Appx96 (15:10-29, cl. 1). Like the specification, claim 1 recites no detail about the "malicious host tracker service" aside from it providing "malicious traffic information." *See id.* Similarly, claim 1 recites no detail about the content or form of the "malicious traffic information" upon which the claimed rules are based. *See id.* And, claim 1 does not limit the "packet matching criterion" of the claimed rules, which are based on the "malicious traffic information," to any particular type of criterion. *Id.*

## II. The Jungck Prior Art Reference

Jungck is directed to a packet interceptor system that protects a network from malicious data traffic by intercepting and processing packets. Appx2689 (Abstract), Appx2728 ([0111]), Appx2731 ([0126]). Jungck discloses a "packet interceptor/processor apparatus [that] is coupled with [a] network so as to be able to intercept and process packets flowing over the network." Appx2689 (Abstract). The packet interceptor/processor apparatus "applies one or more rules to the intercepted packets which execute one or more functions on a dynamically specified portion of the packet and take[s] one or more actions with the packets." *Id.* Such actions may include releasing the packet unmodified, deleting the packet, or forwarding the packet for subsequent processing. *Id.* Jungck's rules may be defined and dynamically modified by devices external to the packet interceptor/processor apparatus. *Id.*

Jungck discloses that the packet interceptor system may include edge servers that intercept traffic at network boundaries based on, for example, the source and destination IP address in the packets flowing past the edge server. Appx. 2727-2728 ([0107]-[0109]). This may be accomplished by applying rules, which may be defined and modified both statically and dynamically via an external management device. Appx2734-2735 ([0157]). The rules may include a function to compare "one or more portions of the packet(s) 704 with one or more pre-defined values" and an action to be taken based on the result of the function, for example, "check[ing] the source IP address of the packet against a list of blocked IP addresses." Appx2733-2734 ([0152], [0157]).

Jungck teaches that its edge servers can monitor data transmissions for "malicious program code," which Jungck describes as "program code that has previously been identified . . . as unwanted, harmful, or destructive such as viruses or other unauthorized data being transmitted," and that such "malicious program code" may have been identified by one of Jungck's servers or by a "third party such as a virus watch service." Appx2728 ([0111]). One example of detecting such malicious program code pertains to identifying a packet that must be a forgery, based on its address information. *Id.*

## III. Overview of the IPR Proceedings

### A. Petition

In its Petition, PAN relied on Jungck in view of U.S. Patent No. 6,687,835 ("Shah")[1] to render the claims of the '906 patent obvious.[2] Appx11. As explained in the Petition, Jungck teaches a packet security gateway in the form of "'edge server 602' with a 'packet interceptor adapter 720'" that "'intercepts all network traffic' and monitors it for 'malicious program code' using rules," which the edge server "receive[s] . . . from a server external to and remote from the edge server, such as 'external device 724,' 'external management device,' and 'server 108'" (i.e., a "security policy management server"). Appx144-146 (citing Appx2727-2728 ([0107], [0111]), Appx2734-2735 ([0157], [0160])).

For the limitation of the independent claims relevant to this appeal—receiving rules that were "created or altered by the [SPMS] based on malicious traffic information received from a malicious host tracker service"—PAN cited to Jungck and the testimony of its expert, Dr. Vijay Madisetti. Appx148-153 (citing Appx1363-1364 (Madisetti Decl. ¶¶ 265-266), Appx1366-1367 (Madisetti Decl. ¶¶

[1] Shah is not relevant to this appeal. PAN relied upon Shah for teaching certain aspects of the packet digest logging function recited in limitation [1.c] that are not at issue here. Appx155-162.

[2] For dependent claims 4, 11, and 16, in addition to Jungck and Shah, PAN also relied upon U.S. Patent No. 7,095,716 ("Ke"). Appx11. Centripetal does not dispute the Board's findings for any elements added by dependent claims. Therefore, the teachings of these references are not at issue in this appeal.

268-269)). PAN explained that Jungck taught packeting filter rules with "functions includ[ing] 'check[ing] the source IP address of the packet against a list of blocked IP addresses.'" Appx150 (citing Appx2737 [0176]-[0177]). Referencing Jungck's teaching of a "third party such as a virus watch service," and citing its expert's declaration, PAN further explained that it "would have been obvious for Jungck's external devices [that created and modified rules] to receive malicious code identifications from such third-party watch services, and that such malicious code identification would include lists of network addresses associated with malicious code" to "advantageously permit identification . . . of communications with potentially malicious hosts." Appx150. PAN further explained, again citing its expert's testimony, that "it would have been obvious from Jungck's teachings to configure Jungck's external devices to dynamically and automatically update rules to correspond to new or changed malicious program code, such as additional blocked IP addresses or address changes of the sources of malicious program code, identified by the virus watch service, because malicious sources constantly change and/or expand their addresses once they are discovered." *Id.*

Throughout, PAN's Petition cited and relied upon its expert's declaration for support. Appx1191-1518. By way of background, Dr. Madisetti explained that it "well known that computers can generate and send messages to other computers that contain 'viruses' and other malware." Appx1229. He further explained that it was

known that "[t]o protect computers from such attacks, devices [such as firewalls] are placed in networks, typically at network interconnection points, that examine packets transiting the network to identify packets containing potentially malicious content as well as packets that may be part of a denial of service attack." Appx1230. One common means of protecting a network was to "configur[e] a firewall . . . to simply maintain a list of network addresses that are either allowed [a whitelist] or not allowed [a blacklist] to be the source or destination of packet traffic." Appx1231.

Dr. Madisetti further explained that it was known that "the increased size and dynamic nature of networks (e.g., enterprise networks, ad hoc networks, etc.) resulted not only in an increased volume of packet traffic, but also in an increased number of diversified sources of malicious data." Appx1232. This, along with other factors, "resulted in the creation of adaptable and specialized third-party malware tracking services" that were "capable of identifying and providing unique and customizable threat information (e.g., suspect IP network addresses) to network devices and administrators for enhanced network security, allowing network devices and administrators to set policies for blocking packet traffic associated with the identified threats." Appx1232-1235 (citing several prior art references for support).

Dr. Madisetti further explained that "before or around April 16, 2014 (e.g., the claimed priority date of the '906 patent) it was well-known and established that different types of identifiable malicious information (e.g., malicious code, IP

network addresses, etc.) were collected by third-party services and provided to administered networks (e.g., enterprise networks, private networks, etc.)" and that sometimes "the identified malicious information provided by these services took the form of lists of network addresses and were offered as part of" a reputation service for use in a network. Appx1235-1236. As one example, Dr. Madisetti explained, "lists of network addresses of known sources of malware were provided to an enterprise network by third-party vendors, and information was also sent from the enterprise back to the third-party, a vendor, or the like, to improve performance of threat management, thus creating feedback of information." *Id*. None of the foregoing was rebutted or addressed by Centripetal's expert, Dr. Goodrich, in the IPR proceeding. *See generally* Appx5046-5160.

Turning to the teachings of Jungck, Dr. Madisetti explained (i) that Jungck teaches monitoring packet transmissions for malicious program code from a third-party "virus watch service," and (ii) referencing his background discussion, that such "third party virus watch services were well-known in the art." Appx1363-1367. Dr. Madisetti concluded that a POSITA would have understood that those services "aggregate malicious host traffic information . . . for use in network security applications in order to identify multiple threats and thereby enhance network security" and that "Jungck teaches, or at least found it obvious, that [Jungck's] third-party virus watch service identifications would include lists of network addresses

associated with malicious code, such as 'list of blocked IP addresses.'" Appx1363-1364. Dr. Madisetti also explained and concluded that it would have been obvious for "Jungck's external devices to receive the identified malicious code (from the third-party virus watch service) in the form of a list of network addresses associated with malicious network traffic" because "it was well-known for third-party watch services to aggregate and disseminate malicious code identifications in the form of a block list of network addresses known to be associated with malicious network traffic." Appx1365. This evidence concerning a POSTIA's knowledge and understanding went unaddressed by Centripetal's expert, Dr. Goodrich, in the IPR proceeding.

