No. 2023-1730

# United States Court of Appeals for the Federal Circuit

CENTRIPETAL NETWORKS, LLC,
*Appellant*,

v.

PALO ALTO NETWORKS, INC.,
*Appellee.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in No. IPR2021-01157

**REPLY BRIEF FOR CENTRIPETAL NETWORKS, LLC**

Paul J. Andre
James Hannah
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
333 Twin Dolphin Dr., Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700

Jeffrey Price
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

Scott M. Kelly
Bradley C. Wright
John R. Hutchins
Banner & Witcoff, Ltd.
1100 13th Street, NW Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000

***ATTORNEYS FOR CENTRIPETAL NETWORKS, LLC***

# TABLE OF CONTENTS

Page

INTRODUCTION ... 1

ARGUMENT ... 4

I. The Court Must Vacate the FWD Because the Board Did Not Construe Disputed Terms Before Assessing Obviousness ... 4

II. This Court Should Construe the Claims and Reverse the Board's FWD Because it is Not Supported by Substantial Evidence ... 7

A. "Malicious Host Tracker Service" and "Malicious Traffic Information" Entail a Service That Tracks Malicious Hosts to Provide Identifying Information About Malicious Hosts ... 8

B. No Evidence Supports a Finding that Jungck Teaches a "Malicious Host Tracker Service" That Provides "Malicious Traffic Information" Under the Proper Claim Scope—Reversal is Warranted ... 15

1. There is No Collateral Estoppel Because the Board Did Not Previously Consider Whether Spoofed IP Addresses Identify Malicious Hosts ... 16

2. Jungck Does Not Teach a "Malicious Host Tracker Service" Providing "Malicious Traffic Information" Under the Proper Scope ... 19

a. Malicious Code Identifications (Spoofed IP Addresses) Do Not Identify Malicious Hosts Associated With the Malicious Traffic—PAN Does Not Show Otherwise ... 19

b. There is No Reasonable Argument that Malicious Program Code Encompasses "Malicious Traffic Information" .......................... 22

c. PAN Only Identified "With Particularity" Jungck's Express Disclosure of Spoofed IP Addresses Allegedly Received From a Virus Watch Service .................................................... 24

III. No Evidence Supports a Finding that Jungck Teaches "Malicious Traffic Information" Received From a "Malicious Host Tracker Service" Under Any Construction—Reversal is Warranted ..................................................................... 26

A. The Board's Finding That Jungck's Edge Server Receives "Malicious Traffic Information From a "Malicious Host Tracker Service" is Not Supported by Substantial Evidence ............................................................ 27

B. PAN's Obviousness Argument Cannot Serve as the Basis to Uphold the Board's Erroneous Decision Nor Does Substantial Evidence Support Such Argument........... 29

CONCLUSION ........................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......... 5

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) .......... 9

*Amgen Inc. v. Vidal*,
No. 2019-2171, 2022 WL 1112817 (Fed. Cir. Apr. 14, 2022) .......... 19

*AMP Plus, Inc. v. DMF, Inc.*,
No. 2021-1595, 2022 WL 16844516 (Fed. Cir. Nov. 10, 2022) .......... 29

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) .......... 29, 30

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
135 S. Ct. 1293 (2015) .......... 16

*CSR, PLC v. Skullcandy, Inc.*,
594 F. App'x 672 (Fed. Cir. 2014) .......... 5, 7

*Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016) .......... 6, 7, 8

*Gechter v. Davidson*,
116 F.3d 1454 (Fed. Cir. 1997) .......... 5

*In re Gorelik*,
657 F. App'x 964 (Fed. Cir. 2016) .......... 27, 31

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017) .......... *passim*

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) .......... 24

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) .......... 13

*In re Johnston*,
435 F.3d 1381 (Fed. Cir. 2006) .......... 12, 13

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020) .......... 25, 26

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d (Fed. Cir. 2004) .......... 8

*Netflix, Inc. v. DivX, LLC*,
84 F.4th 1371 (Fed. Cir. 2023) .......... 26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F. 3d 1351 (Fed. Cir. 2008) .......... 4

*Owens Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) .......... 19

*SkyHawke Techs., LLC v. Deca Int'l Corp.*,
828 F.3d 1373 (Fed. Cir. 2016) .......... 17

*Trs. of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) .......... 12

*VirnetX Inc. v. Apple, Inc.*,
909 F.3d 1375 (Fed. Cir. 2018) .......... 16

*Volvo Penta of the Americas, LLC v. Brunswick Corp.*,
81 F.4th 1202 (Fed. Cir. 2023) .......... 29

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) .......... 10

Statues

35 U.S.C. § 312(a)(3) .......... 24

## INTRODUCTION

The Court must vacate the Final Written Decision because the Board did not construe a disputed claim term, as required under this Court's precedential opinion in *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372 (Fed. Cir. 2017). However, because the Court can resolve the claim construction issue, it should do so and find that the Challenged Claims are patentable because there is no evidence that Jungck discloses receiving "malicious traffic information" from a "malicious host tracker service," as those terms are properly construed.