### B. Patent Owner Preliminary Response

In its Preliminary Response, Centripetal argued that "no express construction of any term is needed" at this stage. Appx223. Centripetal further argued, among other things, that Jungck failed to disclose an SPMS (1) automatically creating or altering rules, or (2) ***updating*** rules based on updated malicious traffic information received from a malicious host tracker service. Appx233-236, Appx247-249. Centripetal has not raised these issues on appeal.

### C. Institution Decision

In the Institution Decision, the Board did not address the construction of the term "malicious traffic information received from a malicious host tracker service"

because it was not in dispute. Appx317-320. The Board did, however, apply constructions for the terms "rules," "packet transformation function," "dynamic security policy," "security policy management server," "packet security gateway," and "monitoring device" that were "consistent with those applied in previous *inter partes* reviews." *Id.* The Board found, contrary to Centripetal's arguments, that Jungck disclosed or, at a minimum, rendered obvious, automatically creating or altering rules and updating those rules based on updated malicious traffic information. Appx329-331, Appx335-337. The Board concluded that PAN showed a reasonable likelihood that PAN could show at least one claim of the '906 patent was unpatentable. Appx344.

### D. Post-Institution and Final Written Decision

In its Patent Owner Response, Centripetal argued for the first time that the term "malicious host tracker service" should be construed. Appx414-415. Specifically, Centripetal argued that "malicious host tracker service" should be construed to require "a service that identifies and provides identifying information about network hosts that have been determined to be associated with malicious network traffic." Appx414 (quoting Appx5075-5076). Centripetal did not propose an express construction of the term "malicious traffic information," even though that term was identified in its claim construction subheading. Appx414.

Centripetal then argued, again for the first time, that Jungck failed to teach an SPMS that generates rules based on "malicious traffic information received from a malicious host tracker service." Appx428-453. Centripetal's arguments both (i) depended on its construction for "malicious host tracker service" and (ii) focused only on Jungck's example of detecting spoofed source addresses. *Id.* In addition, Centripetal's Patent Owner Response did not address the evidence submitted by PAN that services that tracked and provided identifying information about malicious hosts were well-known in the art. Centripetal also reasserted the same arguments made in its Preliminary Response.

In its Reply, PAN demonstrated that Centripetal's express construction of "malicious host tracker service" and implicit construction of "malicious traffic information" that attempted to narrow those terms were unsupported and incorrect. Appx495-497. PAN also noted that Centripetal had failed to argue that the claims were patentable under the plan meaning of those claim terms. Moreover, PAN demonstrated that, even under Centripetal's proposed narrowing constructions, Jungck rendered the claim limitations unpatentable in precisely the same manner as set forth in the Petition. Appx495-503.

Furthermore, PAN explained that, as to Centripetal's arguments about the teaching of Jungck, the Board already reject those very same arguments in the earlier appellate-affirmed -01443 IPR FWD. Appx498-499. PAN cited the Board's earlier

conclusion that Jungck teaches an "SPMS receiving from a subscription service that aggregates malicious network traffic information, a list of network addresses known to be associated with malicious network traffic…[and] generating, based at least in part on the list, one or more rules." *Id.* (citing Appx1851-1853).

In addition, PAN's Reply explained that Centripetal mischaracterized the Petition grounds as limited to Jungck's exemplary disclosure of a virus watch service and only the identification of spoofed source addresses, when the Petition was not so limited. Appx497-503. PAN further noted that it had provided unrebutted evidence that third-party services that tracked and provided identifying information about malicious hosts were well-known, and that a POSITA would have understood that virus watch services were known to track and provide identifying information about malicious hosts. *Id.*

In its Sur-reply, Centripetal "agree[d] with PAN" that the claim language did not limit "the malicious host tracker service or the malicious tracker information it provides," but argued its construction was merely describing what the words of the claim meant. Appx535. Centripetal also continued to argue that the obviousness grounds were limited only to Jungck's express disclosure of an example virus watch service and only to identification of spoofed source addresses. Appx540-541.

In its Final Written Decision and with the benefit of the full trial record, the Board agreed with PAN that the claims require "a service that provides malicious

traffic information (without limitation as to that information's form)" such that "that the independent claims are not limited to the packet identification features Patent Owner asserts." Appx9-10. The Board also agreed "that neither the claims nor Petitioner's challenge are limited to address spoofing" and recognized that Jungck's "virus watch service" was only an example of Jungck's third party services on which the Petition relied. Appx27; Appx24 ("Petitioner further asserts that it would have been obvious for Jungck's edge devices to receive malicious code identifications from third parties, e.g., a virus watch service . . . ."). The Board found that Jungck teaches an SPMS that generates rules based on malicious traffic information received from a malicious host tracker service. Appx25-30. In doing so, the Board explained that, "even applying Patent Owner's narrow interpretation of malicious traffic information," the Board's findings "in the -01443 IPR as to what Jungck discloses apply to the language of the claims" here and found that "Jungck discloses a packet security gateway . . . as claimed." Appx27.

## SUMMARY OF THE ARGUMENT

Substantial evidence supports the Board's determination that Jungck teaches the '906 patent's limitation of "malicious traffic information from a malicious host tracker service" and the Court should affirm. In an effort to undo the Board's findings, Centripetal raises claim construction arguments that are both meritless and irrelevant. They are meritless because Centripetal attempts to read in certain packet identification features that the claims do not require. And they are irrelevant because substantial evidence—and an earlier Board decision that this Court affirmed—supports the Board's finding that Jungck teaches this disputed limitation even under Centripetal's narrowing construction.

**I.** The Board did not err in its claim construction analysis. Contrary to what Centripetal argues here, the Board did not fail to construe "malicious host tracker service," but properly resolved the parties' dispute over the meaning of that term by rejecting Centripetal's attempt to limit the term to certain features not required by the claims or specification, and by instead adopting the term's plain meaning. The Board was correct in rejecting Centripetal's proposed construction that would have required a "malicious host tracker service" to provide a specific type of information—***identifying*** information about malicious network hosts—as opposed to other information, such as information about viruses or worms, such network hosts might propagate. Indeed, as the claims and specification recite, the "malicious

host tracker service" provides "malicious traffic information," without limitation on what that information comprises. Similarly, Centripetal's attempt to limit "malicious traffic information" to only one particular type of information—namely, information that identifies a network host—finds no support in the claim language or the specification, either. In contrast, in other patents in which Centripetal intended to limit what "malicious traffic information" is, or what information a "malicious host tracker service" must provide, Centripetal did so expressly.

Centripetal does not challenge on appeal whether Jungck teaches the disputed limitation under the Board's construction, just as Centripetal did not do so below. Accordingly, if this Court finds that the Board did not err in its claim construction, then the Court can and should affirm the FWD without reaching any other issue.

**II.** Even if this Court agrees with Centripetal's claim construction arguments, still the Court should affirm, for two independent reasons.