The Court must vacate the FWD because the Board did not construe the disputed "malicious host tracker service" and "malicious traffic information" limitations. Although PAN contends that the Court adopted the plain and ordinary meaning of these terms, the Board neither concluded that they *have* plain and ordinary meanings nor stated what those plain and ordinary meanings are. Appx9-11. This is, therefore, not a case where the Board concluded that "terms have plain meanings that do not require additional construction" (Resp. Br. at 28), it is a case where the Board disagreed with Centripetal's proposed

constructions while improperly leaving the correct construction unresolved.

The Court can and should nevertheless construe the "malicious host tracker service" and "malicious traffic information" terms and reverse the FWD because there is no evidence that Jungck's virus watch service is a malicious host tracker service or that it provides malicious traffic information that identifies malicious hosts. These interpretations are dispositive because Jungck's virus watch service undisputedly provides information about malicious program code, not malicious hosts.

Collateral Estoppel does not bar Centripetal's arguments because the issue in the earlier case was different, was decided under a different claim construction standard, and was not actually litigated. In the earlier case,[1] the Board found that Jungck disclosed a virus watch service that identifies malicious program code for monitoring and that spoofed IP addresses are "addresses known to be associated with malicious network traffic." *See* Appx1851-1852. Plainly missing from this finding is any identification of a "host" known to be associated with malicious

[1] The -01443 IPR challenged U.S. Patent No. 9,137,205 (the "'205 Patent").

traffic. Thus, the issues of whether Jungck's virus watch service is a "malicious host tracker service" and whether spoofed IP addresses are "malicious traffic information," have neither been litigated nor decided.

The Court should reverse the FWD because all record evidence demonstrates that Jungck's spoofed IP addresses do not identify malicious hosts. Appx1229-1230 at ¶ 66 (Dr. Madisetti (PAN's expert)) (testifying that spoofed IP addresses provide information "other than the computer that actually generated the packet [malicious code]"). Thus, no evidence could support a conclusion that Jungck's spoofed IP addresses are "malicious traffic information" received from a "malicious host tracker service," as those terms are properly construed.

The Board should also reverse the FWD because substantial evidence does not support the Board's finding that Jungck's edge server (the alleged "packet security gateway" ("PSG")) receives spoofed IP addresses from a virus watch service. Appx29. The Board's finding resolves the case in Centripetal's favor because it shows that the alleged "malicious traffic information" would be received at the PSG, not the security policy management server ("SPMS"), as claimed. Appx96 at Claim 1.

# ARGUMENT

## I. The Court Must Vacate the FWD Because the Board Did Not Construe Disputed Terms Before Assessing Obviousness

The Court must vacate the FWD because the Board did not resolve the parties' disputes over the meanings of the "malicious host tracker service" and "malicious traffic information" terms before finding the claims obvious. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F. 3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").

The parties fundamentally dispute whether a "malicious host tracker service" is a service that tracks malicious hosts (Opening Br. at 22-25) or whether the phrase "malicious host tracker" should be accorded no patentable weight (Resp. Br. at 33-34). The parties also dispute whether the "malicious traffic information received from a malicious host tracker service" must identify malicious hosts. Opening. Br. at 25-29; Resp. Br. at 31-33. Proper construction of these terms is necessary to determine whether Jungck's "virus watch service" is a "malicious host tracker service" and whether the malicious program code identified by the virus watch service is "malicious traffic information."

Longstanding precedent requires that the Board explicitly construe terms in order to resolve claim construction disputes. *CSR, PLC v. Skullcandy, Inc.*, 594 F. App'x 672, 678 (Fed. Cir. 2014) (quoting *Gechter v. Davidson*, 116 F.3d 1454, 1460 (Fed. Cir. 1997) ("The Board's claim construction 'must . . . be explicit, at least as to any construction disputed by parties.'")). Vacatur is necessary because the Board undisputedly did not explicitly construe these terms. Resp. Br. at 27-30.

The Court should reject PAN's suggestion that this Court's decision in *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) absolves the Board of its duty to explicitly construe disputed claim terms. Resp. Br. at 28-30. In *ActiveVideo*, the district court *did* explicitly construe the term "video still image" to mean "an image which is not in motion" before rejecting attempts to import additional limitations into the claim. *ActiveVideo Networks*, 694 F.3d at 1326. The district court did not leave the plain and ordinary meaning undefined—as the Board did in this case—and this Court did not condone such an approach. *Id.*

Nor did this Court condone this approach in *Homeland Housewares*. Resp. Br. at 30. While it is true that "the ordinary meaning

of claim language may be readily apparent and claim construction will involve little more than the application of widely accepted meaning of commonly understood words," the Court used that maxim to support its explicit construction of the term "predetermined" to mean "determine beforehand." *Homeland Housewares,* 865 F.3d at 1372. Accordingly, even if each of the words in the disputed claim terms has a readily apparent ordinary meaning, the Board must explicitly construe those terms in order to resolve the parties' disputes. *Id.*