First, in a prior IPR (the -01443 IPR) involving Centripetal and its related '205 patent, the Board found that Jungck teaches a policy server receiving "from a subscription service that aggregates information associated with malicious network traffic, a list of network addresses known to be associated with malicious network traffic." Appx1850-1852. That fact finding satisfies even Centripetal's narrow construction of the disputed limitation at issue here—i.e., receiving host-identifying information (network addresses) from a service that identifies and provides

identifying information about network hosts that have been determined to be associated with malicious network traffic. Centripetal did not appeal that fact finding. *See* Brief for Appellant, *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 847 F. App'x 929 (Fed. Cir. 2021) (No. 20-1713). And because that fact finding became final when this Court affirmed the Board's FWD, Centripetal is collaterally estopped from relitigating that prior factual finding about the teachings of Jungck that satisfies its construction here.

Second, and independent of collateral estoppel, the Court should affirm because the Board expressly found that Jungck teaches the disputed limitation under Centripetal's construction, and that determination was supported by substantial evidence. In arguing otherwise, Centripetal ignores record evidence that supported the Board's findings, including substantial expert testimony, and misconstrues the grounds as relying upon only certain examples in Jungck that are simply illustrative of its teachings. In addition, Centripetal argues as if PAN had pursued an anticipation ground, arguing only about what Centripetal contends certain passages expressly disclose, and even then, only in isolation, all of which is antithetical to a proper obviousness inquiry. Even so, Centripetal merely disagrees with the Board's factual conclusions regarding Jungck, but such disagreement is irrelevant to substantial evidence review.

## ARGUMENT

### I. LEGAL STANDARDS

#### A. Standard Of Review

The Board's factual findings are reviewed for substantial evidence and its legal conclusions de novo. *Rambus Inc. v. Rea*, 731 F.3d 1248, 1251-52 (Fed. Cir. 2013) (citing *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000)). This Court reviews the Board's legal conclusion of obviousness de novo and the Board's underlying factual findings for substantial evidence. *See, e.g.*, *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261 (2016); *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000); 5 U.S.C. § 706. "Substantial evidence review asks 'whether a reasonable fact finder could have arrived at the agency's decision' and requires examination of the 'record as a whole, taking into account evidence that both justifies and detracts from an agency's decision.'" *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016) (quoting *Gartside*, 203 F.3d at 1312).

Claim construction is a question of law that may involve underlying factual inquiries. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015). This Court reviews the Board's claim construction based solely on intrinsic evidence *de novo*, and reviews subsidiary factual findings regarding extrinsic evidence for substantial evidence. *In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1340 (Fed. Cir. 2016).

Centripetal bears the burden of showing that the Board committed reversible error. *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004). The Board's actions may not be set aside unless they are "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law." *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004); 5 U.S.C. § 706(2)(A).

**B. Collateral Estoppel**

Collateral estoppel applies when: "(1) a prior action presents an identical issue; (2) the prior action actually litigated and adjudged that issue; (3) the judgment in that prior action necessarily required determination of the identical issue; and (4) the prior action featured full representation of the estopped party." *Stephen Slesinger, Inc. v. Disney Enters., Inc.*, 702 F.3d 640, 644 (Fed. Cir. 2012). "Collateral estoppel protects a party from having to litigate issues that have been fully and fairly tried in a previous action and adversely resolved against a party-opponent." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013). "It is well established that collateral estoppel, also known as issue preclusion, applies in the administrative context." *MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1376 (Fed. Cir. 2018).

This Court applies the issue preclusion doctrine "to the Patent Trial and Appeal Board's decision in an IPR once it becomes final." *Papst Licensing GmbH & Co. KG v Samsung Elecs. Am., Inc.*, 924 F.3d 1243, 1250-51 (Fed. Cir. 2019).

Under the AIA, the Board's decision is final once "the time for appeal has expired or any appeal has terminated," at which time "the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable . . . ." 35 U.S.C. § 318(b). This Court has also made clear that "a final judgment on the invalidity of the [patent], . . . has an immediate issue-preclusive effect" on applicable pending or co-pending actions. *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294 (Fed. Cir. 2018); *see also Papst*, 924 F.3d at 1251-52. As the Court explained, "[t]his court has previously applied collateral estoppel to such co-pending cases because 'a patentee, having been afforded the opportunity to exhaust his remedy of appeal from a holding of invalidity, has had his 'day in court.'" *XY*, 890 F.3d at 1294.

This Court's precedent "does not limit collateral estoppel to patent claims that are identical. Rather, it is the identity of the issues that were litigated that determines whether collateral estoppel should apply." *Ohio Willow Wood*, 735 F.3d at 1342; *ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*, 908 F.3d 1267, 1274 (Fed. Cir. 2018) ("Collateral estoppel may bar litigation in cases with different but related patents when there are common issues."). "If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies." *Ohio Willow Wood*, 735 F.3d at 1342.

## II. THE BOARD CORRECTLY REJECTED CENTRIPETAL'S NARROWING CONSTRUCTION OF "MALICIOUS TRAFFIC INFORMATION RECEIVED FROM A MALICIOUS HOST TRACKER SERVICE" AS UNSUPPORTED

Centripetal's claim construction arguments lack merit, but they are also irrelevant to the outcome of this appeal. That is because, even under Centripetal's proffered construction of "malicious traffic information received from a malicious host tracker service," the Board found, based on substantial evidence, that Jungck teaches the limitation. *See* Appx27; *infra* Section III. That decision echoed the Board's earlier -01443 IPR FWD, which this Court affirmed, that Jungck teaches a nearly identical limitation in Centripetal's related '205 patent. Appx1850-1852; Appx2072-2073. Nevertheless, PAN addresses Centripetal's claim construction arguments first because this Court does not need to reach the issue of collateral estoppel, or whether the Board's decision is supported by substantial evidence, if the Court rejects Centripetal's claim construction arguments. The Court need not reach those issues because Centripetal has not argued that the Board's patentability determination was erroneous under the Board's construction of those terms.

Centripetal raises two claim construction issues on appeal—neither of which has merit. First, Centripetal argues that the Board improperly failed to construe the term "malicious host tracker service." Op. Br. 22-25. But the Board did no such thing. The Board specifically considered the parties' dispute over the plain and ordinary meaning of the claim term, rejected Centripetal's attempt to narrow the

meaning of the term, and applied that term's plain and ordinary meaning when evaluating the teachings of Jungck. Appx9-11, Appx25-30. Contrary to Centripetal's arguments, after rejecting Centripetal's attempt to impose unclaimed limitations on that term, the Board was not required to go one step further and adopt an express construction to otherwise explain the plain meaning of that claim term. Second, Centripetal argues that the Board erred in rejecting Centripetal's attempt to limit "malicious traffic information" to certain packet identification features. Op. Br. 25-29. Putting aside for the moment Centripetal's failure below to argue for an express construction of this term, as it does here, the Board did not err because Centripetal's arguments were, and remain, unsupported.

Nevertheless, it bears emphasizing that even if the Board had erred in not adopting Centripetal's proposed constructions (and it did not), that error would have been "harmless." Centripetal's proposed construction is nearly verbatim of what claims in Centripetal's related '205 patent expressly require. *See* Appx1567 (22:19-27) ('205 patent, claim 1). And those claims were already found unpatentable over Jungck in a FWD that this Court affirmed. Appx1850-1852; Appx2072-73. Moreover, the Board below expressly found that Jungck teaches the "malicious traffic information from a malicious host tracker service" under Centripetal's proposed construction, and that decision is supported by substantial evidence. Appx1850-1852. Accordingly, Centripetal's claim construction arguments provide

no basis to reverse, remand, or otherwise disturb the Board's decision below. *See, e.g.*, *Bot M8 LLC v. Sony Interactive Entertainment LLC*, 66 F.4th 1380, 1385 (Fed. Cir. 2023) ("Our review under the APA is subject to a harmless-error rule . . . and the party challenging the Board's decision must demonstrate the harmfulness of the alleged error.") (citation omitted); *Snap-On Inc. v. Milwaukee Elec. Tool Corp.*, 722 F. App'x 1041, 1044 (Fed. Cir. 2018) ("Although the Board erred in omitting the word 'average' from its construction, the Board's fact findings regarding obviousness are still supported by substantial evidence and the Board's legal determinations of obviousness are correct under the proper claim construction.").