As this Court held in *Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319-20 (Fed. Cir. 2016), the Board does not discharge its duty to resolve claim construction disputes by "simply rejecting one proposed construction":

> The dissent contends that the court did, in fact, resolve the parties' dispute by rejecting Silver Spring's "special definition" in favor of plain and ordinary meaning. Dissent at 1329-30. But simply rejecting one proposed construction does not mean that a general jury instruction to give terms their plain and ordinary meaning resolves the relevant dispute. *The court remained obligated to provide the jury with a clear understanding of the disputed claim scope….*

And like in *Eon*, the fact that the Board's "continuing debate as to the meaning of" these terms while conducting its obviousness analysis

(Appx26-27) illustrates that it neither applied "a clear understanding of the disputed claim scope" nor provided this Court with sufficient basis to uphold its decision. *Eon Corp.*, 815 F.3d at 1320.

The FWD must be vacated because the Board's failure to explicitly construe the "malicious host tracker service" and "malicious traffic information" limitations leaves this Court to speculate the Board's reasonings given for the Board's conclusion. *Skullcandy*, 594 F. App'x at 678 (finding that because the Board failed to construe a term "in a manner that would permit meaningful appellate review," the Board's findings are not expressed with "sufficient particularity to enable [the] court, without resort to speculation, to understand the reasoning of the Board.").

## II. This Court Should Construe the Claims and Reverse the Board's FWD Because it is Not Supported by Substantial Evidence

This Court should construe "malicious host tracker service" and "malicious traffic information" because the Board did not construe "malicious host tracker service" or "malicious traffic information," with or without extrinsic evidence. *See Homeland Housewares,* 865 F.3d at 1375 ("Given that the Board did not rely on extrinsic evidence here as to claim construction, we can determine the correct construction . . . ."). The

Court should also reverse the FWD because there is no record evidence to support a conclusion that Jungck teaches these limitations as properly construed. *Id.*; *see also Eon Corp.*, 815 F.3d at 1320.

### A. "Malicious Host Tracker Service" and "Malicious Traffic Information" Entail a Service That Tracks Malicious Hosts to Provide Identifying Information About Malicious Hosts

This Court should construe "malicious host tracker service" to mean a "service that identifies and provides identifying information about network hosts that have been determined to be associated with malicious network traffic," with this identifying information being the "malicious traffic information." Opening Br. at 29; *see also id.* at 22-29. PAN's arguments merely repeat the Board's mistakes, including stripping the phrase "malicious host tracker" of patentable weight and downplaying the specification's uniform description of the kind of information a malicious host tracker service tracks and provides to its the SPMS. *See* Resp. Br. at 31-34.

Centripetal's proposed construction begins with the premise that the "malicious host tracker service" is a service that tracks malicious hosts. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d, 898, 913 (Fed. Cir. 2004) (there is a "'heavy presumption' that [the claims] mean what they

say"); Opening Br. at 22; Appx535. Any service that tracks malicious hosts needs a way to identify known malicious hosts and disseminate those identifications to the service's subscribers. Appx535 ("It is a service that tracks (*i.e.* identifies and provides information about) malicious hosts (*i.e.* network hosts that have been determined to be associated with malicious network traffic).").

PAN responds that a malicious host tracker service might "identify[] and provid[e] other information about malicious hosts, such as the type of malicious activity they are engaged in (e.g., spreading viruses or worms)."[2] Resp. Br. at 31-32. Aside from this being a new argument that PAN did not present below, *the claims do not recite a malicious activity tracker service, they recite a malicious host tracker service*, and such a service must provide subscribers with the *information necessary to track malicious hosts*. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("First and foremost, the analytical focus of claim

---

[2] PAN has not sought to show that this hypothetical service is consistent with the specification.

construction must begin, and remain centered, on the language of the claims themselves.”).

Rather than truly contest Centripetal’s plain-language interpretation of the term, PAN argues that “Claim 1 does not limit or explicate what the ‘malicious host tracker service’ is or does, beyond providing ‘malicious traffic information.’” Resp. Br. at 31. That argument must be rejected because it assumes that the phrase “malicious host tracker” carries no patentable weight independent of the claimed “malicious traffic information” it provides. *See Wasica Fin. GmbH v. Cont’l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) (“It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.” (citations omitted)).

This argument also puts the cart before the horse by assuming broad definitions of “malicious traffic information” and “packet matching criteria” and then using those broad definitions to change the plain meaning of the term “malicious host tracker service.” Resp. Br. at 31; Opening Br. at 22-24. These broad definitions are inconsistent with the specification’s description of what a malicious host tracker service provides to its subscribers and should not, therefore, be used to bootstrap

an unduly broad construction of "malicious host tracker service" that is inconsistent with the plain meaning of the words that make up the term and the inventors' use of that term in the specification.