## A. The Board Correctly Rejected Centripetal's Unduly Narrow Construction of "Malicious Host Tracker Service"

### 1. The Board did not refuse to construe this claim term

Contrary to Centripetal's arguments, the Board did not "refus[e] to construe" the disputed claim term "malicious host tracker service." Op. Br. 20. The dispute between the parties as to that claim term was whether that service was required to "provide[] identifying information about network hosts that have been determined to be associated with malicious network traffic"—as Centripetal argued. Appx9. The Board considered the parties' arguments and rejected Centripetal's position for attempting to "impose limitations . . . not supported by the record." *Id.* And in analyzing the prior art, the Board applied the plain and ordinary meaning of the term, while nevertheless finding that Jungck teaches a service that aggregates and provides

identifying information about network hosts that have been determined to be associated with malicious network traffic, thereby satisfying Centripetal's proposed construction. Appx27 (agreeing that the Board's factual finding in the '205 FWD, i.e., that "Jungck teaches an SPMS receiving from a subscription service aggregated malicious network traffic information, e.g., a list of network addresses known to be associated with malicious network traffic," applies to the language of the '906 patent claims).

The Board was correct in rejecting Centripetal's proposed construction. As the Board explained, nothing in the claim language limits the plain and ordinary meaning of "malicious host tracker service" to providing "identifying information about network hosts," as Centripetal argued, because the claims "do not recite the specifics of the malicious traffic information." Appx9-10. Thus, the Board "agree[d] with the Petitioner" that the plain and ordinary meaning of the term is "not limited to the packet identification features Patent Owner asserts." Appx10; *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) (finding no error in rejecting construction that "erroneously reads limitations into the claims" and "concluding that these terms have plain meanings that do not require additional construction").

Centripetal's argument that the Board was required go beyond rejecting Centripetal's unduly narrow construction and "adopt [an] explicit construction[],"

lacks legal support. Op. Br. 21. "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Claim terms need only be construed "to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). That is precisely what the Board did here. Centripetal asserted that the plain and ordinary meaning of "malicious host tracker service" was a service that "identifies and provides identifying information about network hosts that have been determined to be associated with malicious network traffic." Appx535. The Board rejected that unduly narrow construction after finding that exemplary claim 1 "does not recite the specifics of the malicious traffic information the SPMS receives from the host tracker service." Appx10.

This Court has previously found no error resolving a claim construction dispute by rejecting a construction that would read limitations into a term and concluding that the plain and ordinary meaning of the term required no further construction. *ActiveVideo Networks*, 694 F.3d at 1326. In *ActiveVideo Networks*, patent owner ActiveVideo argued that a claim limitation should be construed narrowly and that "the district court erred in declining to construe" the term. *Id.* at 1325. This Court held that it was not erroneous to reject ActiveVideo's narrowing construction and resolve the dispute by finding the "terms have plain meanings that

do not require additional construction." *Id.* at 1326. Here, the Board similarly rejected Centripetal's narrowing construction of the plain and ordinary meaning of "malicious host tracker service." That is all the Board was required to do to "resolve the controversy." *Vivid Techs.*, 200 F.3d at 803.

Centripetal's cited cases are not to the contrary. *See* Op. Br. 20-21. As the primary case relied upon by Centripetal explains, the Board need only resolve the dispute as to the proper scope of the claims. *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017). While this Court in *Homeland* did fault the Board there for not adopting an explicit construction of the disputed claim term "predetermined settling speed," the parties there had proposed very different meanings for that term and neither side appeared to have contended that the term had a plain meaning that the Board could apply. *Id.* By declining to construe that term at all, the Board failed to resolve the parties' dispute over claim scope. *Id.* But the Court did not suggest that explicit construction is at all times required. *See id.* ("In some cases, the ordinary meaning of claim language may be readily apparent and claim construction will involve little more than the application of the widely accepted meaning of commonly understood words."). *Homeland* is inapposite. Here, PAN and Centripetal disputed whether the claim term was limited to the packet identification features asserted by Centripetal, and the Board resolved that dispute.

### 2. Centripetal's proposed narrowing claim construction is unsupported by and contrary to the evidence

Not only did the Board resolve the parties' claim construction dispute, it also reached the correct conclusion. Centripetal's attempt to read into the claims a requirement in which the "malicious host tracker service" must "identif[y] and provide[] identifying information about network hosts that have been determined to be associated with malicious network traffic" (Op. Br. 22) is unsupported.

***First,*** as the Board found, the claim language broadly recites a "malicious host tracker service" that provides "malicious traffic information." Appx96 (cl. 1). Claim 1 does not limit or explicate what the "malicious host tracker service" is or does, beyond providing "malicious traffic information." *Id.* Likewise, the claims do not limit that provided "malicious traffic information" to a particular type. *Id.* In a similar vein, the claimed "packet matching criterion" of the "packet filtering rules" that are automatically created or altered by the SPMS based on that "malicious traffic information" are not limited to a particular type. *Id.* To be more specific, those packet matching criterion plainly are not limited to information that identifies a malicious network host. Simply put, the claims do not require the "malicious host tracker service" to provide "identifying information about network hosts" as Centripetal argues; they require only that a "malicious host tracker service" provides "malicious traffic information." Likewise, nothing about the words of the claim term itself compels the conclusion that the claimed service identifies and provides

identifying information about malicious hosts, as Centripetal contends, as opposed to, for example, identifying and providing other information about malicious hosts, such as the type of malicious activity they are engaged in (e.g., spreading viruses or worms).

***Second***, the specification does not support Centripetal's construction because it does not require the "malicious host tracker service" be limited as Centripetal suggests. The specification provides scant detail about the "malicious host tracker service," but rather treats it as the proverbial black box. *See, e.g.*, Appx73 (Fig. 3); Appx87-89 (7:27-12:63). Where the specification does refer, in only a few instances, to the "malicious host tracker service," the specification provides only a non-limiting example of what the malicious host tracker service ***may*** do and what it ***may*** provide. For example, the specification explains the "[m]alicious host tracker service 508 ***may*** aggregate information associated with malicious network traffic." Appx91 (15:13-18).[3] Nothing about the words "information associated with" malicious network traffic requires that "information" to ***identify*** a malicious ***host***, when it could, for example, identify the malicious traffic itself or identify other attributes of the malicious network traffic. In addition, the specification explains that the updates provided by the "malicious host tracker service 508 ***may*** include one or more network addresses determined to be associated with malicious network

[3] All emphasis added unless noted otherwise.

traffic." *Id.* Nowhere does the specification state that the "malicious host tracker service" ***must*** provide, or provides ***only***, "identifying information about network hosts." *See In re Johnston*, 435 F.3d 1381, 1384 (Fed. Cir. 2006) (finding a claim limitation "stated in the permissive form 'may'" was an "optional element" that "d[id] not narrow the claim"). In the absence of a such limitation in the specification, there is no reason to limit the claims as Centripetal requests.