Notably, what the Board missed by refusing to construe "malicious host tracker service" is that this "malicious traffic information" is host-identifying information, not malicious activity. The malicious host tracker service is consistently described throughout the specification as a service that identifies and provides information identifying the malicious hosts. *See* Appx85 at 3:34-40; Appx91 at 15:10-39. In contrast, neither PAN nor the Board, pointed to anything in the specification that suggests that the malicious host tracker service identifies and provides information about malicious activity, like viruses and worms. Rather, the specification teaches that when the claimed SPMS receives this information, it automatically creates or alters rules (including the "packet matching criterion," *i.e.* source IP addresses) to identify malicious hosts and block traffic associated with those hosts:

> Malicious host tracker service 508 may aggregate information associated with malicious network traffic and updates received from malicious host tracker service 508 may include *one or more network addresses that have been determined to be associated with malicious network traffic*. Security policy management

> server 120 may be configured to create or alter one or more rules included within a dynamic security policy associated with malicious host tracker service 508 to *block traffic associated with the network addresses received from malicious host tracker service 508*.

Appx91 at 15:13-23 (emphasis added); *see also* Appx95 at 23:38-64.

This uniformity of description shows that the '906 Patent uses "malicious host tracker service" to refer to a service that identifies and provides identifying information about network hosts it tracks. *See* Opening Br. at 23; *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1368 (Fed. Cir. 2016) (construing "probabilistic model of normal computer system usage" in line with the specification's consistent disclosures).

PAN tries to downplay the specification's uniform usage by asserting that the specification discloses non-limiting examples of what a malicious host tracker may provide *See* Resp. Br. at 32-33, 36-37. But the only case PAN cites in favor of this argument is inapposite. Resp. Br. at 33 (citing *In re Johnston*, 435 F.3d 1381 (Fed. Cir. 2006)). In *In re Johnston*, the Federal Circuit held that when claim "limitations are stated in the permissive form 'may,'" those limitations do not narrow the

scope of the claim. 435 F.3d at 1384. There is no similar "permissive" language in the Challenged Claims. *Id.*

Contrary to the inapposite *Johnston* case, non-limiting examples disclosed in the specification *can* provide sufficient information to allow a skilled artisan to infer the bounds of a term. *Cf. Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1371 (Fed. Cir. 2014). Here, the unrebutted testimony of Dr. Goodrich established that a POSITA reading the specification's examples would understand that a malicious host tracker service is a service that identifies and provides information about the malicious hosts it tracks. *See* Appx5076-5077 at ¶¶ 46-47. Therefore, the examples provided sufficient information to allow a POSITA to infer that malicious traffic information is directed to identifying information about malicious hosts.

In any event, the specification's use of the word "may" does not broaden the meaning of the term "malicious host tracker service" beyond its plain meaning. *See* Resp. Br. at 32-33, 36-37. The passage, reproduced below, only states that the information that the service tracks and provides need not be in the form of network addresses:

> Malicious host tracker service 508 may aggregate information associated with malicious network traffic

> and updates received from malicious host tracker service 508 *may* include one or more network addresses that have been determined to be associated with malicious network traffic.

Appx91 at 15:13-18 (emphasis added). Network addresses provide one way, but by no means the only way, to track hosts on the Internet. *See* Opening Br. at 27.

Finally, related U.S. Patent No. 10,785,266 (the '266 Patent")[3] reinforces the '906 specification's usage of "malicious traffic information." The claims of the '266 Patent recite that the "malicious traffic information," received from a "malicious host tracker service," includes "network addresses that have been determined . . . to be associated with malicious network traffic." Appx3740-3741 at Claim 1. Although the claimed "malicious traffic information" is not limited to network addresses as in the '266 Patent claims, the usage in the '266 claims nonetheless confirms that the information must identify malicious hosts the service tracks one way or another. *See* Opening Br. at 27. PAN

---

[3] The '266 Patent has a substantially similar specification.

misses this critical point in arguing that the '266 Patent expressly limited the identifying information to a specific type. *See* Resp. Br. at 33.

For the foregoing reasons and those in the Opening Brief, this Court should find that "malicious host tracker service" is "a service that identifies and provides identifying information about network hosts that have been determined to be associated with malicious network traffic" (with the identifying information being the "malicious traffic information"), as it reflects the plain language of the claims and hews to the specification. *See* Opening Br. at 22-29.

### B. No Evidence Supports a Finding that Jungck Teaches a "Malicious Host Tracker Service" That Provides "Malicious Traffic Information" Under the Proper Claim Scope—Reversal is Warranted

Under the proper claim scope, no evidence supports a finding that Jungck teaches a "malicious host tracker service" that provides "malicious traffic information" because Jungck's spoofed IP addresses obfuscate the identity of the malicious host by falsifying the IP addresses. *See* Opening Br. at 29-38. In response, PAN contends that Centripetal is collaterally estopped from relitigating facts and that the Board determined that Jungck meets Centripetal's proposed constructions, both of which fail. *See* Resp. Br. at 39-40.