***Third***, when Centripetal intended to limit the information provided by a "malicious host tracker service" to a specific type, as it seeks to do here, it did so expressly. Appx496-497. In its U.S. Patent No. 10,785,266, for example, Centripetal limited the claims to "packet matching criteria corresponding to one or more network addresses . . . based on aggregated malicious traffic information received from at least one third party malicious host tracker service." Appx3740-3741 (20:64-21:52). Similarly, in its '205 patent, Centripetal claimed receiving "from a subscription service that aggregates information associated with malicious network traffic, a list of network addresses known to be associated with malicious network traffic." Appx1567 (22:19-27). Here, in contrast, Centripetal chose broadly to claim a "malicious host tracker service" without limitation on the information it aggregates or provides.

Contrary to Centripetal's argument, the Board's rejection of Centripetal's position does not give "malicious host tracker service" no patentable weight or

otherwise render it meaningless. Indeed, the Board expressly gave the term patentable weight and meaning when it analyzed Jungck and concluded that Jungck's teaching of a subscription service providing aggregated malicious network traffic information in the form of a list of network addresses known to be associated with malicious network traffic, discloses the "malicious host tracking service, as claimed." Appx27.

### B. The Board Correctly Did Not Limit "Malicious Traffic Information" to Just One Particular Type of Such Information

The Board did not err by rejecting Centripetal's arguments that the claimed "malicious traffic information" must be information that identifies malicious hosts—even though the Board expressly found that feature, as construed by Centripetal, to be taught by Jungck. Appx27.

While Centripetal did not expressly propose a construction of the term "malicious traffic information" below, despite doing so now on appeal, the Board nonetheless resolved any claim construction dispute with respect to that term in connection with its construction of "malicious host tracker service." Appx9-11. In particular, the Board found the claims "do not recite the specifics of the malicious traffic information the SPMS receives from the host tracker service" and that the packet matching criteria in rules created from the "malicious traffic information" were not limited "to any particular form." Appx9-10. Thus, the Board "agree[d] with the Petitioner" that the plain and ordinary meaning of the term is "not limited

to the packet identification features Patent Owner asserts," *i.e.*, "identifying information about those 'malicious hosts' such as the network addresses." Appx9-10.

Contrary to Centripetal's arguments here, the claims and the specification do not support Centripetal's attempt to narrow "malicious traffic information" to "information identifying the hosts that the service tracks."[4] Op. Br. 25. The claim language does not limit the "malicious traffic information" to any particular type of information. Appx96 (25:33-26:20). Likewise, the claimed "packet matching criterion" in the "packet filtering rules" that are automatically created or altered by the SPMS using the "malicious traffic information" are not limited to any particular type. *Id.* There is no reason to limit the claims as Centripetal suggests.

The specification does not support Centripetal's construction, either. As noted above, the specification does not require the "malicious traffic information" to be limited as Centripetal suggests, but instead describes an ***example*** in which the malicious traffic information "***may*** include one or more network addresses determined to be associated with malicious network traffic." Appx91 (15:13-18).

---

[4] Centripetal never proposed that the Board construe "malicious traffic information" as "information identifying the hosts that the service tracks" and did not use that phrase until its Patent Owner Sur-Reply, where it argued that "it would be inconsistent with the specification and the explicit claim language to suggest that the malicious traffic information provided by the malicious host tracker service does not provide information identifying the hosts that the service tracks." Appx536.

But the specification never requires the "malicious traffic information" be network addresses or "information identifying the hosts that the service tracks." It is simply "information ***associated with*** malicious network traffic." Appx496. Likewise, the specification does not impose a limitation on the packet matching criterion identified in rules created using the "malicious traffic information." Instead, the specification explains that possible packet matching criteria include one or more values found in five-tuple header information (*e.g.*, a protocol type, source IP address, source port, destination IP address, and/or destination port), and/or values found in an application-layer header. Appx87 (7:33-44, 8:19-33). Thus, there is no reason to limit the plain and ordinary meaning of the claims to host-identifying information. Indeed, a "protocol," as expressly contemplated by the specification, is not information that identifies a host. *See* Appx1213 (Madisetti Decl. ¶ 40) (explaining what a network protocol is). Not limiting the claims as suggested by Centripetal is particularly apt when, as noted above, Centripetal knew how to specify a particular type of malicious traffic information when it intended to do so—as it did in the claims of its other patents. *See supra* Section II.A.2. The Board properly applied the plain meaning of the term.

In misguided support of its position, Centripetal points out that "the Board acknowledged" that the specification "'explicitly describes malicious traffic information as including a list of known addresses associated with malicious

traffic.'" Op. Br. 26 (quoting Appx26). While true, that statement does not support Centripetal's position. That the specification provides an example of the type of information within the scope of "malicious traffic information" does not lead to the conclusion that "malicious traffic information" must be limited to that one type of information.

Moreover, contrary to Centripetal's argument, the Board did not "distinguish the 'types of information that the '906 patent refers to as malicious' from 'malware' and 'malicious program code,'" which are words found in Jungck. Op. Br. 26 (quoting Appx26). Centripetal's argument mischaracterizes the Board's FWD on this point throughout its brief. *See* Op. Br. 26, 32, 34, 37. In the section Centripetal cites, the Board was addressing Centripetal's argument that Jungck's "spoofed addresses are not malicious code." Appx26. The Board explained that Centripetal's arguments about "spoofed source addresses" "depart[ed] from the claim language" because those arguments referred to "malicious program code" and "malware" instead of the claim term "malicious traffic information." *Id.* Nowhere did the Board characterize "malicious traffic information," a broad term, as ***excluding*** information about malware or malicious program code, as Centripetal suggests.

Finally, Centripetal's arguments with respect to the Board's discussion of the claims' "packet transformation function" and "packet digest logging function" are irrelevant. Op. Br. 27-29. The Board properly explained why it was rejecting

Centripetal's claim construction arguments, concluded that the claims are not limited to the features that Centripetal argued, and only then cited the claims' other features as "***additional evidence*** that claim 1 is not limited to the packet identification features asserted by the Patent Owner." Appx9-10. Moreover, the Board was correct that this "additional evidence" supports rejection of Centripetal's construction. The features that the Board cited demonstrate that, in the context of the '906 patent, packet information of interest is not limited to, and in fact may exclude, network addresses or other host-identifying information, which reinforces the conclusion that the basis for the rules that trigger those logging functions need not be limited to malicious host-identifying information.

## III. THE BOARD CORRECTLY FOUND THAT JUNGCK TEACHES "MALICIOUS TRAFFIC INFORMATION RECEIVED FROM A MALICIOUS HOST TRACKER SERVICE"—EVEN UNDER CENTRIPETAL'S PROPOSED CONSTRUCTION

The Board correctly found that all challenged claims of the '906 patent are unpatentable. Centripetal's arguments, here and below, that Jungck fails to disclose the claimed "malicious traffic information received from a malicious host tracker service," are premised entirely on Centripetal's proposed construction of that limitation. Centripetal makes no argument for patentability under the proper construction of that limitation. Accordingly, if this Court does not agree with Centripetal's claim construction positions, the Court need not reach any other issue, and it should affirm.

But even if the claims were limited as Centripetal argues, the Court should still affirm, for two independent reasons.