#### 1. There is No Collateral Estoppel Because the Board Did Not Previously Consider Whether Spoofed IP Addresses Identify Malicious Hosts

PAN's contention that the -01443 IPR already litigated findings pertaining to Jungck does not establish collateral estoppel here because the issues are not identical. Resp. Br. at 40-43. For collateral estoppel to apply, PAN must show that -01443 IPR presented "an identical issue." *VirnetX Inc. v. Apple, Inc.*, 909 F.3d 1375, 1377 (Fed. Cir. 2018) (citation omitted).

PAN does not make this showing because the issue of whether Jungck's spoofed IP addresses fall within "malicious traffic information" from "malicious host tracker service," as properly construed under the *Phillips* standard, was not at issue in the -01443 IPR. PAN leaves unrebutted Centripetal's showing that the issues are not identical because the present IPR involves the application of the *Phillips* claim construction standard to construe "malicious host tracker service," a term which is not even recited in the claims challenged in the -01443 IPR. Opening Br. at 30-32; *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1306 (2015) ("[I]ssues are not identical if the second action

involves application of a different legal standard"); *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016).

While PAN highlights similarities between the Challenged Claims and claim 14 of the '205 Patent, the key difference relevant to this appeal remains—namely, that the Challenged Claims explicitly recite a "*malicious host* tracker service" whereas the '205 Patent claims do not.[4] *Cf.* Resp. Br. at 41 ("[W]hat '205 patent claim 14 expressly requires is nearly verbatim of what Centripetal asserts that its proposed claim construction here covers."). Accordingly, the teachings that the Board found to satisfy this broader claim language, considered under a broader claim construction standard, do *not* facially satisfy the claims as properly construed in this case. Appx1851-1852. Thus, contrary to PAN's assertion, what the '205 Patent requires is not at all verbatim to what the proposed claim construction covers.

The Board's actual factual findings about the teachings of Jungck in the -01443 IPR confirm that the issues here are not identical to those

---

[4] Claim 14 of the '205 Patent recites, *inter alia*, "a subscription service that aggregates information associated with malicious network traffic." Appx1567 at Claim 14.

previously litigated. In the -01443 IPR, the Board found that Jungck teaches "malicious code identification" that identifies "malicious program code [as] part of a spoofing DDoS attack that appears (falsely) to come from a client downstream of a network." Appx1851. While PAN argues that this factual finding resolves the issues in this case, PAN's argument omits the Board's recognition that a spoofed IP address is one "that appears (falsely) to come from a client." *Id.* Such a spoofed IP address obfuscates the identity of the malicious host rather than revealing it. Opening Br. at 35-36.

Accordingly, the underlying factual finding relevant to this proceeding is that a spoofed IP address identifies malicious activity (e.g., a DDoS attack), not the malicious actor behind the attack, as PAN's expert acknowledged. Resp. Br. at 42; *see also* Appx1229-1230 at ¶ 66 (Dr. Madisetti Declaration). Therefore, the issue of whether Jungck's spoofed IP address identifies a malicious host, which arises in this case as a consequence of different claim language considered under a different claim construction standard, was not considered or resolved in -01443 IPR. Opening Br. at 31-33, 36. Collateral estoppel does not apply.

### 2. Jungck Does Not Teach a "Malicious Host Tracker Service" Providing "Malicious Traffic Information" Under the Proper Scope

#### a. Malicious Code Identifications (Spoofed IP Addresses) Do Not Identify Malicious Hosts Associated With the Malicious Traffic—PAN Does Not Show Otherwise

The Court should reverse the Board's findings because the only conclusion supported by substantial evidence is that a spoofed IP address obfuscates a malicious host, rather than identifies it. *See Amgen Inc. v. Vidal*, No. 2019-2171, 2022 WL 1112817, at *3 (Fed. Cir. Apr. 14, 2022) (reversing because "under the correct construction of 'final thiol-pair ratio" [] the only conclusion supported by substantial evidence is that neither Schlegl nor Hevehan disclose a 'final thiol-pair ratio.'") (citing *Owens Corning v. Fast Felt Corp.*, 873 F.3d 896, 902 (Fed. Cir. 2017)).

Because the Board did not properly construe the claims, it wrongly concluded that its findings in the -01443 IPR were relevant to the issues raised in this case. *See* Appx27 (citing Appx1850-1852 (-01443 IPR FWD) (finding that "malicious code identification," *i.e.* spoofed IP addresses are used to identify "DDoS attack[s] that appears (falsely)")); Resp. Br. at 45-46, 49, 51-52. Had the Board applied the proper construction of these claims, it would have determined—consistent with its earlier finding—

that spoofed IP addresses help identify malicious activity, not the malicious host behind the activity. *See* Appx1849-1852.