***First***, Centripetal is collaterally estopped from relitigating the Board's earlier fact findings concerning Jungck, which Centripetal did not appeal and that have become final. *See* Brief for Appellant, *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 847 F. App'x 929 (Fed. Cir. 2021) (No. 20-1713); *Papst*, 924 F.3d at 1252-53 (applying issue preclusion where the Board's decision in a separate IPR "resolved against [Patent Owner] the . . . [prior art]-teaching issues now before us"). In the -01443 IPR involving Centripetal and its related '205 patent, the Board already found that Jungck teaches a policy server receiving "from a subscription service that aggregates information associated with malicious network traffic, a list of network addresses known to be associated with malicious network traffic," a finding that meets Centripetal's proposed construction of the disputed claim term here. Appx1850-1852. Centripetal did not appeal those fact findings and the Court affirmed the Board's decision. Appx2072-2073. Therefore, issue preclusion applies.

***Second***, independent of collateral estoppel, the Board determined that Jungck teaches "malicious traffic information received form a malicious host tracker service" under the narrow interpretation set forth by Centripetal, and that determination was supported by substantial evidence, including unrebutted evidence

from PAN's expert, Dr. Madisetti. Centripetal's assertion that there is no record evidence to support a finding of unpatentability under Centripetal's proposed construction ignores the record, including statements by the Board.

### A. Centripetal Is Collaterally Estopped From Relitigating Earlier Fact Findings About Jungck That Satisfy Centripetal's Own Proposed Construction Here

Prior to PAN's Petition in this IPR proceeding, the Board reviewed the claims of Centripetal's '205 patent the -01443 IPR. In that IPR the Board held the challenged claims unpatentable over Jungck in view of Bhatia.[5] Appx1805-1860. Relevant here, the Board found that Jungck taught the limitations of claims 14, 30, and 46. Appx1850-1852. Centripetal did not appeal those fact findings. Brief for Appellant, *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 847 F. App'x 929 (Fed. Cir. 2021) (No. 20-1713). This Court affirmed the Board's FWD in a Rule 36 affirmance. Appx2072-2073.

Claim 14 of the '205 patent recites, in relevant part, "receiving, by the security policy management server and from a subscription service that aggregates information associated with malicious network traffic, a list of network addresses known to be associated with malicious traffic; and generating, by the [SPMS] and based at least in part on the list, one or more rules." Appx1567 (22:19-27). In other

[5] In IPR2018-01443, the Board found claims 1, 4, 12, 14-17, 20, 28, 30-33, 36, 44, and 46-48 unpatentable over Jungck in view of Bhatia. Appx1805-1860.

words, claim 14 of the ’205 patent requires a service that aggregates and provides an SPMS with malicious traffic information in the form of a list of network addresses known to be associated with malicious traffic—which Centripetal cites as an example of the type of “identifying information about [] ‘malicious hosts’” that its proposed construction here requires. Appx9. Indeed, what ’205 patent claim 14 expressly requires is nearly verbatim of what Centripetal asserts that its proposed construction here covers, as shown in the following chart comparing what Centripetal argues here to what ’205 patent claim 14 requires:

| What Centripetal argues falls within the scope of its construction here | What ’205 patent claim 14 expressly requires |
|---|---|
| “a subscription service that aggregates and disseminates identifying information, such as ‘the list of known network addresses associated with malicious network traffic,’ for hosts associated with malicious network traffic.” Op. Br. 11. | “receiving . . . from a subscription service that aggregates information associated with malicious network traffic, a list of network addresses known to be associated with malicious network traffic.” Appx1567 (cl. 14, 22:19-27). |

Centripetal already lost its argument that Jungck does not teach this feature of ’205 patent claim 14, *see* Appx1850-1852, and cannot relitigate that un-appealed, now final determination in this appeal. *Papst*, 924 F.3d at 1250 (“The Supreme Court has made clear that, under specified conditions, a tribunal’s resolution of an issue that is only one part of an ultimate legal claim can preclude the loser on that issue from later contesting, or continuing to contest, the same issue in a separate case.”); *see also MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1376 (Fed.

Cir. 2018) (finding issue preclusion applies in the IPR context); Appx137 n.13, Appx143-144, Appx149, Appx497-499 (asserting that collateral estoppel applies here).

Specifically, in the earlier -01443 IPR, Centripetal argued, as it does here, that Jungck's third-party services identified only malicious "program code" and "malware," which Centripetal characterized as information that is contained only in a packet's payload, and that those services did not identify known malicious hosts. Appx1851. Centripetal repeats that exact argument here. Op. Br. 37-38. In its FWD in the -01443 IPR, the Board rejected that argument. Specifically, the Board rejected Centripetal's arguments that the "Petitioner conflates Jungck's discussion of malicious code identification with the claimed list of network address known to be associated with malicious code." Appx1851. As the Board explained, it "agree[d] with Petitioner that Jungck teaches this limitation of claim 14 to one of ordinary skill in the art" because (1) "Jungck gives an example of malicious program code that is part of a spoofing DDoS attack . . ., i.e., ***malicious code that pertains to the network address***" and (2) Jungck further teaches "rules for analyzing packets based on lists of network addresses associated with malicious network traffic." Appx1851. Accordingly, Jungck was found to teach to a POSITA the limitations of claim 14.

Centripetal is collaterally estopped from relitigating these factual findings concerning Jungck's teachings—which, even under Centripetal's construction,

meets the claim language here. Each of the elements required for collateral estoppel is present here. The issues are identical because they involve what the same prior art—Jungck—discloses, teaches, or suggests to a POSITA. And Centripetal does not and cannot argue that the Board's factual findings concerning Jungck were not "actually litigated," that those findings were not "essential to a final judgment," or that it did not have a "full and fair opportunity to litigate" those factual issues in the -01443 IPR. Centripetal did not appeal those fact findings and the Board's FWD became final once this Court issued its affirmance of the -01443 IPR FWD.

### B. Substantial Evidence Supports The Board's Findings With Respect To The Teachings Of Jungck

Even if Centripetal's unduly narrow construction applies, and even if Centripetal is not collaterally estopped from relitigating the Board's factual findings with respect to Jungck's teachings, still substantial evidence supports the Board's determination that Jungck teaches "malicious traffic information received from a malicious host tracker service." In arguing otherwise, Centripetal ignores record evidence, mischaracterizes aspects of that Board's FWD, and attempts to recast PAN's obviousness ground as an anticipation attack that relied solely on Jungck's exemplary virus watch service and only on detecting spoofed networks addresses. Centripetal's arguments do not undermine the substantial evidence supporting the Board's FWD.

### 1. Overwhelming and unrebutted evidence supports the Board's fact findings

As explained in the Petition, Jungck teaches a packet security gateway in the form of "'edge server 602' with a 'packet interceptor adapter 720'" that "'intercepts all network traffic' and monitors it for 'malicious program code' using rules." Appx144-146 (citing Appx2727-2728 ([0107], [0111]). Jungck's packet filtering rules comprise "a function" and "an action to be taken based on the results of . . . the function." Appx2733-2734 ([0152]); Appx149. The "function" of Jungck's rules includes "check[ing] the source IP address of the packet against a list of blocked IP addresses." Appx2737 ([0176]-[0177]); Appx149. Jungck also discloses that its rules can also monitor for spoofed source addresses. Appx2728 ([0111]); Appx149. Jungck further discloses that its edge servers, which filter packets, "receive rule sets . . . from a server external to and remote from the edge server," such as Jungck's "external device 724," "external management device," and "server 108,'" which external devices correspond to the '906 patent's "security policy management server." Appx2727-2728 ([0107], [0111]), Appx2734-2735 ([0157], [0160]); Appx145-146.

Jungck discloses that its edge servers use rules to monitor network traffic for "malicious program code, i.e. program code that has been previously identified (by the server 108 or a third party such as a virus watch service) as unwanted, harmful, or destructive such as viruses or other unauthorized data being transmitted."