PAN's arguments confirm that Jungck's virus watch service helps identify malicious program code, not malicious hosts. *See* Appx131 ("edge servers monitor packets for malicious program code"), Appx149 ("'monitor the data transmission . . . for malicious program code' for 'a forgery,'" *i.e.* a spoofed IP address by "check[ing] the source IP address of the packet against a list of blocked IP addresses.") (citation omitted), Appx150 (alleging that spoofed IP addresses provide the "malicious code identifications"); Resp. Br. at 45 ("receiv[ing] malicious code identifications" and "updat[ing] rules to correspond to new or changed malicious program code"), *id.* at 46 ("identify multiple threats" by "disseminat[ing] malicious code identifications"), *id.* at 9 ("detecting such malicious program code pertains to identifying a packet that must be a forgery, based on its address information."), *id.* at 49 (same) *id.* at 51 (alleging that malicious code identifications include "a list of network addresses associated with malicious code, " *i.e.* spoofed IP addresses (Appx149-150)). That a spoofed IP address may identify the malicious

traffic sent does not mean it identifies the malicious host behind the traffic, as the proper scope covers.

To the contrary, because spoofed IP addresses are forgeries, the actual hosts associated with the malicious activity are obfuscated. *See* Opening Br. at 34-36. That is, while the malicious activity (DDoS attack) may be detected by the forged addresses under PAN's theory, the actor behind it is unknown. *Id.* In fact, in Jungck, only after the edge server detects the forged packet and eliminates it can the edge server "*then attempt to identify the actual originating client*." Appx2728 at ¶ 111 (emphasis added). Thus, the record evidence demonstrates that spoofed IP addresses (malicious code identification) do not identify the malicious host that generated the attack.

PAN's conclusory argument otherwise does not change this conclusion. *See* Resp. Br. at 55. While PAN cites Dr. Madisetti's testimony that with DDoS attacks "computers can forge packets and masquerade as other computers in the network by replacing ('spoofing') source addresses with fake addresses" (Resp. Br. at 55 (quoting Appx1228-1229)), it omits his admission that these are "fake addresses (*i.e.* addresses of a computer other than the computer that actually

generated the packet.).” Appx1229-1230 at ¶ 66. Dr. Madisetti’s testimony that spoofed IP addresses do not identify the “computer that actually generated the packet” squarely aligns with Centripetal’s argument and the record evidence showing that spoofed IP addresses obfuscate rather than identify malicious hosts. *Id.*; Opening Br. at 34-36. Thus, PAN’s illogical leap that “spoofed source addresses supplied by the third-party service would still be information identifying the hosts [i.e., bad actor]” finds no evidentiary support. Resp. Br. at 55 (internal quotation marks and citation omitted).

#### b. There is No Reasonable Argument that Malicious Program Code Encompasses “Malicious Traffic Information”

There is no reasonable argument that malicious program code identified by a virus watch service can be the claimed “malicious traffic information” because malicious program code generally—and the specific disclosures in Jungck itself—do not identify malicious hosts. *See* Resp. Br. at 49-51. Indeed, the Board determined that the two concepts are distinct. Appx26 (finding that “malicious program code” departs from the “malicious traffic information” claim language).

PAN nevertheless suggests that this issue turns on whether the "malicious program code" is found in the packet's payload or its header. Resp. Br. at 49 ("Centripetal again argues that Jungck's 'malicious program code' does not encompass information that identifies a malicious host but instead is limited to information in a packet's payload."). Centripetal never made such a broad, untenable argument. Host identification data, such as a URL for example, may be located in the payload of a packet. The only point that Centripetal made was that the "other unauthorized data" disclosed in Jungck refers to payload data that does *not* identify a malicious host. Opening Br. at 37-38.

Whether or not spoofed IP addresses can be received from a virus watch service or characterized as malicious program code,[5] the critical fact remains that such addresses do not identify the malicious host behind the traffic. *See* Appx1229-1230 at ¶ 66 (Dr. Madisetti

---

[5] As established in the Opening Brief and herein, spoofed IP addresses are not received from a virus watch service because the edge server itself provides the spoofed-based identification. *See* Opening Br. at 40-42; § III.B, *infra*.

Declaration) (testifying that a fake (spoofed) address is "of a computer other than the computer that actually generated the packet" thus it obfuscates the identity of the actual malicious host). Accordingly, neither malicious program code (the traffic sent) nor spoofed IP addresses fall within "malicious traffic information" under the proper scope.