Appx149-150. Citing Dr. Madisetti's expert testimony about the knowledge and understanding of a POSITA, PAN explained that it "would have been obvious for Jungck's external devices to receive malicious code identifications from such third-party watch services . . ., and that such malicious code identification would include lists of network addresses associated with malicious code, for example in the form of a block list, to advantageously permit identification . . . of communications with potentially malicious hosts." Appx150 (citing Appx1363-1364 (Madisetti Decl. ¶¶ 265-266)). Again citing its expert's testimony, PAN also explained that it "would have been obvious from Jungck's teachings to configure Jungck's external devices to dynamically and automatically update rules to correspond to new or changed malicious program code, ***such as additional blocked IP addresses*** or ***address changes of the sources of malicious program code***, ***identified by the virus watch service***, because malicious sources constantly change and/or expand their addresses once they are discovered." *Id.* (citing Appx1366-1367 (Madisetti Decl. ¶¶ 268-269)).

As described above, Dr. Madisetti explained in detail and with evidentiary support that third party services that tracked and provided identifying information for known malicious hosts were well known, and that a POSITA would have understood Jungck to teach just such a service. *See supra* Statement of the Case, Section III.A. This evidence was unrebutted. That evidence also established that a

"virus watch service" specifically was known to track and provide identifying information about know malicious hosts, for example, those associated with network viruses. Appx501-502. That evidence also went unrebutted. In assessing the disclosures of Jungck, Dr. Madisetti concluded that a POSITA would have understood that the disclosed virus watch services "aggregate malicious host traffic information . . . for use in network security applications in order to identify multiple threats and thereby enhance network security" and that "Jungck teaches, or at least found it obvious, that its third-party virus watch service identifications would include lists of network addresses associated with malicious code, such as 'list of blocked IP addresses.'" Appx1363-1364. Dr. Madisetti further explained and concluded that it would have been obvious for "Jungck's external devices to receive the identified malicious code (from the third-party virus watch service) in the form of a list of network addresses associated with malicious network traffic" because "it was well-known for third-party watch services to aggregate and disseminate malicious code identifications in the form of a block list of network addresses known to be associated with malicious network traffic." Appx1365.

The Board expressly stated that it had considered the arguments and evidence of record and, as a result, determined that "Petitioner [PAN] has demonstrated that Jungck teaches this feature"—referring to an SPMS that generates rules based on malicious traffic information received from a malicious host tracker service—"of

claim limitation 1.a to a person of ordinary skill in the art." Appx30; *see also* Appx26-27 (crediting PAN's arguments as "persuasive" and citing PAN's Petition 40-41 (Appx149-150), which cites Dr. Madisetti's declaration extensively). The foregoing is more than sufficient to qualify as "substantial evidence" supporting the Board's determination that the claims are unpatentable, even under Centripetal's construction. *See* Appx26-27 ("As Petitioner points out, Jungck discloses receiving rules 732 and taking actions based on comparing the packets to predefined values, e.g., checking a received packet's source IP address against a list of blocked addresses and responding accordingly.") (citing Appx149-150); Appx27 (applying Centripetal's construction and finding Jungck discloses "receiving malicious traffic information from a malicious host tracking service, as claimed"). Centripetal's assertion that no record evidence supports the Board's findings lacks merit.

The Board should affirm because there is substantial record evidence to support the Board's determination.

#### 2. The Board expressly found that Jungck teaches the claimed malicious host tracker construction under Centripetal's construction

Centripetal's assertion that, despite the Board's express statement that it had applied Centripetal's construction and still found the claims unpatentable, the Board in fact failed to apply that construction, lacks merit. Op. Br. 29. The Board expressly stated that it agreed with the fact findings made in the -01443 IPR of the related '205

patent, which findings satisfy Centripetal's proposed construction here, and that those fact findings "apply to the language of the claims before us." Appx27.

In an effort to avoid those findings, Centripetal attempts to recast the Board's agreement with the -01443 IPR fact findings as the improper application of collateral estoppel. Op. Br. 30. But the Board did not rely on collateral estoppel, which is mentioned nowhere in that portion of the Board's opinion. Appx27. Rather, the Board expressed its agreement with those earlier fact findings concerning Jungck that were part of the record evidence. *Id.*

Centripetal also incorrectly attacks the Board's conclusion as "not even facially read[ing] on the Challenged Claims," because the Board referred to Jungck's edge server as receiving malicious traffic information, and not an SMPS receiving that information, as claimed. Op. Br. 32. While the Board's language could have been more precise, it made clear that Jungck discloses the "malicious host tracker service" limitation "as claimed."[6] Appx27. And it further agreed with the earlier Board finding of Jungck teaching an ***SPMS*** (and not only an edge server) receiving

[6] The Board's reference to the "packet security gateway" receiving the malicious traffic information from a malicious host tracker service simply reflects the claims' requirement that the packet security gateway ultimately receives from the SPMS rules that are based on the malicious traffic information received from the malicious host tracker service, and so that information is ultimately received by the packet security gateway.

from a subscription service malicious traffic information—plainly meeting the claims of the ’906 patent. *Id.*

#### 3. Centripetal’s attempt to relitigate whether Jungck’s “malicious program code” encompasses “malicious traffic information” fails

Just as it did unsuccessfully in the -01443 IPR, Centripetal again argues that Jungck’s “malicious program code” does not encompass information that identifies a malicious host but instead is limited to information in a packet’s payload, which Centripetal asserts does not identify a host. Op. Br. 38. The Board already rejected that argument in the -01443 IPR. *See* Appx27 (noting that in the -01443 IPR, the Board “rejected previous arguments that Jungck’s third-party services identify only malware and cannot identify malicious hosts”); *supra* Section III.D.

And the Board correctly rejected Centripetal’s argument here, too. Appx27-28. Contrary to Centripetal’s assertion that “malicious program code” refers only to data carried in a packet payload, “offering no identifying information about network hosts,” Op Br. 37-38, Jungck nowhere states that “malicious program code” is limited to payload data. To the contrary, Jungck states that “malicious program code” is “program code that has been previously identified . . . as unwanted, harmful, or destructive such as viruses or other unauthorized data being transmitted” and, immediately after that explanation, provides an example of detecting such “malicious program code” by identifying a packet with a forged source address.

Appx2728 ([0111]). And, throughout, Jungck teaches rules for analyzing packets based on lists of network addresses. Appx2689-2755. A network address is found in a packet header, not payload. *See* Appx85 (3:11-22).

Additionally, and again contrary to Centripetal's argument, the Board never conceded that malicious program code and malware do not identify malicious hosts. *See supra*, Section II.B. Instead, in the portion of the decision Centripetal repeatedly points to as supportive of its argument, the Board explained that ***Centripetal's arguments*** regarding spoofed source addresses referred to "malicious program code" and "malware" and thus "depart from the claim language, i.e., malicious traffic information." Appx26. The Board went on to find spoofed addresses met the "malicious traffic information" limitation based on the specification's identification of lists of network addresses as one example of "malicious traffic information." Appx25-26. Thus, Centripetal's arguments are founded on a misunderstanding or mischaracterization of the Board's decision.