#### c. PAN Only Identified "With Particularity" Jungck's Express Disclosure of Spoofed IP Addresses Allegedly Received From a Virus Watch Service

Finally, because PAN only identified with particularity Jungck's express disclosure of spoofed IP addresses allegedly received from a virus watch service, its argument that this was a non-limiting example and Centripetal ignores POSITA's knowledge is unavailing. Resp. Br. at 51-53. Statutory regulations and this Court's precedent require a petition to "identify 'with particularity' . . . 'the evidence that supports the grounds for the challenge to each claim.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) (quoting 35 U.S.C. § 312(a)(3)).

Here, PAN only identified in the Petition "with particularity" Jungck's "express disclosure" (Resp. Br. at 53) of a virus watch service and malicious program code pertaining to spoofed IP addresses.

Appx115; Appx148-153 (pointing out "with particularity" Jungck's virus watch service and malicious program code pertaining to spoofed IP addresses); *see also* Appx1363-1366 at ¶¶ 265-267 (Dr. Madisetti Declaration) (testifying that a virus watch service identifies malicious program code (pertaining to spoofed source addresses (forgeries)) and provides the malicious code identifications in a list of network addresses). If PAN intended to rely on a service that actually tracks malicious hosts, it was incumbent on PAN to identify that service with particularity in the Petition. Opening Br. at 33. It did not.

PAN's new arguments advance an obviousness ground not found in the Petition—one that relies not on the express teachings of Jungck but Jungck's disclosure in combination with *other* unidentified services. Resp. Br. at 52. Thus even if PAN is correct that "a virus watch service is merely an example of a third party service taught by Jungck" (*id.*), it never identified any *other* service that facially satisfies the claims as properly construed. *See* Resp. Br. at 53 (relying on what "Jungck teaches or suggests to a POSITA"). And although PAN cites this Court's decision in *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337-39 (Fed. Cir. 2020), that decision requires that the combination of the teachings

of a reference with the knowledge of one skilled in the art must be made in the Petition. *Id.*; *see also Netflix, Inc. v. DivX, LLC*, 84 F.4th 1371, 1377 (Fed. Cir. 2023) ("A petitioner may not rely on a vague, generic, and/or meandering petition and later fault the Board for failing to understand what the petition really meant. Ultimately, it is the petitioner's burden to present a clear argument."). Here, the Petition made a clear argument that relied solely on Jungck's express teachings about Jungck's virus watch service and its malicious program code identifications. Appx115 (listing the Petition grounds).

Jungck's disclosures of spoofed IP addresses received from a virus watch service fail to teach or suggest "malicious traffic information" received from a "malicious host tracker service" under the proper claim scope. *See* § II.B.2.a-b, *supra*.

## III. No Evidence Supports a Finding that Jungck Teaches "Malicious Traffic Information" Received From a "Malicious Host Tracker Service" Under Any Construction—Reversal is Warranted

Under any construction, no substantial evidence supports a finding that Jungck's alleged SPMS receives the "malicious traffic information" from the "malicious host tracker server," as claimed. As the Board found, the alleged "malicious traffic information" is received by Jungck's edge

server (the alleged PSG), not the SPMS. *See* Appx29-30; Opening Br. at 38-42; Appx96 at Claim 1 (requiring that the "malicious host tracker service" *provides the SPMS* the "malicious traffic information." PAN's attempts at showing otherwise fail.

Reversal is required under the substantial evidence standard when the Board's factual finding is irrelevant to the relevant claim limitation. *In re Gorelik*, 657 F. App'x 964, 967 (Fed. Cir. 2016) (finding that the Board's finding lacked substantial evidence because the disclosure does not teach the "relevant limitation," and therefore reversed). PAN's contention that the Board "made clear" that Jungck teaches the "malicious host tracker service" limitation (*i.e. external devices* (the alleged SPMSs) receiving "malicious traffic information") is contradicted by the Board's finding otherwise that Jungck's *edge server* receives spoofed IP addresses. Resp. Br. at 48-49.

### A. The Board's Finding That Jungck's Edge Server Receives "Malicious Traffic Information From a "Malicious Host Tracker Service" is Not Supported by Substantial Evidence

The Board's ultimate finding that Jungck "discloses that a virus service can provide the edge server [the alleged PSG] a list of suspect addresses, i.e. spoofed addresses," is not supported by substantial

evidence. Appx29. PAN does not even attempt to dispute the Board's findings here. Resp. Br. at 48 (admitting that the "Board's language [on Appx29] could have been more precise").

Rather, PAN points to an entirely different portion in the FWD to contend, without any explanation, that the Board "made clear that Jungck discloses the 'malicious host tracker service' limitation." Resp. Br. at 48-49 (citing Appx27). But here too, the Board "made clear" that Jungck's *edge server* receives spoofed IP addresses from the virus watch service, not its external devices:

> In this context, our findings in the -01443 IPR as to what Jungck discloses apply to the language of the claims before us in this proceeding and we find that *Jungck discloses a packet security gateway, e.g., Jungck's edge server, receiving malicious traffic information from a malicious host tracking service*, as claimed.