Finally, Centripetal's myopic focus on whether Jungck's "malicious program code" is in fact "malicious traffic information" ignores the obviousness inquiry. The question for obviousness, which was the ground presented, is not whether Jungck expressly discloses "malicious traffic information," but whether the teachings of Jungck would have suggested that feature to a POSITA. *Merck & Co. v. Biocraft Lab'ys, Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) (the question for § 103 is "not

merely what the references expressly teach but what they would have suggested to one of ordinary skill in the art at the time the invention was made"). PAN presented substantial evidence that Jungck at minimum would have suggested that feature to a POSTIA. *See*, *e.g.*, Appx1363-1364 (Dr. Madisetti concluding that a POSITA would have understood that the disclosed virus watch services "aggregate malicious host traffic information . . . for use in network security applications in order to identify multiple threats and thereby enhance network security" and that "Jungck teaches, or at least found it obvious, that its third-party virus watch service identifications would include lists of network addresses associated with malicious code, such as 'list of blocked IP addresses"); *supra* Section III.A.

#### 4. Centripetal's focus only on Jungck's spoofed address example cannot establish that the Board's decision lacked substantial evidence support

Throughout its Opening Brief, Centripetal repeatedly and misguidedly argues that Jungck's virus watch service is not a malicious host tracker service and that spoofed address information is not malicious traffic information. Op. Br. 26, 29, 32-42. As the Board correctly recognized, however, PAN's challenge was not limited to Jungck's exemplary virus watch service or example of address spoofing. Appx27 ("We agree that neither the claims nor Petitioner's challenge are limited to address spoofing."); Appx24 ("Petitioner further asserts that it would have been obvious for

Jungck's edge devices to receive malicious code identifications from third parties, e.g., a virus watch service, . . . .").

Centripetal attacks the Board for "misrepresent[ing] the record" on this issue, Op. Br. 33, but it is Centripetal who misconstrues the evidence and arguments. The Petition cited Jungck's disclosure of "malicious program code…previously identified [by]…***a third party <u>such as</u> a virus watch service.***" As Jungck, by its very terms, and the Petition both make clear, a virus watch service is merely an example of a third party service taught by Jungck. Appx149, Appx2728 ([0111]). PAN also relied on its expert's testimony about what a POSITA would have understood from this disclosure to establish that it renders obvious receiving malicious traffic information from a malicious host tracker service. Appx150 (citing Appx1363-1364 (Madisetti Decl. ¶¶ 265-266), Appx1366-1367 (Madisetti Decl. ¶¶ 268-269)). Likewise, PAN's Petition explained that "***[o]ne*** example of such malicious program code pertains to spoofed source addresses." Appx149-150. PAN further explained, based on its expert's testimony, that from these and other teachings of Jungck, it "would have been obvious for Jungck's external devices to receive malicious code identifications from such third-party watch services" and "that such malicious code identification would include lists of network addresses associated with malicious code" to "advantageously permit identification . . . of

communications with potentially malicious hosts." Appx150. PAN's Reply arguments were consistent. Appx499-503.

Centripetal's arguments conflict not only with Jungck and PAN's Petition, but also with a proper analysis for obviousness. Centripetal's arguments improperly try to limit Jungck to its express disclosure of only certain examples, rather than addressing the evidence about what Jungck teaches or suggests to a POSITA. Centripetal cannot overcome obviousness by ignoring POSITA knowledge. *See Merck*, 874 F.2d at 807; *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337-39 (Fed. Cir. 2020) (an obviousness "analysis ***requires*** an assessment of the '…background knowledge possessed by a person having ordinary skill in the art'") (emphasis in original) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401 (2007)).

Even if, as Centripetal argues, PAN's grounds were limited to Jungck's (a) teachings about spoofed IP addresses, and (b) exemplary virus watch service (they were not)—still the Board found, and still substantial evidence supports, that Jungck teaches the disputed claim limitation to a POSITA. The Board rejected Centripetal's argument, raised again on appeal, that "Jungck's third party virus watch services cannot provide rules that assist in identifying packets with spoofed source addresses." Appx27-29 (citing Appx151-152, Appx2696 (Fig. 7), Appx2733-2734 ([0152]-[0157])); *see* Op. Br. 34-42. Of course, whether Jungck's virus watch

service in fact does those things is irrelevant to an obviousness ground, where the question for § 103 "is not merely what the reference[] expressly teach[es] but what [it] would have suggested to one of ordinary skill in the art at the time the invention was made." *Merck*, 874 F.2d at 807. Regardless, as the Board explained, Centripetal's argument about Jungck incorrectly "assumes that an external management device 722 does not provide such spoofing detection information in the form of rule sets 726 that identify potential spoofed addresses." Appx28 (citing Appx2733-2734 ([0152]-[0157]); Appx2696 (Fig. 7); Appx151-152). In making that finding, the Board cited PAN's Petition at 42-43, which explained that "a POSITA would have understood that Jungck teaches that any of its external devices are configured to dynamically and automatically create or alter rules (e.g., rule criteria, such as network addresses) based on 'malicious program code' received from the 'virus watch service,' or at minimum would have found such configuration to have been obvious to enable enhanced real-time threat detection and remediation." Appx141 (citing Appx1363-1369 (Madisetti Decl. ¶¶ 265-272)). The Board was justified in relying on that substantial evidence support. Indeed, at no point does Jungck state that spoofed addresses can ***only*** be identified by the edge server, as Centripetal suggests. Op. Br. 40-42.

Centripetal's argument that spoofed IP address information cannot fit within "malicious traffic information" under its construction, i.e., "information identifying

the hosts that the service tracks," is similarly unavailing. *See* Op. Br. 34-36. As Dr. Madisetti explained unrebutted, "computers infected with malware can be used by a bad actor to generate a 'denial of service' attack" where "computers can forge packets and masquerade as other computers in the network by replacing ("spoofing") source addresses with fake addresses." Appx1228-1229 (Madisetti Decl. ¶ 66). In other words, those spoofed source addresses supplied by the third-party service would still be "information identifying the hosts [i.e., bad actor] that the service tracks" within Centripetal's incorrect construction.[7]

Centripetal has not shown that the Board's conclusion was unsupported by substantial evidence. Centripetal simply disagrees the Board's well-supported and reasonable conclusion based on the evidence in the record. That is not enough to prevail on this appeal. "If two 'inconsistent conclusions may reasonably be drawn from the evidence in record, [the PTAB]'s decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence.'" *Monsanto Tech. LLC v. E.I. DuPont De Nemours & Co.*, 878 F.3d 1336, 1341 (Fed. Cir. 2018) (quoting *In re Cree, Inc.*, 818 F.3d 694, 701 (Fed. Cir. 2016)).

* * *

[7] That Centripetal contends that its construction of "malicious traffic information" would exclude information about packets with spoofed source addresses, when such spoofing is performed by malicious network hosts, further demonstrates how misguided Centripetal's claims construction positions are, and how untethered they are to the claim language itself.

Because the Board properly construed the claims, and because the Board's ultimate determination of obviousness under either the correct construction or Centripetal's proposed construction is supported by substantial evidence, this Court should affirm.

## CONCLUSION

For the foregoing reasons, PAN respectfully requests that this Court affirm the decision of the United States Patent Trial and Appeal Board finding claims 1-17 of the '906 patent unpatentable.

Respectfully submitted,

/s/ *Andrew T. Radsch*
Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Phone: (202) 508-4600

Andrew T. Radsch
James R. Batchelder
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
Phone: (650) 617-4000

Colin Dunn
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Phone: (212) 596-9000

*Counsel for Appellee Palo Alto Networks, Inc.*

Dated: September 29, 2023

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b)(1). The brief contains 12,072 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ *Andrew T. Radsch*
Andrew T. Radsch
*Counsel for Palo Alto Networks, Inc.*

## CERTIFICATE OF SERVICE

On September 29, 2023, the undersigned caused the foregoing document to be filed electronically by using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Andrew T. Radsch*
Andrew T. Radsch
*Counsel for Palo Alto Networks, Inc.*