Appx27 (emphasis added).[6]

---

[6] In the -01443 IPR, the petitioner relied on Jungck's "subscribing server 108 as an SPMS that identifies malicious program code." Appx1818. Here, PAN relies on Jungck's external devices. Appx144. Thus, the Board's previous finding of server 108 meeting the "SPMS" is not identical to the issue presented here of whether external devices meet the "SPMS" and receive spoofed IP addresses from the virus watch service in Jungck.

Accordingly, the Board's finding that Jungck's edge server (the alleged PSG) receives "malicious traffic information" from a "malicious host tracker service" does not reach the relevant limitation of the SPMS receiving such information. Appx96 at Claim 1. Therefore, substantial evidence does not support the Board's decision.

### B. PAN's Obviousness Argument Cannot Serve as the Basis to Uphold the Board's Erroneous Decision Nor Does Substantial Evidence Support Such Argument

PAN's argument that "it would have been obvious for Jungck's external devices [the alleged SPMSs] to receive malicious code identifications from such third-party watch services" cannot serve as the basis to support the Board's decision because the Board did not rely on it. Resp. Br. at 45 (citing Appx150 (Petition)); *AMP Plus, Inc. v. DMF, Inc.*, No. 2021-1595, 2022 WL 16844516, at *3 (Fed. Cir. Nov. 10, 2022) (finding that the Board did not rely on that argument in its determination, and therefore that argument "cannot serve as a basis for upholding the Board's decision." ) (citing *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012)); *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202, 1212 (Fed. Cir. 2023) (declining to adopt an argument presented at oral argument as a basis to affirm

because the "Board did not rely on this argument in reaching its decision.").

To be sure, nowhere did the Board rely on the argument that Jungck's external devices receive spoofed IP addresses from a virus watch service. *See* Appx29; *see also* Appx26-30. Instead, the Board "made clear" (Resp. Br. at 48) that Jungck's edge server receives spoofed IP addresses from the virus watch service, not the external devices. Appx27, Appx29. Significantly, the Board found that the external devices provide their own "spoofing detection information." Appx28. Regardless of whether the external devices themselves provide the spoofing detection information (as in Appx28) or the edge server receives the spoofing detection information from a virus watch service (as in Appx27, Appx29), the Board made no findings that it would have been obvious for Jungck's external devices to receive such information from the virus watch service. *See* Opening Br. at 39-40. Therefore, PAN's argument cannot serve as a basis to uphold the Board's decision. *In re Applied Materials*, 692 F.3d at 1294; Resp. Br. at 45.

Nor is PAN's argument supported by substantial evidence because Jungck's edge servers identify spoofed IP addresses with no involvement

from a virus watch service or the external devices. *See* Opening Br. at 40-42; Resp. Br. at 45. PAN is silent as to Jungck's teaching that its edge server provides the spoofed-based identification for the DDoS attacks. Opening Br. at 40-42. Specifically, the Internet Service Provider ("ISP") provides the edge server with a list of IP addresses associated with the ISP's network, allowing for the edge server to detect forged packets that could not have come from the network. *Id.* (citing Appx435-436; Appx2695 at Fig. 6; Appx549-550). Thus, the edge server itself provides the spoofed-based identification, with no need to receive such information from the virus watch service or external devices. Opening Br. at 40-42.

* * *

Because the Board did not find, and the evidence does not support, Jungck's external devices (the alleged SPMs) receiving "malicious traffic information" from a "malicious host tracker service," Jungck does not teach the "malicious host tracker service" limitation. Therefore, reversal is warranted. *In re Gorelik*, 657 F. App'x at 967.

## CONCLUSION

Centripetal respectfully requests that the Court reverse the Board's Final Written Decision in IPR2021-01157 and find Claims 1-17 of the '906

Patent patentable. In the alternative, the Court should vacate and remand for further proceedings.

Respectfully submitted,

Dated: November 20, 2023 By: */s/ James Hannah*

Paul J. Andre
James Hannah
Kramer Levin Naftalis
& Frankel LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel: (650) 752-1700
Fax: (650) 752-1800
pandre@kramerlevin.com
jhannah@kramerlevin.com

Jeffrey Price
Kramer Levin Naftalis
& Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-7502
jprice@kramerlevin.com

Scott M. Kelly
Bradley C. Wright
John R. Hutchins
Banner & Witcoff, Ltd.
1100 13th Street, NW Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000
skelly@bannerwitcoff.com
bwright@bannerwitcoff.com
jhutchins@bannerwitcoff.com

*Attorneys for Appellant*
Centripetal Networks, LLC

## CERTIFICATE OF COMPLIANCE WITH RULE 32(B)

1. This brief complies with the type-volume limitation of Fed. Cir. R. 32(b) because this brief contains 5,974 words, exclusive of the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century14 point font.

Dated: November 20, 2023

By: */s/ James Hannah*
James Hannah

*Attorneys for Appellant,*
Centripetal Networks, LLC